IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FIREMAN'S FUND INSURANCE
COMPANY,

     Plaintiff,

v.

                            Civil Action No. _____

KAJIMA BUILDING & DESIGN
GROUP, INC.,

     Defendant.

## **COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

Plaintiff, Fireman's Fund Insurance Company, as subrogee of Valmiera Glass USA Corp., files this Complaint for Damages and Demand for Jury Trial against defendant, Kajima Building & Design Group, Inc., and respectively shows this Court the following:

### **Parties**

1.     Plaintiff, Fireman's Fund Insurance Company (hereinafter "Fireman's Fund"), is an insurance company organized and existing pursuant to the laws of the State of California, with its principal business address located at 225 West Washington Street, Suite 1800, Chicago, Illinois. At all times material to this action, Firemen's Fund was licensed and authorized to provide insurance coverage in the State of Georgia.

2.     Defendant, Kajima Building & Design Group, Inc., (hereinafter "Kajima"), is a Delaware corporation registered to do business within the State of Georgia and conducting business from its principal office address at 3490 Piedmont Road, N.E., Suite 900, Atlanta, Georgia 30305. Defendant Kajima can be served with process through its registered agent, Corporation Service Company, at its registered address, 2 Sun Court, Suite 400, Peachtree Corners, Gwinnett County, Georgia 30092.

**Jurisdiction and Venue**

3.      Jurisdiction in this action is properly placed before this Court pursuant to 28 U.S.C. § 1332, because the amount in controversy greatly exceeds the required sum of $75,000.00, and there is complete diversity of citizenship between the corporate Plaintiff and corporate Defendant.

4.      Venue is this action is properly placed within this judicial district, pursuant to 28 U.S.C. § 1391(b)(1), because the Defendant's principal place of business is in Fulton County.

**Factual Background**

5.      This case arose because of Defendant Kajima's defective design and construction of the roofing systems on a large commercial manufacturing facility located in Dublin, Georgia, for Valmiera Glass USA Corp. (hereinafter "Valmiera Glass"). Valmiera Glass manufactured specialized fiberglass products used in composite materials and in high temperature insulation applications.

6.      In 2016 Defendant Kajima, as "Design-Builder", entered into an agreement with Valmiera Glass, as "Owner", to design and construct a production facility for Valmiera Glass in Dublin, Georgia, at a cost of approximately $19,021,627.00 (hereinafter "Agreement").

7.      The production facility included two large roofing sections, one of which was a metal roofing system, and another section which was a larger thermoplastic or "TPO" roofing system.

8.      Kajima, as the Design-Builder, agreed that the production facility would be constructed in compliance with the requirements of the International Building Code, 2012 Addition with Georgia Amendments. This building code required that the roofing systems for the Valmiera manufacturing facility be able to withstand wind loads of at least 115 mph.

9.      On the evening of October 10 and 11, 2018, the remnants of Hurricane Michael arrived in Dublin, Georgia with tropical storm force wind gusts of approximately 65 mph.

10.     The wind loads experienced at the Valmiera Glass production facility were significantly below the 2012 International Building Code's wind load requirements.

11.     The roofing systems of the Valmiera Glass production facility sustained major damage during the storm. The large metal roofing sections pulled away from the building structure and rolled across the structural supports and roof decking below. The even larger TPO roofing system became unattached in several areas and pulled away from its structural supports, tearing and damaging the membrane, which necessitated its replacement.

12.     Investigation and analysis regarding the reason the roofing systems failed at wind speeds significantly below the wind loads required by building code revealed that the roofing trim systems on both the metal roof and the TPO roofing systems were not properly attached to the building and roofing system. When the roofing trim systems failed and blew off during the storm, the trim not only damaged other sections of the roof, but its failure allowed wind to blow underneath the metal roofing sections and TPO roofing sections, which caused their failure.

13.     The Valmiera Glass production facility sustained serious water damage because of this roofing system failure, including damage to the building, the complex equipment inside the building, and its inventory.

14.     Fireman's Fund provided property insurance for the Valmiera Glass production facility located at 168 Willie Paulk Parkway, in Dublin, Georgia at the time of the storm. After investigating the nature and extent of the property damages, Fireman's Fund paid Valmiera Glass $1,440,182.45 to repair the building damages, replace damaged building contents, and reimburse Valmiera Glass for damaged inventory and related losses pursuant to the terms of the Fireman's Fund insurance policy. Fireman's Fund's damages for prejudgment and post judgment interest will continue to accrue through the trial of this action and entry of judgment.

15.     By virtue of Fireman's Fund's payments, as well as by operation of law, Plaintiff Fireman's Fund is subrogated to all rights of recovery against Defendant Kajima to the extent of payments made by Fireman's Fund.

16.     Fireman's Fund's subrogation rights against Defendant Kajima arise under the principles of conventional and equitable subrogation, and Fireman's Fund is entitled to recover from Defendant Kajima the damages specified within this action.

### Count I – Negligent Construction

17.     Plaintiff realleges and incorporates the preceding allegations contained within paragraphs 1 through 16 of this Complaint, as if fully restated in this paragraph.

18.     Defendant Kajima voluntarily agreed to serve as the Design-Builder for the Valmiera Glass production facility.

19.     Defendant Kajima had a duty to perform its design, supervision, and construction services in a good and workmanlike manner, in accordance with construction industry standards, building code requirements, and the roofing system manufacturer's requirements and specifications.

20.     Defendant Kajima's duties included assuring that the building's roofing systems were properly designed and constructed so that they would protect the building and its contents when wind speeds significantly below the wind speeds required by the building code were experienced on the site.

21.     Defendant Kajima breached these duties in numerous ways, including, but not limited to the following:

A.    Failing to properly design the fastening system for the roof and roof trim, so that the system would remain attached and not fail at wind speeds well below the wind speeds required by the applicable building codes;

B.    Failing to follow the roofing system manufacturers' requirements for securing the roofing systems to the structure of the building;

C.    Failing to properly supervise contractors and subcontractors working on the roofing systems to assure that they used enough fasteners and the proper type of fasteners to assure the roofing system would remain attached to the building at designed wind speeds; and

D.    Failing to properly perform its construction services correctly by failing to use enough fasteners of the proper type, to assure that the building roofing systems would remain attached when the building experienced designed wind loads.

22.    As a direct, proximate, and foreseeable result of the Defendant's negligent acts and omissions, the building roofing systems failed during a storm at wind speeds well below the State mandated building code wind speed requirements.

23.    Fireman's Fund is entitled to recover damages totaling $1,440,182.45 from Defendant Kajima, pursuant to Fireman's Fund's legal and equitable subrogation rights as required by Georgia law.

## Count II – Breach of Contract

24.    Plaintiff realleges and incorporates in this paragraph, the preceding allegations of this Complaint as if fully restated herein.

25.    Defendant Kajima entered into the binding contractual Agreement with Fireman's Fund's insured, Valmiera Glass, for the design and construction of a major fiberglass production

facility in Dublin, Georgia. Defendant Kajima agreed to serve as the "Design-Builder" for the manufacturing facility, for payment in the amount of $19,021,627. A true and correct copy of the Agreement is attached as Exhibit A.

26.     Pursuant to the Agreement with Valmiera Glass, Kajima agreed to design and construct a manufacturing facility as specified within the contract documents. (Section 2.7.1).

27.     Defendant Kajima, acting as Design-Builder, also agreed that it would perform its work consistent with all legal requirements, including the 2012 edition of the International Building Code with Georgia Amendments. (Section 2.5.1).

28.     Defendant Kajima also agreed that "Design-Builder assumes responsibility to Owner for the proper performance of the Work of Subcontractors and any acts and omissions in connection with such performance." (Section 2.7.4).

29.     Defendant Kajima breach the contractual duties as a Design-Builder in numerous ways, including but now limited to the following:

    A.     Failing to properly design the roofing structure and attachment systems so that the roof would not fail when experiencing wind loads of less than 65 mph, well below the building code required design of 115 mph;

    B.     Failing to properly supervise the work of employees, contractors and subcontractors who were installing the roofing system to assure that they used the appropriate number and type of fasteners needed to assure that the roof did not fail under wind conditions significantly below the building code specified wind loads; and

    C.     Failing to properly install the roofing system by failing to use enough fasteners and the appropriate type of fasteners necessary to properly secure the roof to the building.

30.     As a direct, proximate, and foreseeable result of the Defendant Kajima's breach of its contractual duties, the building roofing systems failed during a storm at wind speeds well below the State mandated building code wind speed requirements.

31.     Fireman's Fund is entitled to recover damages totaling $1,440,182.45 from Defendant Kajima, pursuant to Fireman's Fund's legal and equitable subrogation rights as required by Georgia law.

## Count III – Breach of Warranty

32.     Plaintiff realleges and incorporates in this paragraph, the preceding allegations of this Complaint as if fully restated herein.

33.     Defendant Kajima, as Design-Builder, warranted that its work would be free from defects for a period of one year from substantial completion of the project in Section 2.9 of the Agreement.

34.     The building roofing systems failed on the evening of October 10th and 11th, 2018, and significant construction work remained to be completed, so substantial completion had not yet occurred by this date.

35.     Defendant Kajima has breached its contractual warranty because of Kajima's improper design, supervision, and construction of the building roofing systems, the roof failed during a storm at wind speeds well below the State mandated building code wind speed requirements. Defendant Kajima further breached its contractual warranty by failing to correct its defective work when asked by Valmiera Glass to correct defective construction work on the property.

36.     Fireman's Fund is entitled to recover damages totaling $1,440,182.45, from Defendant Kajima, pursuant to Fireman's Fund's legal and equitable subrogation rights as required by Georgia law.

**Count IV – Breach of Contract: Failure to Obtain Required Insurance**

37.     Plaintiff realleges and incorporates in this paragraph, the preceding allegations of this Complaint as if fully restated herein.

38.     Defendant Kajima specifically agreed to obtain property insurance on the construction project which would include the Owner as an additional insured. The Agreement provides, in part:

> The property insurance obtained by Design – Builder shall be the broadest coverage commercially available and shall include as additional insureds the interests of Owner, Design-Builder, Design Consultants and Subcontractors of any tier. Such insurance shall include but not be limited to the perils of fire and extended coverage, theft, vandalism, malicious mischief, collapse, flood, earthquake, debris removal and other perils or causes of loss as called for in the Contract Documents. The property insurance shall include physical loss of physical loss or damage to the work . . . .

39.     Defendant Kajima failed to obtain the required property insurance covering Valmiera Glass for damage to the property, and Plaintiff Fireman's Fund has incurred significant damages because of Defendant's failure to obtain and provide the required property insurance.

40.     Fireman's Fund is entitled to recover damages totaling $1,440,182.45 from Defendant Kajima, pursuant to Fireman's Fund's legal and equitable subrogation rights as required by Georgia law.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests the following relief:

1.   Trial by Jury for all issues so triable;

2. Judgment in favor of Plaintiff and against Defendant awarding Plaintiff all damages incurred because of Defendant's negligent acts and omissions as alleged in Count I of this Complaint;

3. Judgment in favor of Plaintiff and against Defendant awarding Plaintiff all damages incurred because of Defendant's breach of contract as alleged in Count II of this Complaint;

4. Judgment in favor of Plaintiff and against Defendant awarding Plaintiff all damages incurred because of Defendant's breach of warranty as alleged in Count III of this Complaint;

5. Judgment in favor of Plaintiff and against Defendant awarding Plaintiff all damages incurred because of Defendant's breach of contract by failing to obtain required insurance policies as alleged in Count IV of this Complaint;

6. Judgment in favor of Plaintiff against Defendant awarding Plaintiff prejudgment interest and costs of Court, as allowed by Georgia law; and

7. Any other and further relief that this Honorable Court deems just and proper.

Respectfully submitted this 18th day of October 2021.


*/s/ Robert E. Jones*
Robert E. Jones
Georgia Bar No. 398206

The Jones Law Firm, P.C.
245 Riverside Avenue, Suite 510
Jacksonville, Florida 32202
Telephone: (904) 351-6221
rob@robjoneslaw.com

**EXHIBIT A**



# STANDARD FORM OF AGREEMENT BETWEEN OWNER AND DESIGN-BUILDER - LUMP SUM

**Document No. 525**
Second Edition, 2010
© Design-Build Institute of America
Washington, DC

SGR/13088537.1

SGR/14303025.1



## Design-Build Institute of America - Contract Documents
## LICENSE AGREEMENT

**By using the DBIA Contract Documents, you agree to and are bound by the terms of this License Agreement.**

1. **License.** The Design-Build Institute of America ("DBIA") provides DBIA Contract Documents and licenses their use worldwide. You acknowledge that DBIA Contract Documents are protected by the copyright laws of the United States. You have a limited nonexclusive license to: (a) Use DBIA Contract Documents on any number of machines owned, leased or rented by your company or organization; (b) Use DBIA Contract Documents in printed form for bona fide contract purposes; and (c) Copy DBIA Contract Documents into any machine-readable or printed form for backup or modification purposes in support of your permitted use.

2. **User Responsibility.** You assume sole responsibility for the selection of specific documents or portions thereof to achieve your intended results, and for the installation, use, and results obtained from the DBIA Contract Documents. You acknowledge that you understand that the text of the DBIA Contract Documents has important legal consequences and that consultation with an attorney is recommended with respect to use or modification of the text. You will not represent that any of the contract documents you generate from DBIA Contract Documents are DBIA documents unless (a) the document text is used without alteration or (b) all additions and changes to, and deletions from, the text are clearly shown.

3. **Copies.** You may not use, copy, modify, or transfer DBIA Contract Documents, or any copy, modification or merged portion, in whole or in part, except as expressly provided for in this license. Reproduction of DBIA Contract Documents in printed or machine-readable format for resale or educational purposes is expressly prohibited. You will reproduce and include DBIA's copyright notice on any printed or machine-readable copy, modification, or portion merged into another document or program.

4. **Transfers.** You may not transfer possession of any copy, modification or merged portion of DBIA Contract Documents to another party, except that a party with whom you are contracting may receive and use such transferred material solely for purposes of its contract with you. You may not sublicense, assign, or transfer this license except as expressly provided in this Agreement, and any attempt to do so is void.

5. **Term.** The license is effective for one year from the date of purchase. DBIA may elect to terminate it earlier, by written notice to you, if you fail to comply with any term or condition of this Agreement.

6. **Limited Warranty.** DBIA warrants the electronic files or other media by which DBIA Contract Documents are furnished to be free from defects in materials and workmanship under normal use during the Term. There is no other warranty of any kind, expressed or implied, including, but not limited to the implied warranties of merchantability and fitness for a particular purpose. Some states do not allow the exclusion of implied warranties, so the above exclusion may not apply to you. This warranty gives you specific legal rights and you may also have other rights which vary from state to state. DBIA does not warrant that the DBIA Contract Documents will meet your requirements or that the operation of DBIA Contract Documents will be uninterrupted or error free.

7. **Limitations of Remedies.** DBIA's entire liability and your exclusive remedy shall be: the replacement of any document not meeting DBIA's "Limited Warranty" which is returned to DBIA with a copy of your receipt, or at DBIA's election, your money will be refunded. In no event will DBIA be liable to you for any damages, including any lost profits, lost savings or other incidental or consequential damages arising out of the use or inability to use DBIA Contract Documents even if DBIA has been advised of the possibility of such damages, or for any claim by any other party. Some states do not allow the limitation or exclusion of liability for incidental or consequential damages, so the above limitation or exclusion may not apply to you.

8. **Acknowledgement.** You acknowledge that you have read this agreement, understand it and agree to be bound by its terms and conditions and that it will be governed by the laws of the District of Columbia. You further agree that it is the complete and exclusive statement of your agreement with DBIA which supersedes any proposal or prior agreement, oral or written, and any other communications between the parties relating to the subject matter of this agreement.

# INSTRUCTIONS

For DBIA Document No. 525 Standard Form of Agreement Between Owner and Design-Builder - Lump Sum (2010 Edition)

## Checklist

Use this Checklist to ensure that the Agreement is fully completed and all exhibits are attached.

| | | |
|---|---|---|
| _____ | Page 1 | Owner's name, address and form of business |
| _____ | Page 1 | Design-Builder's name, address and form of business |
| _____ | Page 1 | Project name and address |
| _____ | Section 2.1.3 | Identify other exhibits to the Agreement |
| _____ | Section 4.2 | Note the optional provisions that are provided |
| _____ | Section 4.3.2 | Complete blanks for additional sum for use of Work Product |
| _____ | Section 5.2.1 | Complete blanks for calendar days and note the optional language that is provided |
| _____ | Section 5.2.2 | Insert any interim milestones (optional) |
| _____ | Section 5.4 | Complete blanks for liquidated damages and note the optional provisions that are provided |
| _____ | Section 5.5 | If the parties select the option provided they have to insert an amount |
| _____ | Section 5.6 | Complete blanks for early completion bonus and note the optional provision that is provided |
| _____ | Section 5.7 | Note the optional provisions that are provided |
| _____ | Section 6.1 | Complete blanks for Contract Price |
| _____ | Section 6.2 | Insert markups for changes and note optional provisions |
| _____ | Section 6.3.4 | Note the optional provision that is provided |
| _____ | Section 6.4.1 | Note optional provision |
| _____ | Section 7.1.1 | Complete blanks for day of month |
| _____ | Section 7.2.1 | Complete blanks for retention percentage and note optional provision |
| _____ | Section 7.4 | Complete blanks for interest rate |
| _____ | Section 8.1.3 | Choose overhead/profit method for termination for convenience |
| _____ | Section 8.2.1 | Complete blanks for percentages |
| _____ | Section 8.2.2 | Complete blanks for percentages |
| _____ | Section 9.1.1 | Insert Owner's Senior Representative's name, etc. (optional) |
| _____ | Section 9.1.2 | Insert Owner's Representative's name, etc. (optional) |
| _____ | Section 9.2.1 | Insert Design-Builder's Senior Representative's name, etc. (optional) |
| _____ | Section 9.2.2 | Insert Design-Builder's Representative's name, etc. (optional) |
| _____ | Section 10.1 | Attach Insurance Exhibit |
| _____ | Section 10.2 | Insert amount and conditions of bonds or other security and note the options that are provided |
| _____ | Section 11.1 | Insert any other provisions (optional) |
| _____ | Last Page | Owner's and Design-Builder's execution of the Agreement |

# General Instructions

| No. | Subject | Instruction |
|---|---|---|
| 1. | Standard Forms | Standard form contracts have long served an important function in the United States and international construction markets. The common purpose of these forms is to provide an economical and convenient way for parties to contract for design and construction services. As standard forms gain acceptance and are used with increased frequency, parties are able to enter into contracts with greater certainty as to their rights and responsibilities. |
| 2. | DBIA Standard Form Contract Documents | Since its formation in 1993, the Design-Build Institute of America ("DBIA") has regularly evaluated the needs of owners, design-builders, and other parties to the design-build process in preparation for developing its own contract forms. Consistent with DBIA's mission of promulgating best design-build practices, DBIA believes that the design-build contract should reflect a balanced approach to risk that considers the legitimate interests of all parties to the design-build process. DBIA's Standard Form Contract Documents reflect a modern risk allocation approach, allocating each risk to the party best equipped to manage and minimize that risk, with the goal of promoting best design-build practices. |
| 3. | Use of Non-DBIA Documents | To avoid inconsistencies among documents used for the same project, DBIA's Standard Form Contract Documents should not be used in conjunction with non-DBIA documents unless the non-DBIA documents are appropriately modified on the advice of legal counsel. Moreover, care should also be taken when using different editions of the DBIA Standard Form Documents on the same project to ensure consistency. |
| 4. | Legal Consequences | DBIA Standard Form Contract Documents are legally binding contracts with important legal consequences. Contracting parties are advised and encouraged to seek legal counsel in completing or modifying these Documents. |
| 5. | Reproduction | DBIA hereby grants to purchasers a limited license to reproduce its Documents consistent with the License Agreement accompanying these Documents. At least two original versions of the Agreement should be signed by the parties. Any other reproduction of DBIA Documents is strictly prohibited. |
| 6. | Modifications | Effective contracting is accomplished when the parties give specific thought to their contracting goals and then tailor the contract to meet the unique needs of the project and the design-build team. For that reason, these Documents may require modification for various purposes including, for example, to comply with local codes and laws, or to add special terms. DBIA's latest revisions to its Documents provide the parties an opportunity to customize their contractual relationship by selecting various optional contract clauses that may better reflect the unique needs and risks associated with the project.<br><br>Any modifications to these Documents should be initialed by the parties. At no time should a document be re-typed in its entirety. Re-creating the document violates copyright laws and destroys one of the advantages of standard forms-familiarity with the terms. |
| 7. | Execution | It is good practice to execute two original copies of the Agreement. Only persons authorized to sign for the contracting parties may execute the Agreement. |

## Specific Instructions

| Section | Title | Instruction |
|---|---|---|
| General | Purpose of This Agreement | DBIA Document No. 525 ("Agreement") should be used only when the parties intend that Owner pay Design-Builder a lump sum fixed price for the completion of all design and construction services. There will be greater mutual understanding and cooperation if the lump sum is established based on Owner's Project Criteria that are well defined.<br><br>If there is uncertainty about Owner's Project Criteria, or it remains to be developed by Owner and Design-Builder jointly, a cost-plus/guaranteed maximum price ("GMP") contracting approach may be more suitable. In such case, the parties should use DBIA Document No. 530. |
| General | Purpose of These Instructions | These Instructions are not part of this Agreement, but are provided to aid the parties in their understanding of the Agreement and in completing the Agreement. |
| General | Related Documents | This Agreement shall be used in conjunction with the General Conditions of Contract. Other related Contract Documents are listed in Article 2 of this Agreement. |
| General | Date | On Page 1, enter the date when both parties reach a final understanding. It is possible, due to logistical reasons, that the dates when the parties execute the Agreement may be different. Once both parties execute the Agreement, the effective date of the Agreement will be the date recorded on Page 1. This date does not, however, determine Contract Time, which is measured according to the terms of Article 5. |
| General | Parties: Owner and Design-Builder | On Page, 1 enter the legal name and full address of Owner and Design-Builder, as well as the legal form of each entity, e.g., corporation, partnership, limited partnership, limited liability company, or other. |
| 2.1.2 | Basis of Design Documents | The Basis of Design Documents are critical in establishing the scope of work. These documents include the Owner's Project Criteria, Design-Builder's Proposal, and the Deviation List, if any, contained in the Design-Builder's Proposal. Prior to the execution of this Agreement, Design-Builder will have submitted its Proposal based on Owner's Project Criteria. To avoid ambiguities or conflicts between Owner's Project Criteria and Design-Builder's Proposal, Design-Builder's Proposal shall specifically list any deviations from Owner's Project Criteria. Design-Builder's Deviation List shall, if accepted by Owner, become a Contract Document and shall have precedence over Owner's Project Criteria. |
| 2.1.5 | Construction Documents | After execution of the Agreement, and consistent with the requirements of Section 2.4 of the General Conditions of Contract, Design-Builder will prepare Construction Documents subject to Owner's review and approval. |
| 3.2 | Order of Precedence | The Contract Documents are listed in Section 2.1 in the order of their precedence. This hierarchy of documents reflects DBIA's belief that the Basis of Design Documents are critical documents that take precedence over other Contract Documents existing at the time the Agreement is executed. This section also makes clear that if a Deviation List exists it takes precedence over the Owner's Project Criteria. Moreover, Section 2.1.3 recognizes that there may be other exhibits attached to this Agreement. If this is the case, the parties should discuss whether these exhibits should be part of the Basis of Design Documents. If these exhibits are not made part of the Basis of Design Documents, these exhibits will not take priority over the Basis of Design Documents in the event of a conflict. |
| 3.3 | Definitions | Terms, words and phrases used in the Agreement shall have the same meanings used in the General Conditions of Contract. |

| Section | Title | Instruction |
|---|---|---|
| 3.4 | Design Specification | The Owner is cautioned that if it includes design specifications in its Project Criteria, there is case law holding that the Design-Builder is entitled to rely on such information, and to the extent such information is not accurate, the Design-Builder will be entitled to an adjustment in the Contract Price and/or Contract Time. Accordingly, the Owner to avoid such potential liability should consider using performance specifications. |
| 4.1 | Work Product | This Agreement provides that the Design-Builder shall retain ownership of the Work Product it produces, but obligates Design-Builder to grant a limited license to Owner to use the Work Product according to the terms and circumstances described in Sections 4.2, 4.3, 4.4 and 4.5. |
| 4.2 | Owner's Limited License Upon Payment in Full | Design-Builder shall grant Owner, at Owner's sole risk, a limited license to use the Work Product at the completion of the Work in connection with Owner's occupation of the Project. This Section also provides the parties with the option of transferring ownership of some or all of the Work Product to the Owner upon payment in full for all Work performed. Generally, where the Owner desires ownership of Work Product, it is sufficient to transfer ownership of unique architectural and design elements. |
| 4.3 | Owner's Limited License Upon Owner's Termination for Convenience or Design-Builder's Election to Terminate | Owner should not use the Termination for Convenience Clause to obtain Design-Builder's valuable design concepts, and then seek lower bids from other design-builders. Therefore, where Owner terminates this Agreement for its convenience, and then decides to complete the Project with its own or third-party forces, Design-Builder shall grant Owner the rights set forth in Section 4.2, provided Owner pays Design-Builder all amounts due Design-Builder as required by the Contract Documents, including paying Design-Builder an additional sum per Section 4.3.2 for the use of the Work Product. In the event Design-Builder elects to terminate this Agreement for cause, for reasons set forth in Section 11.4 of the General Conditions of Contract, these same conditions apply to Owner's use of the Work Product. |
| 4.3.2 | Additional Compensation | To minimize disputes, the parties should negotiate prior to execution of the Agreement the amount Owner shall pay Design-Builder for the use of Design-Builder's Work Product in the event Owner terminates this Agreement for its convenience or Design-Builder elects to terminate this Agreement for cause. Enter this amount. |
| 4.4 | Owner's Limited License Upon Design-Builder's Default | If Design-Builder is properly terminated for default, Owner is granted a limited license to use the Work Product, to complete the Project, and Owner shall thereafter have the same rights and obligations as set forth in Section 4.2. |
| 4.5 | Owner's Indemnification for Use of Work Product | Owner's use or alteration of the Work Product shall be at its sole risk, and Owner must agree to defend, indemnify and hold harmless Design-Builder and anyone working by or through Design-Builder, including Design Consultants of any tier. |
| 5.1 | Date of Commencement | Design-Builder's obligation to commence work is triggered by its receipt of a Notice to Proceed unless the parties mutually agree otherwise. |
| 5.2.1 | Substantial Completion of the Entire Work | Enter the calendar days duration by which Substantial Completion has to be achieved. The parties in this Section have the option of modifying the definition of Substantial Completion set forth in the General Conditions of Contract if they want to use a Temporary Certificate of Occupancy as the benchmark. If this option is selected, Substantial Completion will be deemed to be achieved no later than the date a Temporary Certificate of Occupancy is issued if applicable to the Project. |

| Section | Title | Instruction |
|---------|-------|-------------|
| 5.2.2 | Interim Milestones | It may be that some portions of the Work must be completed in phases or within a prescribed period of time to accommodate Owner's needs. The parties may, at their option, identify these portions of the Work to be completed prior to Substantial Completion of the entire Work. Enter the calendar days, starting from the Date of Commencement, for achieving Substantial Completion of these identified portions of the Work. If these portions of the Work are required to be substantially completed by certain milestone dates, enter those dates. As presently drafted no remedy is provided to the Owner if an interim milestone is not met. If the Owner has special requirements as it relates to interim milestones, the Owner may want to consider a remedy for the Design-Builder's failure to meet an interim milestone, as well as a bonus to the Design-Builder for satisfying such interim milestone. |
| 5.4 | Liquidated Damages | Owner should make a good faith evaluation of the amount that is reasonably necessary to compensate it for delay. Owner should not establish liquidated damages to penalize Design-Builder.<br><br>Section 5.4 establishes a grace period between the Scheduled Substantial Completion Date and the assessment of liquidated damages in order to prevent disputes as to which party bears responsibility for only a few days of delay. The parties should enter the calendar days that may pass following the Scheduled Substantial Completion Date before liquidated damages will be assessed. The parties are also provided the option of establishing liquidated damages if the Design-Builder fails to achieve Final Completion within a specified number of days after Substantial Completion. If this option is selected, the parties have to negotiate the number of days, as well as the liquidated damages amount. The parties in negotiating liquidated damages should keep in mind that the amount of liquidated damages for failing to achieve Final Completion should be a considerably scaled down amount and should reflect the financial harm to the Owner. In no case should the total amount of liquidated damages for the Project exceed an amount that is reasonably necessary to compensate Owner for Project delay.<br><br>The parties also have the option here of eliminating liquidated damages altogether, in which case the Owner can recover actual damages for Project delay at an amount that is capped by the parties. The Owner is cautioned that even if this option for actual damages is selected it still cannot recover consequential damages, as these are waived under Section 10.5.1 of the General Conditions of Contract. |
| 5.5 | Liquidated Damages Cap | The parties can agree to cap liquidated damages for delay at a negotiated amount. |
| 5.6 | Early Completion Bonus | If the Project economics justify liquidated damages, then it is appropriate to couple these liquidated damages with an early completion bonus. The parties should enter the number of calendar days prior to the Scheduled Substantial Completion Date that will set the Bonus Date. Also, enter the amount of the bonus to be paid per day that will allow Owner to share with Design-Builder the economic benefits of early completion. The parties also have the option in Section 5.6 of capping the early completion bonus at a negotiated amount. |
| 5.7 | Compensation for Force Majeure Events | The parties are provided the opportunity of providing the Design-Builder the right to receive compensation for Force Majeure Events. By selecting this option, the parties agree to modify Section 8.2.2 of the General Conditions of Contract, in which case the parties have to negotiate how many cumulative days of Force Majeure delays must occur before the Design-Builder is entitled to either a negotiated amount per day for delay or the direct costs it has incurred as a result of such delay. |
| 6.1 | Contract Price | Enter the lump sum price Owner will pay Design-Builder for the Scope of Work. The Contract Price should compensate Design-Builder for the services it provides and the risk it assumes in providing single point responsibility to Owner. |

| Section | Title | Instruction |
|---------|-------|-------------|
| 6.2 | Markups for Changes | Enter the markups agreed upon by Design-Builder and Owner to be used for pricing Changes to the Work. Prior to negotiating or agreeing to these markups, both parties should familiarize themselves with Article 9 of the General Conditions of Contract, Changes to the Contract Price and Time. For additive Change Orders, the parties have to negotiate the Fee the Design-Builder will receive. For deductive Change Orders, parties have the option by checking the appropriate box of whether there will be no additional reduction or whether there will be an additional reduction based on a negotiated percentage. |
| 6.3.4 | Allowance Value | This section recognizes that the parties may agree that certain items of Work should be treated as an Allowance Item and priced based on Allowance Values. The Allowance Value for which the Design-Builder will be entitled to receive compensation includes direct cost of labor, materials, equipment, transportation, taxes and insurance associated with the Allowance Item. All other costs associated with the Allowance Item, such as design fees, general conditions costs and fee, are deemed to be included in the Contract Price. However, the parties agree that in the event the actual cost of the Allowance Item is greater than or less than the Allowance Value by a negotiated percentage, then Design-Builder's right to Fee and markup shall be determined pursuant to Section 6.2. |
| 6.4 | Performance Incentives | There may be performance incentives that will influence Project success. Such incentives may include award fees tied to the Design-Builder achieving certain standards relative to client satisfaction, safety, and personnel retention. The parties are encouraged to discuss the use of such incentives during negotiation of this Agreement. Any agreement on the use of incentives should be set forth in an exhibit attached to this Agreement. |
| 7.1.1 | Progress Payments | Enter the day of the month when Design-Builder shall submit its Application for Payment. |
| 7.2.1 | Retainage | Enter the percentage Owner will retain from Progress Payments to Design-Builder until fifty percent (50%) of the Work is completed. Owner should recognize that it creates undue hardship to hold retainage on Subcontractors that have completed their work early in the Project. Owner should accordingly consider releasing retainage on Subcontractors that complete work early in the Project, providing that these Subcontractors have satisfactorily performed their portion of the Work.

The parties are provided the option of modifying the retainage provision by checking the box. This option excludes from retainage the Design-Builder's General Conditions costs and amounts paid to Design-Builder's Design Consultant. The rationale for selecting this option is that the Design-Builder is obligated to pay its General Conditions costs in full each month and that under the design-bid-build delivery method, the Owner typically does not retain sums from its designer. |
| 7.4 | Interest | The parties should enter the rate at which interest will accrue on Design-Builder's payments if unpaid five (5) days after due. Late payment creates a hardship for Design-Builder, its Design Consultants and Subcontractors. |
| 7.5 | Record Keeping | The Owner is provided access to Design-Builder's accounting information as it relates to changes of the Work. However, if the parties have agreed to multipliers or markups for changes, the time to challenge and negotiate those percentages is at the time the parties execute the Agreement and not during the Project or after it has been completed. Accordingly, the Owner can at any time audit these percentages only to confirm that such percentage has been properly charged and not to challenge the composition of such percentage. |

| Section | Title | Instruction |
|---|---|---|
| 8.1.3 | Termination for Convenience: Overhead and Profit | The parties should choose prior to execution of the Agreement the method that will be used to determine overhead and profit paid to Design-Builder in the event Owner terminates Design-Builder for its convenience. The parties may choose to set percentage rates for overhead and profit prior to execution of the Agreement, or may choose to determine reasonable sums to be paid for overhead and profit at the time of the termination. If the parties choose to set overhead and profit rates prior to execution of the Agreement, the percentages should be entered in Section 8.1.3. |
| 8.2 | Termination for Convenience: Additional Payments | Although it is important for Owner to have a process for terminating this Agreement for convenience, the process must consider the interests of Design-Builder. If Owner terminates this Agreement for its own convenience, compensating Design-Builder for its costs will not be adequate because Design-Builder will have committed its resources for a small amount of revenue. Therefore, in addition to the overhead and profit paid in Section 8.1, Owner shall pay Design-Builder an additional sum, calculated as a percentage of the remaining balance of the Contract Price. Enter the percentages Owner shall pay Design-Builder if Owner terminates this Agreement for its own convenience prior to or after the start of construction. |
| 8.3 | Termination for Convenience: Owner's Use of Work Product | Owner should not use the Termination for Convenience clause to obtain Design-Builder's valuable design concepts and then seek lower bids from another design-builder. If Owner terminates this Agreement for its own convenience, and chooses to proceed with the Project using Design-Builder's Work Product, Owner should pay an additional sum for the use of Design-Builder's Work Product pursuant to Section 4.3. |
| Article 9 | Representatives of the Parties | Enter the name, title, address and telephone number of Owner's Senior Representative and Owner's Representative at Sections 9.1.1 and 9.1.2, respectively.<br><br>Enter the name, title, address and telephone number of Design-Builder's Senior Representative and Design-Builder's Representative at Sections 9.2.1 and 9.2.2, respectively.<br><br>The parties can elect to establish Representatives during the performance of the Project rather than at the time of execution of this Agreement. If Representatives are identified after execution of the Agreement, an appropriate amendment should be made to the Agreement at the time these individuals are designated. |
| 10.1 | Insurance | Attach an Insurance Exhibit setting forth in detail the insurance coverages required for the Project. Parties are advised to familiarize themselves with the terms of Article 5 of the General Conditions of Contract, Insurance and Bonds, and to consult their insurance advisor. |
| 10.2 | Bonds | Enter the type and amount of bonds or other performance security required for the Project. Where bonding is not required by statute, Owner may want to evaluate the project risks versus the bonding costs in deciding what type of performance security to require. |
| 11.1 | Other Provisions | Insert any other provisions. For example, the parties may elect to have disputes resolved through litigation rather than arbitration in which case the optional language in this Section should be included. |

# TABLE OF CONTENTS

**Article   Name   Page**

Article 1    Scope of Work.......................................................................................23

Article 2    Contract Documents..........................................................................23

Article 3    Interpretation and Intent .................................................................23

Article 4    Ownership of Work Product.............................................................35

Article 5    Contract Time.......................................................................................45

Article 6    Contract Price.......................................................................................57

Article 7    Procedure for Payment ....................................................................68

Article 8    Termination for Convenience .........................................................79

Article 9    Representative of the Parties ..........................................................89

Article 10  Bonds and Insurance .........................................................................910

Article 11  Other Provisions ..................................................................................911



# Standard Form of Agreement Between Owner and Design-Builder - Lump Sum

*This document has important legal consequences. Consultation with
an attorney is recommended with respect to its completion or modification.*

This **AGREEMENT** is made as of the <u>17th</u> day of <u>August </u> in the year of <u>2016  </u>,   by  and  between  the
following parties, for services in connection with the Project identified below.

**OWNER:**
*(Name and address)*

Valmiera Glass USA Corp., a Delaware corporation (hereinafter the "Owner")
168 Willie Paulk Parkway
Dublin, GA 31021

**DESIGN-BUILDER:**
*(Name and address)*

Kajima Building & Design Group, Inc., a Delaware corporation (the "Design-Builder")
3490 Piedmont Rd., NE
Suite 900
Atlanta, GA 30305-4804

(GA GC License No. <u>  GCC001987</u>
(GA Arch. License No. <u>                              </u>)
(GA PE License No. <u>                              </u>)
(as applicable)

**PROJECT:**
*(Include Project name and location as it will appear in the Contract Documents)*

Valmiera Production Facility, Dublin, GA.

In consideration of the mutual covenants and obligations contained herein, Owner and Design-Builder agree
as set forth herein.

# Article 1

## Scope of Work

**1.1**    Design-Builder shall perform all design and construction services, and provide all material, equipment, tools and labor, necessary to complete the Work described in and reasonably inferable from the Contract Documents.

1.2    The Project is located at the Site identified by the "**Property Description,**" attached hereto as **Exhibit "A"** and incorporated by reference.

# Article 2

## Contract Documents

**2.1**    The Contract Documents are comprised of the following:

**2.1.1**   All written modifications, amendments, minor changes and Change Orders to this Agreement issued in accordance with DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (2010 Edition) ("General Conditions of Contract"), as revised;

**2.1.2**   The Basis of Design Documents are as follows:  KBDG proposal dated 8/12/16.

**2.1.3**   This Agreement, including the following exhibits and attachments, executed by Owner and Design-Builder (List for example, performance standard requirements, performance incentive requirements, markup exhibits, allowances, or unit prices), as revised;
   "A"      **KBDG Proposal dated 8/12/16**
   "B"      **Sample Insurance Certificate.**
   "C"      **Liability Insurance Requirements**

**2.1.4**   The General Conditions of Contract; and

**2.1.5**   Construction Documents prepared by or on behalf of Design Builder and approved by Owner in accordance with Section 2.4 of the General Conditions of Contract.

# Article 3

## Interpretation and Intent

**3.1**    **Review and Inspection;**
   **3.1.1**   Design-Builder, prior to execution of the Agreement, has–carefully reviewed all the Contract Documents, including the various documents comprising the Basis of Design Documents, for any errors, omissions, inconsistencies, conflicts and ambiguities.  Design Builder  and Owner have discussed and resolved all such errors, omissions, inconsistencies, conflicts and ambiguities identified by Design-Builder prior to execution of the Agreement, which Design-Builder has included in Design-Builder's Proposal and clarifications.  In no event will Design-Builder be entitled to an adjustment to the Contract Price or Contract Time for any error, omission, inconsistency, conflict, or ambiguity (1) that Design-Builder identified, yet failed to include in Design Builder's Proposal and clarifications prior to execution of the Agreement, or (2) that an

ordinary, experienced design-builder should have discovered upon a reasonable and careful review of all the Contract Documents.

**3.1.2**   Owner's Separate Contractor will perform all or a significant portion of the civil Site work in before commencement of Design-Builder's construction Work. Design-Builder, upon notice that the Separate Contractor is ready to turn such Site work, will carefully inspect such Site work for any physical conditions that conflict or are inconsistent with the Contract Documents, the then existing Design Documents, or the then existing Construction Documents, if any, or that are otherwise reasonably unacceptable to Design Builder for the performance of its construction Work.   Design Builder  will promptly notify Owner and the Separate Contractor in the writing of all such  conditions, in which event Owner, Design-Builder, and the Separate Contractor will meet to discuss and resolve all such conflicts, inconsistencies, and unacceptable physical condition of the Site.  In no event will Design-Builder be entitled to an adjustment to the Contract Price or Contract Time for any conflict,  inconsistency, or unacceptable physical condition of the Site (1) that Design-Builder  identified, yet failed to include in its written notice to Owner prior to commencing construction Work on the Site, or (2) that an ordinary, experienced design-builder should have discovered upon a reasonable and careful investigation of the Site upon turn-over.

**3.2**   The Contract Documents are intended to permit Design-Builder to complete the Work and all obligations required by the Contract Documents within the Contract Time(s) for the Contract Price. The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted in a manner consistent with construction and design industry standards, unless a more stringent requirement is set forth therein. In the event errors, omissions, inconsistencies, conflicts, or ambiguities between or among the Contract Documents are discovered after execution of the Agreement, Design-Builder and Owner shall attempt to resolve any ambiguity, conflict or inconsistency informally, recognizing that the Contract Documents shall take precedence in the order in which they are listed in Section 2.1 hereof. Conflicts existing within Section 2.1.2 shall be resolved by giving precedence first to the Deviation List, if any, then the Owner's Project Criteria, and then the Design-Builder's Proposal.

**3.3**   Terms, words and phrases used in the Contract Documents, including this Agreement, shall have the meanings given them in the General Conditions of Contract.

**3.4**   If Owner's Project Criteria contain prescriptive design specifications that detail and require with particularity the precise materials and equipment the Design-Builder must use and the manner in which the Work must be performed: (a) Design-Builder shall be entitled to reasonably rely on the adequacy of such prescriptive design specification, and (b) Design-Builder may make a claim for an adjustment in the Contract Price and/or Contract Time(s) in accordance with Article 10 of the General Conditions to the extent Design-Builder's cost and/or time of performance have been adversely impacted by such inaccurate design specification.  All other specifications set forth in Owner's Project Criteria will be deemed  performance specifications.

**3.5**   The Contract Documents form the entire, integrated agreement between Owner and Design-Builder and by incorporation herein are as fully binding on the parties as if repeated herein. Upon execution, the Contract Documents will supersede and preclude reliance upon any and all prior and contemporaneous representations, agreements, discussions, and understandings between the parties arising out of or relating in any way to the Contract Documents, except as specifically stated in the Contract Documents.

# Article 4

## Ownership of Work Product

**4.1**   **Work Product.** Owner shall retain the ownership and property interests, including but not limited to any intellectual property rights, copyrights, trade secret, trade mark, trade name, and/or patents in all design

criteria, drawings, specifications and other documents and electronic data, including any such documents identified in the General Conditions of Contract, furnished by Owner or its employees, representatives, agents, or consultants to Design Builder under this Agreement ("Owner's Property Rights").  Subject to Owner's Property Rights,  all drawings, specifications and other documents and electronic data, including such documents identified in the General Conditions of Contract, furnished by Design-Builder to Owner under this Agreement ("Work Product") are deemed to be instruments of service.

**4.2**     Design-Builder acknowledges that the Work Product is a work for hire and that, upon creation, Owner will Owner own and retain the ownership and property interests, including but not limited to any intellectual property rights, copyrights, trade secret, trade mark, trade name, and/or patents in all Work Product, except to the extent that Design-Builder establishes that, prior to its first introduction to Owner and the Project, its ownership and property interest in any standard architectural and other design elements and specifications incorporated into the Work Product ("DB's Property Rights").   Upon Owner's payment for the preparation of the Construction Documents, or either party's termination of the Agreement, with or without cause, Design-Builder will grant Owner a limited license to use DP's Property Rights in connection with Owner's occupancy of the Project.  Owner acknowledges that its alteration of the Work Product without the involvement of Design-Builder is at Owner's sole risk and without liability or legal exposure to Design-Builder or anyone working by or through Design-Builder, including Design Consultants of any tier (collectively the "Indemnified Parties"), and on the Owner's obligation to provide the indemnity set forth in Section 4.5 below.

**4.3     INTENTIONALLY NOT USED**

**4.4     INTENTIONALLY NOT USED**

**4.5**     Owner's Indemnification for Use of Work Product. If Owner is required to indemnify any Indemnified Parties based on alteration of the Work Product under any of the circumstances identified in this Article 4, Owner shall defend, indemnify and hold harmless such Indemnified Parties from and against any and all claims, damages, liabilities, losses and expenses, including attorneys' fees, arising out of or resulting from the alteration of the Work Product; provided, however, the obligations set forth in this section will not apply to the extent of any negligent actions or omissions of the Indemnified Parties with respect to such Work Product.

# Article 5

## Contract Time

**5.1     Date of Commencement.** The design portion of the Work shall commence immediately upon execution of the Agreement by both parties("Date of Commencement").

> **5.1.1**     Design-Builder will notify Owner in writing at least fifteen (15) days before Design-Builder intends to commence the construction portion of the Work.
>
> **5.1.2**     No later than fifteen (15) days after Design-Builder physically commences the construction portion of the Work at the Site, Design-Builder  shall prepare, sign as contractor, and file with the Office of the Clerk of the County in which the Project is located, a Notice of Commencement that conforms in all respects with O.C.G.A. § 44-14-361.5(b).
>
> **5.1.3**     Within one (1) work day of filing the Notice of Commencement, Design-Builder will (1) provide Owner with a copy of the Notice of Commencement stamped "received" or "filed" by the Clerk of the County where the Project is located; and (2) post a copy of the Notice of Commencement at the Project site in a location visible to Subcontractors, suppliers, and vendors.

**5.2     Substantial Completion and Final Completion.**

**5.2.1**   Substantial Completion of the entire Work shall be achieved no later than the following date: December 1, 2017:

**5.2.2**   Interim milestones and/or Substantial Completion of identified portions of the Work ("Scheduled Interim Milestone Dates") shall be achieved as follows: *(Insert any interim milestones for portions of the Work with different scheduled dates for Substantial Completion)*
Furnace Area Substantial Completion: November 1, 2017, 2017
Warehouse Area Substantial Completion: November 15, 2017

**5.2.3**   Final Completion of the Work shall be achieved as expeditiously as reasonably practicable. Final Completion is the date when all Work is complete pursuant to the definition of Final Completion set forth in Section 1.2.7 of the General Conditions of Contract.

**5.2.4**   All of the dates set forth in this Article 5 (collectively the "Contract Time(s)") shall be subject to adjustment in strict accordance with the procedures set forth in the General Conditions of Contract.

**5.3**   **Time is of the Essence.** Owner and Design-Builder mutually agree that time is of the essence with respect to the dates and times set forth in the Contract Documents.

**5.4**   **Liquidated Damages.** Design-Builder understands that if Substantial Completion is not attained by the Scheduled Substantial Completion Date, Owner will suffer damages which are difficult to determine and accurately specify. Design-Builder agrees that if Substantial Completion is not attained by ten (____10_____) days after the Scheduled Substantial Completion Date (the "LD Date"), Designer-Builder shall pay Owner One Thousand Dollars ($ 1,000.00___) as liquidated damages for each day that Substantial Completion extends beyond the LD Date.

**5.5**   Any liquidated damages assessed pursuant to this Agreement shall be in lieu of all liability for any and all extra costs, losses, expenses, claims, penalties and any other damages, whether special or consequential, and of whatsoever nature incurred by Owner which are occasioned by any delay in achieving the Contract Time(s). Owner and Design-Builder agree that the maximum aggregate liability Design-Builder has for any liquidated damages that may be assessed under this Agreement for failure to achieve the Contract Time(s) shall be One Hundred Thousand Dollars ($ 100,000.00__).

**5.6**——**INTENTIONALLY NOT USED**

# Article 6

## Contract Price

**6.1**   **Contract Price.** Owner shall pay Design-Builder in accordance with Article 6 of the General Conditions of Contract the sum of Nineteen Million, Twenty-One Thousand, Six Hundred Twenty Seven Dollars ($19,021,627) ("Contract Price"), subject to adjustments made in strict accordance with the procedures set forth in the General Conditions of Contract. Unless otherwise provided in the Contract Documents, the Contract Price is deemed to include all sales, use, consumer and other taxes mandated by applicable Legal Requirements.

**6.2**   **Markups for Changes.** If the Contract Price requires an adjustment due to changes in the Work, and the cost of such changes is determined under Sections 9.4.1.3 or 9.4.1.4 of the General Conditions of Contract, the following markups and markdowns shall be the sole markups and sole markdowns allowed on the net cost of such changes:

**6.2.1**   For net additive Change Orders, including net additive Change Orders arising from both

additive and deductive items, Design-Builder's markup for profit, overhead, and indirect costs, including general conditions cost, will not to exceed Seven percent (7%) applied to the net additional direct cost attributable to that Change Order.

**6.2.2**    For net deductive Change Orders, including net deductive Change Orders arising from both additive and deductive items, Design-Builder's markdown for profit, overhead, and indirect costs, including general conditions costs, will equal Two percent      (2%) applied to the direct costs of the net reduction in direct cost attributable to that Change Order.

**6.3     Allowance Items and Allowance Values.**

**6.3.1**    Any and all Allowance Items, as well as their corresponding Allowance Values, are set forth in an Exhibit hereto. See Exhibit "A"

**6.3.2**    Design-Builder and Owner have worked together to review the Allowance Items and Allowance Values based on design information then available to determine that the Allowance Values constitute reasonable estimates for the Allowance Items. Design-Builder and Owner will continue working closely together during the preparation of the design to develop Construction Documents consistent with the Allowance Values. Nothing herein is intended in any way to constitute a guarantee by Design-Builder that the Allowance Item in question can be performed for the Allowance Value.

**6.3.3**    No work shall be performed on any Allowance Item without Design-Builder first obtaining in writing advanced authorization to proceed from Owner. Owner agrees that if Design-Builder is not provided written authorization to proceed on an Allowance Item by the date set forth in the Project schedule, due to no fault of Design-Builder, Design-Builder may be entitled to an adjustment of the Contract Time(s) and Contract Price.

**6.3.4**    The Allowance Value for an Allowance Item includes the direct cost of labor, materials, equipment, transportation, taxes and insurance associated with the applicable Allowance Item. All other costs, including design fees, Design-Builder's overall project management and general conditions costs, overhead and fee, are deemed to be included in the original Contract Price, and are not subject to adjustment, regardless of the actual amount of the Allowance Item.

**6.3.5**    Whenever the actual costs for an Allowance Item is more than or less than the stated Allowance Value, the Contract Price shall be adjusted accordingly by Change Order, subject to Section 6.3.4. The amount of the Change Order shall reflect the difference between actual costs incurred by Design-Builder for the particular Allowance Item and the Allowance Value.

# <u>Article 7</u>

## Procedure for Payment

**7.1     Progress Payments.**

**7.1.1**    Design-Builder shall submit to Owner on the twenty-fifth (25th) day of each month, beginning with the first month after the Date of Commencement, Design-Builder's preliminary (pencil) draft of the Application for Payment in accordance with Article 6 of the General Conditions of Contract. The preliminary draft of the Application for Payment will include all supporting documentation required by the Contract Documents and/or established at the meeting required by Section 2.1.4 of the General Conditions. No later than the 3rd day of the following month, Owner and Design-Builder will agree upon the progress of the Work reflected in the Application for Payment.

**7.1.2**    Owner shall make payment within twenty (20) days after Owner's receipt of each properly submitted and accurate Application for Payment in accordance with Article 6 of the General

Conditions of Contract, but in each case less the total of payments previously made, and less amounts properly withheld under Section 6.3 of the General Conditions of Contract.

**7.2** **Retainage on Progress Payments.**

**7.2.1**    Owner will retain ten percent (10%) of each Application for Payment provided, however, that when fifty percent (50%) of the Work has been satisfactorily completed by Design-Builder and for so long as Design-Builder is otherwise in compliance with its contractual obligations, Owner will not retain any additional retention amounts from Design-Builder's subsequent Applications for Payment. Owner will also reasonably consider reducing retainage for Subcontractors completing their work early in the Project. Nothing in this provision will preclude Owner from withholding all or a portion of payments to Design-Builder under other provisions of the Contract Documents.

**7.2.2**    Within thirty (30) days after Substantial Completion of the entire Work, Owner shall release to Design-Builder all retained amounts relating, as applicable, to the entire Work, less an amount equal to (a) two hundred percent (200%) of the reasonable value of all remaining or incomplete items of Work as noted in the Certificate of Substantial Completion and (b) all other amounts Owner is entitled to withhold pursuant to Section 6.3 of the General Conditions of Contract.

**7.3** **Final Payment.** Design-Builder shall submit its Final Application for Payment to Owner in accordance with Section 6.7 of the General Conditions of Contract. Owner shall make payment on Design-Builder's properly submitted and accurate Final Application for Payment within thirty (30) days after Owner's receipt of the Final Application for Payment, provided that Design-Builder has satisfied the requirements for final payment set forth in Section 6.7.2 of the General Conditions of Contract.

**7.4** **Interest.** Payments due and unpaid by Owner to Design-Builder, whether progress payments or final payment, shall bear interest commencing five (5) days after payment is due at the statutory rate of seven percent (7%) per annum simple interest until paid.

**7.5** **Record Keeping and Finance Controls.** With respect to changes in the Work performed on a cost basis by Design-Builder pursuant to the Contract Documents, Design-Builder shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles and as may be provided in the Contract Documents. During the performance of the Work and for a period of six (6) years after Final Payment, Owner and Owner's accountants shall be afforded access to, and the right to audit from time-to-time, upon reasonable notice, Design-Builder's records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to changes in the Work performed on a cost basis in accordance with the Contract Documents, all of which Design-Builder shall preserve for a period of six (6) years after Final Payment. Such inspection shall take place at Design-Builder's offices during normal business hours unless another location and time is agreed to by the parties. Any multipliers or markups agreed by the Owner and Design-Builder as part of this Agreement are only subject to audit to confirm that such multiplier or markup has been charged in accordance with this Agreement, with the composition of such multiplier or markup not being subject to audit.

# Article 8

## Termination for Convenience

**8.1**    Upon ten (10) days' written notice to Design-Builder, Owner may, for its convenience and without cause, elect to terminate this Agreement. In such event, Owner shall pay Design-Builder for the following:

**8.1.1**    All Work executed and for proven loss in connection with the Work;

**8.1.2** The reasonable costs and expenses attributable to such termination, including demobilization costs and amounts due in settlement of terminated contracts with Subcontractors and Design Consultants; and

**8.1.3** Overhead and profit in the amount of five percent (5%) on the sum of items 8.1.1 above.

## 8.2    INTENTIONALLY NOT USED

**8.3** If Owner terminates this Agreement pursuant to Section 8.1 above and proceeds to design and construct the Project through its employees, agents or third parties, Owner's rights to use the Work Product shall be as set forth in Section 4.3 hereof.

# <u>Article 9</u>

## Representatives of the Parties

**9.1    Owner's Representatives.**

**9.1.1** Owner designates the individual listed below as its Senior Representative ("Owner's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Andre Schwiontek

**9.1.2** Owner designates the individual listed below as its Owner's Representative, which individual has the authority and responsibility set forth in Section 3.4 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Talis Dreimanis

**9.2    Design-Builder's Representatives.**

**9.2.1** Design-Builder designates the individual listed below as its Senior Representative ("Design-Builder's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 10.2.3 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Jeff Stiner
Senior Vice President, Chief Operating Officer
Kajima Building & Design Group, Inc.
3490 Piedmont Rd., NE
Suite 900
Atlanta, GA 30305-4804
404 812 8600

**9.2.2** Design-Builder designates the individual listed below as its Design-Builder's Representative, which individual has the authority and responsibility set forth in Section 2.1.1 of the General Conditions of Contract: *(Identify individual's name, title, address and telephone numbers)*

Jim Goodwin
Vice President, Regional Manager
Kajima Building & Design Group, Inc.
3490 Piedmont Rd., NE
Suite 900
Atlanta, GA 30305-4804
404 812 8600

# Article 10

## Bonds and Insurance

**10.1     Insurance.** Design-Builder and Owner shall procure the insurance coverages set forth in the Insurance Exhibit attached hereto and in accordance with Article 5 of the General Conditions of Contract.

**10.2     Bonds and Other Performance Security.** Design-Builder shall provide the following performance bond and labor and material payment bond or other performance security:

**Performance Bond.**

*[Check one box only. If no box is checked, then no bond is required.]*

☐ Required          ☒ Not Required

**Payment Bond.**

*[Check one box only. If no box is checked, then no bond is required.]*

☐ Required          ☒ Not Required

# Article 11

## Other Provisions

**11.1     Other provisions, if any, are as follows:** *(Insert any additional provisions)*

Any claims, disputes, or controversies between the parties arising out of or related to the Agreement, or the breach thereof, which have not been resolved in accordance with the procedures set forth in Section 10.2 of the General Conditions of Contract shall be resolved in a court of competent jurisdiction in the state in which the Project is located.

In executing this Agreement, Owner and Design-Builder each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the services described herein.

**OWNER:**

_____
*(Name of Owner)*

_____
*(Signature)*

_____
*(Printed Name)*

_____
*(Title)*

Date: _____

**DESIGN-BUILDER:**

Kajima Building & Design Group, Inc
*(Name of Design-Builder)*

_____
*(Signature)*

Jeff Stiner
*(Printed Name)*

Senior Vice President, Chief Operating Officer
*(Title)*

Date: _____

**Caution: You should sign an original DBIA document which has this caution printed in blue. An original assures that changes will not be obscured as may occur when documents are reproduced.**



# STANDARD FORM OF GENERAL CONDITIONS OF CONTRACT BETWEEN OWNER AND DESIGN-BUILDER

**Document No. 535**

Second Edition, 2010
© Design-Build Institute of America
Washington, DC

# TABLE OF CONTENTS

| Article | Name | Page |
|---|---|---|
| Article 1 | General................................................................... | 1~~1~~ |
| Article 2 | Design-Builder's Services and Responsibilities............................................ | 2~~3~~ |
| Article 3 | Owner's Services and Responsibilities....................................................... | 7~~7~~ |
| Article 4 | Hazardous Conditions and Differing Site Conditions................................... | 9~~9~~ |
| Article 5 | Insurance and Bonds ................................................................. | 10~~11~~ |
| Article 6 | Payment ................................................................. | 11~~12~~ |
| Article 7 | Indemnification ................................................................. | 15~~16~~ |
| Article 8 | Time ................................................................. | 17~~18~~ |
| Article 9 | Changes to the Contract Price and Time................................ | 18~~19~~ |
| Article 10 | Contract Adjustments and Disputes ........................................ | 20~~22~~ |
| Article 11 | Stop Work and Termination for Cause ................................... | 22~~24~~ |
| Article 12 | Electronic Data ................................................................. | 24~~26~~ |
| Article 13 | Miscellaneous................................................................. | 25~~27~~ |

# Article 1

## General

**1.1  Mutual Obligations**

**1.1.1**  *Owner and Design-Builder* commit at all times to cooperate fully with each other, and proceed on the basis of trust and good faith, to permit each party to realize the benefits afforded under the Contract Documents.

**1.2  Basic Definitions**

**1.2.1**  *Agreement* refers to the executed contract between Owner and Design-Builder under DBIA Document No. 525, Standard Form of Agreement Between Owner and Design-Builder - Lump Sum (2010 Edition), as modified.

**1.2.2**  *Basis of Design Documents* are as follows: Design-Builder's Proposal dated 8/12/16.

**1.2.3**  *Construction Documents* are the documents, consisting of Drawings and Specifications, to be prepared or assembled and coordinated by the Design-Builder consistent with the Basis of Design Documents unless a deviation from the Basis of Design Documents is specifically set forth in a Change Order executed by both the Owner and Design-Builder, as part of the design review process contemplated by Section 2.4 of these General Conditions of Contract.

**1.2.4**  *Day* or *Days* shall mean calendar days unless otherwise specifically noted in the Contract Documents.

**1.2.5**  *Design-Build Team* is comprised of the Design-Builder, the Design Consultant, and key Subcontractors identified by the Design-Builder.

**1.2.6**  *Design Consultant* is a qualified, licensed design professional who is not an employee of Design-Builder, but is retained by Design-Builder, or employed or retained by anyone under contract with Design-Builder, to furnish design services required under the Contract Documents. A Design Sub-Consultant is a qualified, licensed design professional who is not an employee of the Design Consultant, but is retained by the Design Consultant or employed or retained by anyone under contract to Design Consultant, to furnish design services required under the Contract Documents.

**1.2.7**  *Final Completion* is the date on which all Work is complete in accordance with the Contract Documents, including but not limited to, any items identified in the punch list prepared under Section 6.6.1 and the submission of all documents set forth in Section 6.7.2.

**1.2.8**  *Force Majeure Events* are those events that are beyond the control of both Design-Builder and Owner, including the events of war, floods, labor disputes, earthquakes, epidemics, adverse weather conditions not reasonably anticipated, and other acts of God.

**1.2.9**  *General Conditions of Contract* refer to this DBIA Document No. 535, *Standard Form of General Conditions of Contract Between Owner and Design-Builder* (2010 Edition), as revised.

**1.2.10**  NOT USED

**1.2.11**  NOT USED

**1.2.12**  *Hazardous Conditions* are any materials, wastes, substances and chemicals deemed to be hazardous under applicable Legal Requirements, or the handling, storage, remediation, or disposal of which are regulated by applicable Legal Requirements.

**1.2.13** *Legal Requirements* are all applicable federal, state and local laws, codes, ordinances, rules, regulations, orders and decrees of any government or quasi-government entity having jurisdiction over the Project or Site, the practices involved in the Project or Site, or any Work.

**1.2.14** *Owner's Project Criteria* are developed by or for Owner to describe Owner's program requirements and objectives for the Project, including use, space, price, time, site and expandability requirements, as well as submittal requirements and other requirements governing Design-Builder's performance of the Work. Owner's Project Criteria may include conceptual documents, design criteria, performance specifications, prescriptive design specifications, and LEED® or other sustainable design criteria and other Project-specific technical materials and requirements.

**1.2.15** *Site* is the land or premises on which the Project is located.

**1.2.16** *Subcontractor* is any person or entity retained by Design-Builder as an independent contractor to perform a portion of the Work and shall include materialmen and suppliers.

**1.2.17** *Sub-Subcontractor* is any person or entity retained by a Subcontractor as an independent contractor to perform any portion of a Subcontractor's Work and shall include materialmen and suppliers.

**1.2.18** *Substantial Completion* or *Substantially Complete* means the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete in accordance with the Contract Documents so that Owner can occupy and use the Project or a portion thereof for its intended purposes, subject to the conditions precedent set forth in Section 6.6 hereof.

**1.2.19** A Weather Day is any day upon which Design-Builder had previously scheduled Work on the critical path of the Project Schedule that is unsuitable for the performance of such Work due solely to rain or other forms of precipitation.

**1.2.20** *Work* is comprised of all Design-Builder's design, construction and other services required by the Contract Documents, including procuring and furnishing all materials, equipment, services and labor reasonably inferable from the Contract Documents.

# Article 2

## Design-Builder's Services and Responsibilities

**2.1    General Services.**

**2.1.1**    Design-Builder's Representative shall be reasonably available to Owner and shall have the necessary expertise and experience required to supervise the Work. Design-Builder's Representative shall communicate regularly with Owner and shall be vested with the authority to act on behalf of Design-Builder. Design-Builder's Representative may be replaced only with the mutual agreement of Owner and Design-Builder.

**2.1.2**    Design-Builder shall provide Owner with a monthly status report detailing the progress of the Work, including (i) whether the Work is proceeding according to schedule, (ii) whether discrepancies, conflicts, or ambiguities exist in the Contract Documents that require resolution, (iii) whether health and safety issues exist in connection with the Work; (iv) status of the contingency account to the extent provided for in the Standard Form of Agreement Between Owner and Design-Builder - Cost Plus Fee with an Option for a Guaranteed Maximum Price; and (v) other items that require resolution so as not to jeopardize Design-Builder's ability to complete the Work for the Contract Price and within the Contract Time(s).

**2.1.3**    Unless a Critical Path Method ("CPM") schedule for the execution of the Work has been

attached to the Agreement as an exhibit at the time the Agreement is executed, Design-Builder shall prepare and submit, at least three (3) days prior to the meeting contemplated by Section 2.1.4 hereof, a detailed CPM schedule for the execution of the Work for Owner's review and response. The schedule shall indicate the dates for the start and completion of the various stages of Work, including reasonable period of time for Owner to provide information and approvals.  Design-Builder will notify Owner in writing at least ten (10) days before specific information or approvals are required to avoid impacting Design-Builder's ability to achieve the Contract Time(s), the failure of which will waive any claim that Design-Builder otherwise could make for delay in relation to such information or approval. The schedule shall be revised as required by conditions and progress of the Work, but such revisions shall not relieve Design-Builder of its obligations to complete the Work within the Contract Time(s), as such dates may be adjusted in accordance with the Contract Documents. Design-Builder shall promptly notify Owner and Owner's Representative in writing of each and every revision Design-Builder makes to the CPM schedule, including all revisions affecting the identification of an activity, its duration, its logic, predecessor and successor activities, lag and lead relationships, and float   Owner's review of, and response to, the schedule shall not be construed as accepting any obligations imposed on Owner therein, or otherwise relieving Design-Builder of its complete and exclusive control over the means, methods, sequences and techniques for executing the Work.

**2.1.4**    The parties will meet within seven (7) days after execution of the Agreement to discuss issues affecting the administration of the Work and to implement the necessary procedures, including those relating to submittals and payment, to facilitate the ability of the parties to perform their obligations under the Contract Documents.

**2.1.5**    Design-Builder shall promptly review and approve all shop drawings, product data, samples and submittals required by Owner ("Owner-Required Submittals").  Design-Builder shall submit all Owner-Required Submittals to Owner's Representative for review and approval in such sequence and in sufficient time, so as to cause no delay in the progress of the Work or in the activities of Owner or its separate contractors.

**2.1.6**    Design Builder shall be responsible to Owner for any act or omission by any Design Consultant, Subcontractor, or by any employee, officer, agent, representative, or consultant of any of them, arising out of or relating to the Project.

**2.2      Design Professional Services.**

**2.2.1**    Design-Builder shall, consistent with applicable state licensing laws, provide through qualified, licensed design professionals employed by Design-Builder, or procured from qualified, independent licensed Design Consultants and Subcontractors, the necessary design services, including architectural, engineering and other design professional services, for the preparation of the required drawings, specifications and other design submittals, which shall be detailed, complete, complementary, and coordinated, to permit Design-Builder to complete the Work consistent with the Contract Documents. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Design Consultant or Subcontractor.

**2.3      Standard of Care for Design Professional Services.**

**2.3.1**    The standard of care for all design professional services performed to execute the Work shall be the care and skill ordinarily used by members of the design profession practicing under similar conditions at the same time and locality of the Project.

**2.4      Design Development Services.**

**2.4.1**    Design-Builder and Owner shall, consistent with any applicable provision of the Contract Documents, agree upon any interim design submissions that Owner may wish to review, which interim design submissions may include design criteria, drawings, diagrams and specifications

setting forth the Project requirements.  Interim design submissions shall be consistent with the Basis of Design Documents, and as the Basis of Design Documents may have been changed through the design process set forth in this Section 2.4.1. On or about the time of the scheduled submissions, Design-Builder and Owner shall meet and confer about the submissions, with Design-Builder identifying during such meetings, among other things, the evolution of the design and any changes to the Basis of Design Documents, or, if applicable, previously submitted design submissions. Changes to the Basis of Design Documents, including those that are deemed minor changes under Section 9.3.1, shall be processed in accordance with Article 9. Minutes of the meetings, including a full listing of all changes, will be maintained by Design-Builder and provided to all attendees for review. Following the design review meeting, Owner shall review and approve the interim design submissions and meeting minutes in a time that is consistent with the turnaround times set forth in Design-Builder's schedule.

**2.4.2**    Design-Builder shall submit to Owner Construction Documents setting forth in detail drawings and specifications describing the requirements for construction of the Work. The Construction Documents shall be (1) consistent with the latest set of interim design submissions, as such submissions may have been modified in a design review meeting and recorded in the meetings minutes; (2) conform in all respects with the Legal Requirements; (3) meet or exceed all other known objectives of Owner with respect to Design-Builder's scope of Work. The parties shall have a design review meeting to discuss, and Owner shall review and approve, the Construction Documents in accordance with the procedures set forth in Section 2.4.1 above. Design-Builder shall proceed with construction in accordance with the approved Construction Documents and shall submit one set of approved Construction Documents to Owner prior to commencement of construction.

**2.4.3**    Owner's review and approval of interim design submissions, meeting minutes, and the Construction Documents is for the purpose of mutually establishing a conformed set of Contract Documents compatible with the requirements of the Work. Neither Owner's review nor approval of any interim design submissions, meeting minutes, and Construction Documents shall be deemed to transfer any design liability from Design-Builder to Owner.

**2.4.4**    To the extent not prohibited by the Contract Documents or Legal Requirements, Design-Builder may prepare interim design submissions and Construction Documents for a portion of the Work to permit construction to proceed on that portion of the Work prior to completion of the Construction Documents for the entire Work.

## 2.5     Legal Requirements.

**2.5.1**    Design-Builder shall perform the Work in accordance with all Legal Requirements and shall provide all notices applicable to the Work as required by the Legal Requirements.

**2.5.2**    The Contract Price and/or Contract Time(s) shall be adjusted to compensate Design-Builder for the effects of any changes in the Legal Requirements enacted after the date of the Agreement affecting the performance of the Work, or if a Guaranteed Maximum Price is established after the date of the Agreement, the date the parties agree upon the Guaranteed Maximum Price. Such effects may include, without limitation, revisions Design-Builder is required to make to the Construction Documents solely because of changes in Legal Requirements.

## 2.6     Government Approvals and Permits.

**2.6.1**    Except as identified as Owner's responsibility in Section 3.5.1, Design-Builder shall obtain and pay for all necessary permits, approvals, licenses, government charges and inspection fees required for the prosecution of the Work by any government or quasi-government entity having jurisdiction over the Project.

**2.6.2**    Design-Builder shall provide reasonable assistance to Owner in obtaining those permits, approvals and licenses that are Owner's responsibility.

**2.7**     **Design-Builder's Construction Phase Services.**

**2.7.1**     Unless otherwise provided in the Contract Documents to be the responsibility of Owner or a separate contractor, Design-Builder shall provide through itself or Subcontractors the necessary supervision, labor, inspection, testing, start-up, material, equipment, machinery, temporary utilities and other temporary facilities to permit Design-Builder to complete construction of the Project consistent with the Contract Documents.

**2.7.2**     Design-Builder shall perform all construction activities efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract Documents. Design-Builder shall at all times exercise complete and exclusive control over the means, methods, sequences and techniques of construction.

**2.7.3**     Design-Builder shall employ only Subcontractors who are duly licensed, have the necessary financial, equipment, and labor resources, and are qualified to perform their portion of the Work consistent with the Contract Documents. Owner may reasonably object to Design-Builder's selection of any Subcontractor in which event Design-Builder will recommend another Subcontractor to which Owner has no objection.  In the event that Owner's objection to Design-Builder's recommendation to use a particular Subcontractor is unreasonable (as defined below), Design-Builder may make a Claim under Article 10 of the General Conditions for an increase to the Contract Price and/or Contract Time(s) to the extent that Owner's decision impacts Design-Builder's cost and/or time of performance.  The reasonableness of Owner's objection under this Section will be measured by the same criteria a public owner could reject a bidder in the State of Georgia for not being the lowest, responsible, and responsive bidder on a public works project where  responsibleness will be based upon whether the Subcontractor is (1) capable of diligently performing their specific scope of work in terms of (i) labor, equipment, and financial resources, and (ii) experience performing work of the same scope, size, and complexity; and (2) ready and willing to perform their specific scope of work in terms of (i) reputation for integrity, (ii) claims history, (iii) experience in successfully performing similar work on time and without defects, and (iv) ability to work in harmony with others on the Project,

**2.7.4**     Design-Builder assumes responsibility to Owner for the proper performance of the Work of Subcontractors and any acts and omissions in connection with such performance. Nothing in the Contract Documents is intended or deemed to create any legal or contractual relationship between Owner and any Subcontractor or Sub-Subcontractor, including but not limited to any third-party beneficiary rights; provided, however, Owner shall be an intended third-party beneficiary of any warranty, indemnification, and insurance obligation that any Subcontractor or Sub-Subcontractor owes to Design-Builder.

**2.7.5**     Design-Builder shall coordinate the activities of all Subcontractors. If Owner performs other work on the Project or at the Site with separate contractors under Owner's control, Design-Builder agrees to reasonably cooperate and coordinate its activities with those of such separate contractors so that the Project can be completed in an orderly and coordinated manner without unreasonable disruption.

**2.7.6**     Design-Builder shall use best efforts to minimize any interference of the Work with Owner's possession, enjoyment, and use of any occupied areas, buildings, and properties existing on or adjacent to the Site.   Design-Builder shall keep the Site free from debris, trash and construction wastes to permit Design-Builder to perform its construction services efficiently, safely and without interfering with the use of adjacent land areas. Upon Substantial Completion of the Work, or a portion of the Work, Design-Builder shall remove all debris, trash, construction wastes, materials, equipment, machinery and tools arising from the Work or applicable portions thereof to permit Owner to occupy the Project or a portion of the Project for its intended use.

**2.8**     **Design-Builder's Responsibility for Project Safety.**

**2.8.1**     Design-Builder recognizes the importance of performing the Work in a safe manner so as

to prevent damage, injury or loss to (i) all individuals at the Site, whether working or visiting, (ii) the Work, including materials and equipment incorporated into the Work or stored on-Site or off-Site, and (iii) all other property at the Site or adjacent thereto. Design-Builder assumes sole responsibility as between Owner and Design-Builder for implementing and monitoring all safety precautions and programs related to the performance of the Work. Design-Builder shall, prior to commencing construction, designate a Safety Representative with the necessary qualifications and experience to supervise the implementation and monitoring of all safety precautions and programs related to the Work. Design-Builder's Safety Representative shall be an individual stationed at the Site who may have responsibilities on the Project in addition to safety. The Safety Representative shall make routine daily inspections of the Site and shall hold weekly safety meetings with Design-Builder's personnel, Subcontractors and others as applicable.

**2.8.2**   Design-Builder and Subcontractors shall comply with all Legal Requirements relating to safety, as well as any Owner-specific safety requirements set forth in the Contract Documents, provided that such Owner-specific requirements do not violate any applicable Legal Requirement. Design-Builder will immediately report in writing any safety-related injury, loss, damage or accident arising from the Work to Owner's Representative and, to the extent mandated by Legal Requirements, to all government or quasi-government authorities having jurisdiction over safety-related matters involving the Project or the Work.

**2.8.3**   Design-Builder's responsibility for safety under this Section 2.8 is not intended in any way to relieve Subcontractors and Sub-Subcontractors of their own contractual and legal obligations and responsibility for (i) complying with all Legal Requirements, including those related to health and safety matters, and (ii) taking all necessary measures to implement and monitor all safety precautions and programs to guard against injuries, losses, damages or accidents resulting from their performance of the Work.

**2.9**   **Design-Builder's Warranty.**

**2.9.1**   Design-Builder warrants to Owner that the construction, including all materials and equipment furnished as part of the construction, shall be new and unused, unless otherwise specified in the Contract Documents, of good merchantable quality, in conformance with the Contract Documents and the applicable manufacturer's instructions, standards, and guidelines, and that such construction shall be free of defects in materials and workmanship, in compliance with all Legal Requirements with respect to Design-Builder's scope of Work. Design-Builder's warranty obligation excludes defects caused solely by Owner's abuse, alterations, or failure to maintain the Work in a commercially reasonable manner. Nothing in this warranty is intended to limit any manufacturer's warranty which provides Owner with additional or different warranty rights than set forth in this Section 2.9 or the Contract Documents. Design-Builder will provide Owner with all manufacturers' warranties upon Substantial Completion.

**2.10**   **Correction of Defective Work.**

**2.10.1**   Design-Builder agrees to correct any Work that is found to be incomplete or to not be not in conformance with the Contract Documents, including that part of the Work subject to Section 2.9 hereof, within a period of one year from the date of Substantial Completion of the Work or any portion of the Work, or within such longer period to the extent required by any specific warranty included in the Contract Documents.

**2.10.2**   Design-Builder shall as soon as practical, which in no event shall exceed two (2) business days after receipt of written notice from Owner that the Work is not in conformance with the Contract Documents, take meaningful steps to commence correction of such nonconforming Work, including the correction, removal or replacement of the nonconforming Work and any damage caused to other parts of the Work affected by the nonconforming Work. If Design-Builder fails to commence the necessary steps within such two business (2) day period, Owner, in addition to any other remedies provided under the Contract Documents, may commence correction of such nonconforming Work with its own forces. If Owner does perform such corrective Work, Design-

Builder shall be responsible for all reasonable costs incurred by Owner in performing such correction. If the nonconforming Work creates an emergency requiring an immediate response to protect against bodily harm, personal injury, property damage, interference with Owner's operations, the two business (2) day period identified herein shall be deemed inapplicable.

**2.10.3**  The one-year period referenced in Section 2.10.1 above applies only to Design-Builder's obligation to correct nonconforming Work and is not intended to constitute a period of limitations for any other rights or remedies Owner may have regarding Design-Builder's other obligations under the Contract Documents.

# Article 3

## Owner's Services and Responsibilities

**3.1**  **Owner's Performance**

**3.1.1**  Owner shall, throughout the performance of the Work, act in good faith to perform its responsibilities, obligations and services within a reasonable period of time and so as not to intentionally delay or interfere with Design-Builder's performance of its obligations under the Contract Documents.

**3.1.2**  Owner shall review and approve Design-Builder's interim design submissions and Construction Documents consistent with the turnaround times agreed to by Owner and Design Builder or otherwise within a reasonable period of time under the circumstances.

**3.2**  **Furnishing of Services and Information.**

**3.2.1**  Unless expressly stated to the contrary in the Contract Documents, Owner shall provide, at its own cost and expense, for Design-Builder's information and use the following, all of which Design-Builder is entitled to reasonably rely upon in performing the Work:

**3.2.1.1**  Surveys describing the property, boundaries, topography and reference points for use during construction, including existing service and utility lines;

**3.2.1.2**  Geotechnical studies describing subsurface conditions, and other surveys describing other latent or concealed physical conditions at the Site;

**3.2.1.3**  Temporary and permanent easements, zoning and other requirements and encumbrances affecting land use, or necessary to permit the proper design and construction of the Project and enable Design-Builder to perform the Work;

**3.2.1.4**  A legal description of the Site;

**3.2.1.5**  To the extent available, record drawings of any existing structures at the Site; and

**3.2.1.6**  To the extent available, environmental studies, reports and impact statements describing the environmental conditions, including Hazardous Conditions, in existence at the Site.

**3.2.2**  Owner is responsible for securing and executing all necessary agreements with adjacent land or property owners that are necessary to enable Design-Builder to perform the Work. Owner is further responsible for all costs, including attorneys' fees, incurred in securing these necessary agreements.

**3.2.3**  Design-Builder is responsible for securing and paying for all temporary easements and

agreements with adjacent land or property owners that are desired or necessary for Design-Builder's chosen means and methods of performing the Work, but not absolutely necessary to enable Design-Builder to perform the Work.

**3.3     Financial Information.**

**3.3.1**    At Design-Builder's request before commencement of the construction Work, Owner shall promptly furnish reasonable evidence satisfactory to Design-Builder that Owner has adequate funds available and committed to fulfill all of Owner's contractual obligations under the Contract Documents. If Owner fails to furnish such financial information in a timely manner, Design-Builder may refuse to commence Work until such evidence is provided.

**3.3.2**    Design-Builder shall cooperate with the reasonable requirements of Owner's lenders or other financial sources, which may include signing consents to assignment and subordinating its lien rights to lenders and other financial sources providing funds for the Project.

**3.4     Owner's Representative.**

**3.4.1**    Owner's Representative shall be responsible for providing Owner-supplied information and approvals within a reasonable period of time after Design-Builder's request thereof. Owner's Representative shall also provide Design-Builder with prompt notice if it observes and recognizes any failure on the part of Design-Builder to fulfill its contractual obligations, including any errors, omissions or defects in the performance of the Work. Owner's Representative shall communicate regularly with Design-Builder, but it shall not have authority to bind Owner with respect to adjustments to the Contract Price or the Contract Time, or any amendment or waiver of the terms and conditions of the Agreement or General Conditions.

**3.5     Government Approvals and Permits.**

**3.5.1**    Owner shall obtain and pay for all necessary permits, approvals, licenses, government charges and inspection fees for operation and use of the completed project.

**3.5.2**    Owner shall provide reasonable assistance to Design-Builder in obtaining those permits, approvals and licenses that are Design-Builder's responsibility.

**3.6     Owner's Separate Contractors.**

**3.6.1**    Owner is responsible for all work performed on the Project or at the Site by separate contractors under Owner's control. Owner shall contractually require its separate contractors to cooperate with, and coordinate their activities so as not to interfere with, Design-Builder in order to enable Design-Builder to timely complete the Work consistent with the Contract Documents.

**3.6.2**    Design-Builder shall cooperate with, and coordinate its activities with Owner's separate contractors so as not to interfere with such separate contractors in order to enable such separate contractors to timely complete their work consistent with the their contracts with Owner.

**3.6.3**    In the event that Design-Builder has a claim against any of Owner's separate contractors, or any of Owner's separate contractors have a claim against Design-Builder, Design-Builder and such separate contractor shall exercise their best efforts to resolve such claims without intervention by Owner or Owner's Representative.  In no event shall Owner be liable to Design-Builder for any claim that it may have against a separate contractor in excess of the amount that Owner recovers from such separate contractor.

# Article 4

## Hazardous Conditions and Differing Site Conditions

**4.1**     **Hazardous Conditions.**

**4.1.1**     Unless otherwise expressly provided in the Contract Documents to be part of the Work, Design-Builder is not responsible for any Hazardous Conditions encountered at the Site. Upon encountering any Hazardous Conditions, Design-Builder will stop Work immediately in the affected area and duly notify Owner and, if required by Legal Requirements, all government or quasi-government entities with jurisdiction over the Project or Site.

**4.1.2**     Upon receiving notice of the presence of suspected Hazardous Conditions, Owner shall take the necessary measures required to ensure that the Hazardous Conditions are remediated or rendered harmless. Such necessary measures shall include Owner retaining qualified independent consultants to (i) ascertain whether Hazardous Conditions have actually been encountered, and, if they have been encountered, (ii) prescribe the remedial measures that Owner must take either to remove the Hazardous Conditions or render the Hazardous Conditions harmless.

**4.1.3**     Design-Builder shall be obligated to resume Work at the affected area of the Project only after Owner's consultant provides it with written certification that (i) the Hazardous Conditions have been removed or rendered harmless and (ii) all necessary approvals have been obtained from all government and quasi-government entities having jurisdiction over the Project or Site.

**4.1.4**     Design-Builder will be entitled, in accordance with these General Conditions of Contract, to an adjustment in its Contract Price and/or Contract Time(s) to the extent Design-Builder's cost and/or time of performance have been adversely impacted by the presence of Hazardous Conditions.

**4.1.5**     To the fullest extent permitted by law, Owner shall indemnify, defend and hold harmless Design-Builder, Design Consultants, Subcontractors, anyone employed directly or indirectly by any of them, and their officers, directors, employees and agents, from and against any and all claims, losses, damages, liabilities and expenses, including attorneys' fees and expenses, arising out of or resulting from the presence, removal or remediation of Hazardous Conditions at the Site.

**4.1.6**     Notwithstanding the preceding provisions of this Section 4.1, Owner is not responsible for Hazardous Conditions that are part of the Work, or that were negligently released or introduced to the Site by Design-Builder, Subcontractors or anyone for whose acts they may be liable. To the fullest extent permitted by law, Design-Builder shall indemnify, defend and hold harmless Owner, the City of Dublin and County of Laurens Development Authority (the "Authority"), the City of Dublin, Georgia (the "City"), and the County of Laurens, Georgia (the "County"), and any of the directors, officers,  and  employees, officials, members, agents, and designated representatives of any of them, from and against all claims, losses, damages, liabilities and expenses, including attorneys' fees and expenses, arising out of or resulting from those Hazardous Conditions that are part of the Work or are otherwise negligently released or introduced to the Site by Design-Builder, Subcontractors or anyone for whose acts they may be liable.

**4.2**     **Differing Site Conditions.**

**4.2.1**     Concealed or latent physical conditions or subsurface conditions at the Site that (i) materially differ from the conditions indicated in the Contract Documents or (ii) are of an unusual nature, differing materially from the conditions ordinarily encountered and generally recognized as inherent in the Work are collectively referred to herein as "Differing Site Conditions." If Design-Builder encounters a previously unknown Differing Site Condition in the performance of the Work, Design-Builder may be entitled to an adjustment in the Contract Price and/or Contract Time(s) if and to the extent Design-Builder's proves that its cost and/or time of performance were adversely

impacted by the Differing Site Condition and Design-Builder strictly complies with Article 10 of the General Conditions.

**4.2.2**   Upon encountering a Differing Site Condition, Design-Builder shall provide prompt written notice to Owner of such condition in strict conformance with Article 10 of the General Conditions, which notice shall not be later than fourteen (14) days after such condition has been encountered. Design-Builder shall, to the extent reasonably possible, provide such notice before the Differing Site Condition has been substantially disturbed or altered.

**4.2.3**   In no event will Design-Builder be entitled to an adjustment to the Contract Price or the Contract Time for a Differing Site Condition that was discoverable upon a reasonable inspection of the Site or the other information reasonably available to Design-Builder before the Agreement was signed, or the Contract Price established, whichever occurs later.


# Article 5

## Insurance and Bonds

**5.1**   **Design-Builder's Insurance Requirements.**

**5.1.1**   Design-Builder is responsible for procuring and maintaining the insurance for the coverage amounts all as set forth in the **Liability Insurance Requirements** set forth in **Exhibit "C"** to the Agreement.

**5.1.2**   Design-Builder's insurance shall specifically delete any design-build or similar exclusions that could compromise coverages because of the design-build delivery of the Project.

**5.1.3**   At least ten (10) days prior to commencing any construction services hereunder, Design-Builder shall provide Owner with all endorsements, riders, and certificates evidencing that (i) all insurance obligations required by the Contract Documents are in full force and in effect and will remain in effect for the duration required by the Contract Documents and (ii) no insurance coverage will be canceled, renewal refused, or materially changed unless at least thirty (30) days prior written notice is given to Owner. If any of the foregoing insurance coverages are required to remain in force after final payment are reasonably available, an additional certificate evidencing continuation of such coverage shall be submitted with the Final Application for Payment. If any information concerning reduction of coverage is not furnished by the insurer, it shall be furnished by the Design-Builder with reasonable promptness according to the Design-Builder's information and belief.

**5.2**   **Owner's Liability Insurance.**

**5.2.1**   Owner shall procure and maintain from insurance companies authorized to do business in the state in which the Project is located such liability insurance as set forth in the Insurance Exhibit to the Agreement, if any, to protect Owner from claims which may arise from the performance of Owner's obligations under the Contract Documents or Owner's conduct during the course of the Project.

**5.3**   **Property Insurance.**

**5.3.1**   Design-Builder shall procure and maintain from insurance companies authorized to do business in the state in which the Project is located property insurance upon the entire Contract Amount to the full insurable value of the Contract Amount, including professional fees, overtime premiums and all other expenses incurred to replace or repair the insured property. The property insurance obtained by Design - Builder shall be the broadest coverage commercially available, and shall include as additional insureds the interests of Owner, Design-Builder, Design Consultants and Subcontractors of any tier. Such insurance shall include but not be limited to the perils of fire and

extended coverage, theft, vandalism, malicious mischief, collapse, flood, earthquake, debris removal and other perils or causes of loss as called for in the Contract Documents. The property insurance shall include physical loss or damage to the Work, including materials and equipment in transit, at the Site or at another location as may be indicated in Design-Builder's Application for Payment and approved by Owner.

**5.3.2**   Unless the Contract Documents provide otherwise, Owner shall procure and maintain boiler and machinery insurance that will include the interests of Owner, Design-Builder, Design Consultants, and Subcontractors of any tier. The Owner is responsible for the payment of any deductibles under the insurance required by this Section 5.3.2.

**5.3.3**   Prior to Design-Builder commencing any Work, Design-Builder shall provide Owner with certificates evidencing that (i) all Design-Builder property insurance obligations required by the Contract Documents are in full force and in effect and will remain in effect until Design-Builder has obtained Substantial Completion  (i) no insurance coverage will be canceled, renewal refused, or materially changed unless at least thirty (30) days prior written notice is given to Owner. Property insurance shall not lapse or be canceled if Owner occupies a portion of the Work pursuant to Section 6.6.3 hereof. Design-Builder shall provide Owner with the necessary endorsements from the insurance company prior to occupying a portion of the Work.

**5.3.4**   Any loss covered under Design-Builder's property insurance shall be adjusted with Owner and Design-Builder and made payable to both of them as trustees for the insureds as their interests may appear, subject to any applicable mortgage clause. All insurance proceeds received as a result of any loss will be placed in a separate account and distributed in accordance with such agreement as the interested parties may reach. Any disagreement concerning the distribution of any proceeds will be resolved in accordance with Article 10 hereof.

**5.3.5**   Owner and Design-Builder waive against each other and Owner's separate contractors, Design Consultants, Subcontractors, agents and employees of each and all of them, all damages covered and paid by property insurance provided herein, except such rights as they may have to the proceeds of such insurance. Design-Builder and Owner shall, where appropriate, require similar waivers of subrogation from Owner's separate contractors, Design Consultants and Subcontractors and shall require each of them to include similar waivers in their contracts. These waivers of subrogation shall not contain any restriction or limitation that will impair the full and complete extent of its applicability to any person or entity unless agreed to in writing prior to the execution of this Agreement.

**5.4**   **Bonds and Other Performance Security.**

**5.4.1** Bonds Not Required.

# Article 6

## Payment

**6.1**   **Schedule of Values.**

**6.1.1**   Unless required by the Owner upon execution of this Agreement, within ten (10) days of execution of the Agreement, Design-Builder shall submit for Owner's review and approval a schedule of values for all of the Work. The Schedule of Values will (i) subdivide the Work into its respective parts, (ii) include values for all items comprising the Work and (iii) serve as the basis for monthly progress payments made to Design-Builder throughout the Work.

**6.1.2**   The Owner will timely review and approve the schedule of values so as not to delay the submission of the Design-Builder's first application for payment. The Owner and Design-Builder shall timely resolve any differences so as not to delay the Design-Builder's submission of its first application for payment.

**6.2      Monthly Progress Payments.**

**6.2.1**     On or before the date established in the Agreement, Design-Builder shall submit for Owner's review and approval its Application for Payment requesting payment for all Work performed as of the date of the Application for Payment. No sums shall be due on any Application for Payment unless and until Design-Builder provides Owner's Representative with the applicable lien waivers and releases set forth below, which are absolute conditions precedent to Owner's obligation to pay Design-Builder:

.1      INTERIM WAIVERS: Signed and notarized waivers and releases by Design-Builder, each Subcontractor, and each Sub-Subcontractor providing a Notice to Contractor under O.C.G.A. § 44-14-361.5 through the date of the current Application for Payment conforming to the statutory form entitled "INTERIM WAIVER AND RELEASE UPON PAYMENT", set forth in O.C.G.A. § 44-14-366(c) and incorporated herein by reference; and

.2      FINAL WAIVERS: Signed and notarized waivers and releases by Design-Builder, each Subcontractor and Design Consultant, and each Sub-Subcontractor providing a Notice to Contractor under O.C.G.A. § 44-14-361.5 through the date of the current Application for Payment conforming to the statutory form entitled "WAIVER AND RELEASE UPON FINAL PAYMENT", set forth in O.C.G.A. § 44-14-366(d) and incorporated herein by reference.

**6.2.2**     The Application for Payment may request payment for equipment and materials not yet incorporated into the Project, provided that (i) Owner is satisfied that the equipment and materials are suitably stored at either the Site or another acceptable off-Site location, (ii) the equipment and materials are protected by suitable insurance and (iii) upon payment, Owner will receive the equipment and materials free and clear of all liens and encumbrances.

**6.2.3**     Design-Builder shall provide written notice to Owner of the opportunity to take all discounts offered by Subcontractor, Sub-Subcontractors and suppliers to Design-Builder within a reasonable period of time before such discount expires, which if and to the extent paid in advance by Owner shall accrue one hundred percent to Owner.  If and to the extent that Owner does not take a particular discount, such discount shall accrue one hundred percent to Design-Builder to the extent Design-Builder advances payment. Unless Owner advances payment to Design-Builder to receive the discount, Design-Builder may include in its Application for Payment the full undiscounted cost of the item for which payment is sought.

**6.2.4**     The Application for Payment shall constitute Design-Builder's representation that the Work described herein has been performed in conformance with the Contract Documents, has progressed to the point indicated in the Application for Payment, and that title to all Work will pass to Owner free and clear of all claims, liens, encumbrances, and security interests upon the incorporation of the Work into the Project, or upon Design-Builder's receipt of payment, whichever occurs earlier.

**6.2.5**     Owner's payment of any Application for Payment shall not constitute acceptance of any portion of the Work, nor excuse Design-Builder from the proper and timely performance of any obligation under the Contract Documents

**6.3      Withholding of Payments.**

**6.3.1**     On or before the date established in the Agreement, Owner shall pay Design-Builder all amounts properly due. If Owner determines that Design-Builder is not entitled to all or part of an Application for Payment for any reason, it will notify Design-Builder in writing within five (5) days of Owner's determination, which in no event will be after the date payment is due. The notice shall indicate the specific amounts Owner intends to withhold, the reasons basis for the withholding, and the specific measures Design-Builder must take to rectify Owner's concerns. Design-Builder and Owner will attempt to resolve Owner's concerns prior to the date payment is due.  If Design-Builder disputes Owner's right to take such action, Design-Builder may pursue its rights under Article 10

hereof.

**6.3.2**    Owner shall pay Design-Builder all undisputed amounts in an Application for Payment within the times required by the Agreement.

**6.4    Right to Stop Work and Interest.**

**6.4.1**    If Owner fails to pay timely Design-Builder any amount that becomes due, without complying with Section 6.3.1,  Design-Builder, in addition to all other remedies provided in the Contract Documents, may provide written notice to Owner and if Owner does not thereafter make payment or comply with Section 6.3.1, Design Builder may stop Work pursuant to Section 11.3 hereof. All payments due and unpaid shall bear interest at the rate set forth in the Agreement.

**6.5    Design-Builder's Payment Obligations.**

**6.5.1**    Design-Builder will pay Design Consultants and Subcontractors, in accordance with its contractual obligations to such parties, all the amounts Design-Builder has received from Owner on account of their work within ten (10) days of Design-Builder's receipt thereof. Design-Builder will impose similar requirements on Design Consultants and Subcontractors to pay those parties with whom they have contracted. Design-Builder will indemnify and defend Owner against any claims for payment and mechanic's liens as set forth in Section 7.3 hereof.

**6.5.2** Owner shall have the right, but not the obligation, to contact any Design Consultant or Subcontractor to confirm Design-Builder's proper disbursement of payments. If Design-Builder fails to object or properly disburse payments within ten (10) days of Owner's Representative's written notice, Owner may, at its sole discretion, take action to avoid loss to Owner as a result of such failure, including making direct or joint payments to Subcontractors, in which event such payments shall be deducted from the unpaid balance of the Contract Price.

**6.6    Substantial Completion.**

**6.6.1**    Design-Builder shall notify Owner when it believes the Work, or to the extent permitted in the Contract Documents, a portion of the Work, is Substantially Complete. Design-Builder's notice shall include a thorough punch list, describing in detail all known incomplete and defective Work remaining at that time. Within five (5) days of Owner's receipt of Design-Builder's notice, Owner and Design-Builder will jointly inspect such Work to verify that it is Substantially Complete in accordance with the requirements of the Contract Documents. If such Work is Substantially Complete, Owner shall prepare and issue a Certificate of Substantial Completion that will set forth (i) the date of Substantial Completion of the Work or portion thereof, (ii) the remaining items of Work that have to be completed before final payment, (iii) provisions (to the extent not already provided in the Contract Documents) establishing Owner's and Design-Builder's responsibility for the Project's security, maintenance, utilities and insurance pending final payment, and (iv) an acknowledgment that warranties commence to run on the date of Substantial Completion, except as may otherwise be noted in the Certificate of Substantial Completion.

**6.6.2**    Notwithstanding anything to the contrary in the Contract Documents, Substantial Completion shall not occur until:

**.1**    Design-Builder's Work is sufficiently complete that it can be used by subsequent Contractors to commence and perform their scope of work on the Project;

**.2**    A commercially reasonable number of punch list items of Work may remain, as determined by Owner;

**.3**    Design-Builder provides Owner's Representative with a final Certificate of Completion.

**6.6.3**    Design-Builder may submit to Owner's Representative an Application for Payment upon

achieving Substantial Completion.

**6.6.4**    Design-Builder shall at all times promptly and diligently pursue completion of all items identified on or added to any punch list.  The punch list may be revised at any time to include incomplete or defective Work not previously included therein.  Failure to include any item on the punch list shall not constitute Owner's acceptance thereof, or otherwise waive, release, or excuse Design-Builder from conformance of the Work with the Contract Documents.

**6.6.5**    Owner, at its option, may use a portion of the Work which has been determined to be Substantially Complete, provided, however, that (i) a Certificate of Substantial Completion has been issued for the portion of Work addressing the items set forth in Section 6.6.1 above, (ii) Design-Builder and Owner have obtained the consent of their sureties and insurers, and to the extent applicable, the appropriate government authorities having jurisdiction over the Project, (iii) Design-Builder's completion of the remaining Work will not interfere with Owner's use or occupancy of the Substantially Complete portion of the Work; and (iv)  Owner's use or occupancy of the Substantially Complete portion of the Work will not interfere with Design-Builder's completion of the remaining Work.

**6.6.6**    Owner's acceptance of Substantial Completion and occupancy of the entire Work, or any designated portion thereof, shall not constitute acceptance of Work not conforming to the Contract Documents.

**6.7**      **Final Payment.**

**6.7.1**    After receipt of a Final Application for Payment from Design-Builder, Owner shall make final payment by the time required in the Agreement, provided that Design-Builder has achieved Final Completion.

**6.7.2**    At the time of submission of its Final Application for Payment, Design-Builder shall provide the following information as absolute conditions precedent to Owner's obligation to pay Design Builder:

**6.7.2.1**  An affidavit that conforms to O.C.G.A. §44-14-361.2 that that the agreed price or reasonable value of the labor, services, or materials has been paid or waived in writing by all lien claimants;

**6.7.2.2**  A general release executed by Design-Builder waiving, upon receipt of final payment by Design-Builder, all claims, except those claims previously made in writing to Owner and remaining unsettled at the time of final payment;

**6.7.2.3**  Consent of Design-Builder's surety, if any, to final payment;

**6.7.2.4**  All operating manuals, warranties and other deliverables required by the Contract Documents, and as-built documents (in both a hard copy and electronic form) revised by Design-Builder to accurately reflect the as-built condition of the Work,;

**6.7.2.5**  Certificates of insurance confirming that required coverages will remain in effect consistent with the requirements of the Contract Documents; and

**6.7.2.6**  Unless previously delivered to Owner, signed and notarized waivers and releases by Design-Builder, each Subcontractor and Design Consultant, and each Sub-Subcontractor providing a Notice to Contractor under O.C.G.A. § 44-14-361.5 through the date of the Application for Final Payment conforming to the statutory form entitled "WAIVER AND RELEASE UPON FINAL PAYMENT", set forth in O.C.G.A. § 44-14-366(d) and incorporated herein by reference.

**6.7.3**    Upon making final payment, Owner waives all claims against Design-Builder except claims relating to (i) Design-Builder's failure to satisfy its payment obligations, if such failure affects Owner's interests, (ii) Design-Builder's failure to complete the Work consistent with the Contract Documents, including defects appearing after Substantial Completion, (iii) the terms of any general and special warranties required by the Contract Documents, (iv) any insurance and indemnification matters.

**6.7.4**    Deficiencies in the Work discovered after Substantial Completion, whether or not such deficiencies would have been included on the Punch List if discovered earlier, shall be deemed warranty Work.  Such deficiencies shall be corrected by Design-Builder under Sections 2.9 and 2.10 herein, and shall not be a reason to withhold final payment from Design-Builder, provided, however, that Owner shall be entitled to withhold from the Final Payment the reasonable value of completion of such deficient work until such work is completed.

**6.7.5**    Owner may, in its sole and absolute discretion, accept Work that is incomplete, non-conforming, or defective, in which event Owner may deduct from the Contract Price, an appropriate and equitable amount, taking into consideration the cost of repair and the diminished value of the Project as a result of such incomplete, non-conforming, or defective Work.  Owner's acceptance of incomplete, non-conforming, or defective Work must be in writing to be valid.

**6.7.6**    Before final acceptance, Design-Builder shall schedule and coordinate demonstrations and trial operations of equipment for Owner's designated personnel.  Design-Builder shall:  (1) meet with Owner's personnel at the Site to provide basic instructions needed for proper operation and maintenance of Work, (2) provide instruction by manufacturer's representatives, as required, (3) review maintenance manuals, record documentation, tools, spare parts and materials, lubricants, fuels, identification materials, control sequences, hazards, cleaning and similar procedures and facilities, (4) demonstrate start-up, shut-down, emergency operations, noise and vibration adjustments, safety, economy/efficiency adjustments, and similar operations, and (5) review maintenance and operations in relation to warranties and similar continuing commitments.

# Article 7

## Indemnification

**7.1**    **Patent and Copyright Infringement.**

**7.1.1**    Design-Builder shall defend any action or proceeding brought against Owner based on any claim that the Work, or any part thereof, or the operation or use of the Work or any part thereof, constitutes infringement of any United States patent or copyright, now or hereafter issued. Owner shall give prompt written notice to Design-Builder of any such action or proceeding and will reasonably provide authority, information and assistance in the defense of same. Design-Builder shall indemnify and hold harmless Owner from and against all damages and costs, including but not limited to attorneys' fees and expenses awarded against Owner or Design-Builder in any such action or proceeding. Design-Builder agrees to keep Owner informed of all developments in the defense of such actions.

**7.1.2**    If Owner is enjoined from the operation or use of the Work, or any part thereof, as the result of any patent or copyright suit, claim, or proceeding, Design-Builder shall at its sole expense take reasonable steps to procure the right to operate or use the Work. If Design-Builder cannot so procure such right within a reasonable time, Design-Builder shall promptly, at Design-Builder's option and at Design-Builder's expense, (i) modify the Work so as to avoid infringement of any such patent or copyright or (ii) replace said Work with Work that does not infringe or violate any such patent or copyright.

**7.1.3**    Sections 7.1.1 and 7.1.2 above shall not be applicable to any suit, claim or proceeding

based on infringement or violation of a patent or copyright (i) relating solely to a particular process or product of a particular manufacturer specified by Owner and not offered or recommended by Design-Builder to Owner or (ii) arising from modifications to the Work by Owner or its agents after acceptance of the Work. If the suit, claim or proceeding is based upon events set forth in the preceding sentence, Owner shall defend, indemnify and hold harmless Design-Builder to the same extent Design-Builder is obligated to defend, indemnify and hold harmless Owner in Section 7.1.1 above.

**7.1.4**    The obligations set forth in this Section 7.1 shall constitute the sole agreement between the parties relating to liability for infringement of violation of any patent or copyright.

## 7.2    Tax Claim Indemnification.

**7.2.1**    If, in accordance with Owner's direction, an exemption for all or part of the Work is claimed for taxes, Owner shall indemnify, defend and hold harmless Design-Builder from and against any liability, penalty, interest, fine, tax assessment, attorneys' fees or other expenses or costs incurred by Design-Builder as a result of any action taken by Design-Builder in accordance with Owner's directive. Owner shall furnish Design-Builder with any applicable tax exemption certificates necessary to obtain such exemption, upon which Design-Builder may rely.

## 7.3    Payment Claim Indemnification.

**7.3.1**    Provided that Owner is not in breach of its contractual obligation to make payments to Design-Builder for the Work, Design-Builder shall indemnify, defend and hold harmless Owner from any claims or mechanic's liens brought against Owner or against the Project as a result of the failure of Design-Builder, or those for whose acts it is responsible, to pay for any services, materials, labor, equipment, taxes or other items or obligations furnished or incurred for or in connection with the Work. Within three (3) days of receiving written notice from Owner that such a claim or mechanic's lien has been filed, Design-Builder shall commence to take the steps necessary to discharge said claim or lien, including, if necessary, the furnishing of a mechanic's lien bond. If Design-Builder fails to do so, Owner will have the right to discharge the claim or lien and hold Design-Builder liable for costs and expenses incurred, including attorneys' fees.

## 7.4    Design-Builder's General Indemnification.

**7.4.1**    Design-Builder, to the fullest extent permitted by law, shall indemnify, hold harmless and defend Owner, its Separate Contractors, the City of Dublin and County of Laurens Development Authority (the "Authority"), the City of Dublin, Georgia (the "City"), the County of Laurens, Georgia (the "County"),  and the directors,  officers,  employees, officials, members, and designated representatives of any of them from and against claims, losses, damages, liabilities, including attorneys' fees and expenses, for bodily injury, sickness or death, and property damage or destruction (other than to the Work itself) arising out of or resulting, in whole or part, from the acts or omissions of Design-Builder, Design Consultants, Subcontractors, Sub-Subcontractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable; provided, however, this provision shall not apply to any indemnified party whose sole negligence causes any such injury, damage, or harm.

**7.4.2**    If an employee of Design-Builder, Design Consultants, Subcontractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable has a claim against Owner, its officers, directors, employees, or agents, Design-Builder's indemnity obligation set forth in Section 7.4.1 above shall not be limited by any limitation on the amount of damages, compensation or benefits payable by or for Design-Builder, Design Consultants, Subcontractors, or other entity under any employee benefit acts, including workers' compensation or disability acts.

## 7.5    Owner's Separate Contractor's General Indemnification.

**7.5.1**    Owner will exercise reasonable efforts to include indemnification provisions in its contracts

with Separate Contractors to require such Separate Contractors, to the fullest extent permitted by law, shall indemnify, hold harmless and defend Design-Builder and any of Design-Builder's officers, directors, and employees, from and against claims, losses, damages, liabilities, including attorneys' fees and expenses, for bodily injury, sickness or death, and property damage or destruction (other than to the Work itself) to the extent resulting from the negligent acts or omissions of Owner's separate contractors or anyone for whose acts any of them may be liable.

# Article 8

## Time

**8.1**   **Obligation to Achieve the Contract Times.**

**8.1.1**   Design-Builder agrees that it will commence performance of the Work and achieve the Contract Time(s) in accordance with Article 5 of the Agreement.

**8.2**   **Delays to the Work.**

**8.2.1**   Design-Builder may make a claim in strict conformance with the procedure and time periods set forth in Article 10 of the General Conditions of Contract to adjust the Contract Time(s) only in the event of a delay of one (1) day upon which critical path Work was planned ("Work Day") or longer that, at the time of its occurrence, will extend Substantial Completion of the Work, or a designated portion thereof, beyond the applicable Contract Time(s), and for which Design-Builder, or any person or entity for whom Design-Builder is responsible, did not directly or indirectly cause, in whole or in part, and for which Design-Builder could not avoid or control through the exercise of reasonable care ("Excusable Delay").  An Excusable Delay may include delay caused by Owner or Owner's Representative, Force Majeure, Differing Site Conditions, Hazardous Conditions, or any separate contractor.

**8.2.2**   A Weather Day shall not be an Excusable Delay, unless and to the extent that the cumulative number of substantiated Weather Days exceeds the cumulative number of anticipated Weather Days, which shall be equal to the average number of business days in which 0.1 inches or more of precipitation was recorded for a 24-hour period in the general vicinity of the Project during the ten (10) year period immediately preceding the calendar year for the effective date of the Agreement, as reported by the U.S. Department of Commerce's National Climatic Data Center at the reporting station closest to the Project, for the comparable period of time on the Project Schedule between the Commencement Date and building dry-in.  To substantiate a Weather Day, Design-Builder shall notify Owner in writing of such event within three (3) days of its occurrence. In the event the cumulative number of anticipated Weather Days exceeds the cumulative number of substantiated Weather Days at building dry-in, the unused, anticipated Weather Days shall be considered float time.

**8.2.3** Design-Builder may make a claim in strict conformance with the procedure and time periods set forth in Article 10 of the General Conditions of the Contract to adjust the Contract Price for a delay only if and to the extent that Design-Builder establishes that it incurred additional direct costs and/or extended on-Site general conditions costs solely as a result of an Excusable Delay attributable to Owner or Owner's Representative, or a Differing Site Conditions, Hazardous Conditions, or any separate contractor, that continues more than five (5) Work Days after Owner's Representative's receipt of Design-Builder's written notice thereof.  In no event will Design-Builder be entitled to an adjustment to the Contract Price for an Excusable Delay attributable to Force Majeure events.

# Article 9

## Changes to the Contract Price and Time

**9.0      Changes in general.**  Owner may make changes to the Work at any time without invalidating the Agreement; provided, however, Design Builder shall not proceed with the performance of any change to the Work without first receiving either an Amendment, Change Order, or a Work Change Directive signed by an authorized Owner representative.  Owner shall be bound to a proposed adjustment to the Contract Price or Contract Time, or to a modification of the Contract Documents, only if and to the extent such adjustment is memorialized in a signed Amendment or Change Order.

**9.1      Change Orders.**

    **9.1.1**      A Change Order is a written instrument issued after execution of the Agreement signed by Owner and Design-Builder, stating their agreement upon all of the following:

        **9.1.1.1**  The scope of the change in the Work;

        **9.1.1.2**  The amount of the adjustment to the Contract Price; and

        **9.1.1.3**  The extent of the adjustment to the Contract Time(s).

    **9.1.2**      All changes in the Work authorized by applicable Change Order shall be performed under the applicable conditions of the Contract Documents. Owner and Design-Builder shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for such changes.

    **9.1.3**      Each Change Order shall include all adjustments to the Contract Price and Contract Time(s), if any, resulting directly or indirectly from the changes described therein.  All Claims arising out of or relating to a signed Change Order shall be deemed waived and released, unless expressly reserved therein.

    **9.1.4**      Notwithstanding the Parties' execution of a Change Order, in no event will Design-Builder be entitled to an adjustment to the Contract Price or Contract Time(s) for a Change caused by either an error, omission, inconsistency, conflict or ambiguity in the Construction Documents, or a Change in Design-Builder's planned means, methods, procedures, or sequence in performing the Work, or a Change in materials or equipment not requested by and attributable to Owner.

**9.2      Work Change Directives.**

    **9.2.1**      A Work Change Directive is a written order prepared and signed by Owner authorizing Design-Builder to proceed with the activities described therein prior to Owner and Design-Builder resolving a potential change, including where Owner and Design-Builder have yet to agree upon the material terms of a Change Order, or where Owner and Design-Builder dispute whether a particular activity is part of the Work or a change.  Work Change Directives shall not be greater than an estimated price of $100,000.

    **9.2.2**      Upon receipt of a Work Change Directive, Design-Builder will promptly and diligently proceed with the changes required therein unless the Work Change Directive required otherwise. Owner and Design-Builder shall negotiate in good faith and as expeditiously as possible the appropriate adjustments for the Work Change Directive. Upon reaching an agreement, the parties shall prepare and execute an appropriate Change Order reflecting the terms of the agreement.

**9.3      Minor Changes in the Work.**

    **9.3.1**      Minor changes in the Work do not involve an adjustment in the Contract Price and/or Contract Time(s) and do not materially and adversely affect the Work, including the design, quality,

performance and workmanship required by the Contract Documents. Design-Builder may make minor changes in the Work consistent with the intent of the Contract Documents, provided, however, that Design-Builder shall promptly inform Owner, in writing, of any such changes and record such changes on the documents maintained by Design-Builder.

**9.4     Contract Price Adjustments.**

**9.4.1**     The increase or decrease in Contract Price resulting from a change in the Work shall be determined by one or more of the following methods:

> **9.4.1.1**  Unit prices set forth in the Agreement or as subsequently agreed to between the parties;
>
> **9.4.1.2**  A mutually accepted lump sum, properly itemized and supported by sufficient substantiating data to permit evaluation by Owner;
>
> **9.4.1.3**  Costs, fees and any other markups set forth in the Agreement; or
>
> **9.4.1.4**  If an increase or decrease cannot be agreed to as set forth in items 9.4.1.1 through 9.4.1.3 above or Owner issues a Work Change Directive that does not specify the method for adjusting the Contract Price, Design-Builder shall maintain detailed cost and time records evidencing Design-Builder's and its Subcontractors' actual cost and time spent to perform the Work Change Directive. Design-Builder's records shall be submitted to Owner's Representative, no later than five (5) days following the date when such cost or time was incurred or spent. Design-Builder's submission of any cost or time record to Owner's Representative shall be a representation to Owner that Design-Builder has reviewed, monitored, and verified the accuracy of such record, irrespective of whether the record was prepared by Design-Builder or any Subcontractor. Submission of such record may be considered by Owner and Design-Builder in negotiating the terms of a Change Order; however, such submission shall not constitute Owner's acceptance of either the amount or accuracy of the record, or Design-Builder's entitlement to an adjustment to the Contract Price or Contract Time(s) in relation thereto.

**9.4.2**     If unit prices are set forth in the Contract Documents or are subsequently agreed to by the parties, but application of such unit prices will cause substantial inequity to Owner or Design-Builder because of differences in the character or quantity of such unit items as originally contemplated, such unit prices shall be equitably adjusted.

**9.4.3**     Design-Builder may apply for payment and Owner shall make payment for any undisputed portion of a Work Change Directive, in which event a partial Change Order shall be signed by Owner and Design-Builder fully settling the undisputed portions of the Work Change Directive, and reserving the disputed portions of the Work Change Directive for further resolution.

**9.5.4**     Design-Builder's lump sum pricing of an adjustment to the Contract Price for each change shall not exceed the sum of:

> .1      Design-Builder's net increase or decrease to the actual or best estimated cost of
>
> > a.     Labor (including any applicable insurance and taxes) to perform the change with its own workers;
> >
> > b.     Materials and consumables (including any applicable sales tax) incorporated or used in the direct performance of the change;
> >
> > c.     Small tools and equipment used in the direct performance of the change at their actual rental rate, unless rented from Design-Builder or any entity affiliated or related in any way to Design-Builder, in which event the rental rate shall be

based upon the fair rental rate for the same or similar tools or equipment within the county where the project is located; and

d.      The actual additional cost or credit due to each Design Consultant and Subcontractor performing Work directly in relation to such change;

.2      Markup calculated in accordance with Section 6.2 of the Agreement, which in the event the change affects the Scheduled Substantial Completion Date for the Entire Work may include the net increase or decrease of the actual or estimated general conditions costs directly attributable to the change.

## 9.5    Emergencies.

**9.5.1**    In any emergency affecting the safety of persons and/or property, Design-Builder shall act, at its discretion, to prevent threatened damage, injury or loss. Any change in the Contract Price and/or Contract Time(s) on account of emergency work not caused in whole or part by Design-Builder or those for whom it is responsible shall be determined as provided in this Article 9.

# Article 10

## Contract Adjustments and Disputes

### 10.1    Requests for Contract Adjustments and Relief.

**10.1.1**    If Design-Builder believes that it is entitled to an adjustment to the Contract Price or the Contract Time(s) for any cause, condition, or event arising out of or related to the Work or Project, Design-Builder shall provide written notice thereof to Owner's Representative within a reasonable time, not to exceed five (5) Work Days, after the occurrence of the cause or the date upon which Design-Builder reasonably should have recognized the event or condition giving rise to the claim, but in either case before Design-Builder incurs any significant additional costs as a result thereof.

**10.1.2**    Within five (5) additional Work Days thereafter, Design-Builder shall submit a written claim to Owner's Representative setting forth all known and presumed facts upon which such claim is based, including: (i) the character, duration, and extent of such cause, condition, or event; (ii) the date upon which Design-Builder first knew of such cause, condition, or event; (iii) all Work activities impacted by such cause, condition, or event; and (iv) Design-Builder's best estimate of the cost and time consequences of such claim.  No claim shall be considered effective until such information is provided to Owner's Representative in strict conformance with this Section.

**10.1.3**    Design-Builder acknowledges that Owner will be substantially prejudiced if Design-Builder fails to provide timely notice and submit its claim in strict conformance with this Section. Verbal notice, shortness of time, or Owner's or Owner's Representative's actual or constructive knowledge of a cause, condition, or event giving rise to a claim shall not waive, satisfy, discharge, or otherwise excuse Design-Builder's strict compliance with this Section. All claims shall be deemed abandoned and waived, unless made in strict accordance with this Section.

### 10.2    Dispute Avoidance and Resolution.

**10.2.1**    The parties are fully committed to working with each other throughout the Project and agree to communicate regularly with each other at all times so as to avoid or minimize disputes or disagreements. If disputes or disagreements do arise, Design-Builder and Owner each commit to resolving such disputes or disagreements in an amicable, professional and expeditious manner so as to avoid unnecessary losses, delays and disruptions to the Work.

**10.2.2**  Design-Builder and Owner will first attempt to resolve disputes or disagreements at the field level through discussions between Design-Builder's Representative and Owner's Representative which shall conclude within fourteen (14) days of the written notice provided for in Section 10.1.1 unless the Owner and Design-Builder mutually agree otherwise.

**10.2.3**  If a dispute or disagreement cannot be resolved through Design-Builder's Representative and Owner's Representative, Design-Builder's Senior Representative and Owner's Senior Representative, upon the request of either party, shall meet as soon as conveniently possible, but in no case later than thirty (30) days after such a request is made, to attempt to resolve such dispute or disagreement. Five (5) days prior to any meetings between the Senior Representatives, the parties will exchange relevant information that will assist the parties in resolving their dispute or disagreement.

**10.2.4**  If after meeting the Senior Representatives determine that the dispute or disagreement cannot be resolved on terms satisfactory to both parties, the parties shall submit within thirty (30) days of the conclusion of the meeting of Senior Representatives the dispute or disagreement to non-binding mediation. The mediation shall be conducted by a mutually agreeable impartial mediator, or if the parties cannot so agree, a mediator designated by the American Arbitration Association ("AAA") pursuant to its Construction Industry Mediation Rules. The mediation will be governed by and conducted pursuant to a mediation agreement negotiated by the parties or, if the parties cannot so agree, by procedures established by the mediator. Unless otherwise mutually agreed by the Owner and Design-Builder and consistent with the mediator's schedule, the mediation shall commence within ninety (90) days of the submission of the dispute to mediation.

## 10.3   Dispute Resolution

**10.3.1** Any claims, disputes or controversies between the parties arising out of or relating to the Agreement, or the breach thereof, which have not been resolved in accordance with the procedures set forth in Section 10.2 above shall be decided by litigation in the District Courts of the county where the Project is located, which shall constitute the exclusive venue for any litigation between the Parties.

## 10.4   Duty to Continue Performance.

**10.4.1**  Unless provided to the contrary in the Contract Documents, Design-Builder shall continue to perform the Work and Owner shall continue to satisfy its payment obligations to Design-Builder, pending the final resolution of any dispute or disagreement between Design-Builder and Owner.

## 10.5   CONSEQUENTIAL DAMAGES.

**10.5.1**  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY NEITHER DESIGN-BUILDER NOR OWNER SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL LOSSES OR DAMAGES WHETHER ARISING IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO LOSSES OF USE, PROFITS, BUSINESS, REPUTATION OR FINANCING.

**10.5.2**   The consequential damages limitation set forth in Section 10.5.1 above is not intended to affect the payment of liquidated damages, set forth in Article 5 of the Agreement, which both parties recognize has been established, in part, to reimburse Owner for some damages that might otherwise be deemed to be consequential.

# Article 11

## Stop Work and Termination for Cause

**11.1    Owner's Right to Stop Work.**

**11.1.1**   Owner may, without cause and for its convenience, order Design-Builder in writing to stop and suspend the Work. Such suspension shall not exceed sixty (60) consecutive days or aggregate more than ninety (90) days during the duration of the Project.

**11.1.2**   Design-Builder is entitled to seek an adjustment of the Contract Price and/or Contract Time(s) if its cost or time to perform the Work has been adversely impacted by any suspension of stoppage of the Work by Owner.

**11.2    Owner's Right to Perform and Terminate for Cause.**

**11.2.1**   If Design-Builder fails to (i) provide a sufficient number of skilled workers, (ii) supply the materials required by the Contract Documents, (iii) comply with applicable Legal Requirements, (iv) timely pay, without good cause, Design Consultants or Subcontractors, (v) prosecute the Work with promptness and diligence to ensure that the Work is completed by the Contract Time(s), as such times may be adjusted, or (vi) perform material obligations under the Contract Documents, then Owner, in addition to any other rights and remedies provided in the Contract Documents or by law, shall have the right to place Design-Builder in default.

**11.2.2**   Upon the occurrence of a default under Section 11.2.1, Owner may provide written notice to Design-Builder that it intends to terminate the Agreement unless the default is cured within seven (7) days of Design-Builder's receipt of such notice, or within such time period, the cure is promptly commenced and diligently continued through completion.   If Design-Builder fails to cure, or commence or diligently continue to cure, such default, then Owner may give a second written notice to Design-Builder that the Agreement is terminated.

**11.2.3**   Upon declaring the Agreement terminated pursuant to Section 11.2.2 above, Owner may enter upon the premises and take possession, for the purpose of completing the Work, of all materials, equipment, scaffolds, tools, appliances and other items thereon, which have been purchased or provided for the performance of the Work, all of which Design-Builder hereby transfers, assigns and sets over to Owner for such purpose, and to employ any person or persons to complete the Work and provide all of the required labor, services, materials, equipment and other items.  In the event of such termination, Design-Builder shall not be entitled to receive any further payments under the Contract Documents until the Work shall be finally completed in accordance with the Contract Documents.  At such time, if the unpaid balance of the Contract Price exceeds the cost and expense incurred by Owner in completing the Work, plus all damages, set-offs, backcharges, and credits Owner is entitled to take under this or any other Contract between Owner and Design-Builder, such excess shall be paid by Owner to Design-Builder. If Owner's cost and expense of completing the Work, plus all damages, set-offs, backcharges, and credits Owner is entitled to take under this or any other Contract between Owner and Design-Builder, exceeds the unpaid balance of the Contract Price, then Design-Builder shall be obligated to pay the difference to Owner.  Such costs and expense shall include not only the cost of completing the Work, but also all losses, damages, costs and expense, including attorneys' fees and expenses, incurred by Owner in connection with the reprocurement and defense of claims arising from Design-Builder's default, subject to the waiver of consequential damages set forth in Section 10.5 hereof..

**11.2.4**   If Owner improperly terminates the Agreement for cause, the termination for cause will be converted to a termination for convenience in accordance with the provisions of Article 8 of the Agreement.

**11.3    Work.**

**11.3.1**   Design-Builder may, in addition to any other rights afforded under the Contract Documents or at law, stop the Work for the following reasons:

**11.3.1.1**   NOT USED

**11.3.1.2**   Owner's failure to pay undisputed amounts properly due under Design-Builder's Application for Payment without providing a basis for withholding such payments.

**11.3.2**   Should any of the events set forth in Section 11.3.1 above occur, Design-Builder has the right to provide Owner with written notice that Design-Builder will stop the Work unless said event is cured within seven (7) days from Owner's receipt of Design-Builder's notice. If Owner does not cure the problem within such seven (7) day period, Design-Builder may stop the Work. In such case, Design-Builder shall be entitled to make a claim for adjustment to the Contract Price and Contract Time(s) to the extent it has been adversely impacted by such stoppage.

**11.4**   **Design-Builder's Right to Terminate for Cause.**

**11.4.1**   Design-Builder, in addition to any other rights and remedies provided in the Contract Documents or by law, may terminate the Agreement for cause for the following reasons:

**11.4.1.1**   NOT USED

**11.4.1.2**    NOT USED.

**11.4.1.3**   Owner's failure to cure the problems set forth in Section 11.3.1 above after Design-Builder has stopped the Work.

**11.4.2**   Upon the occurrence of an event set forth in Section 11.4.1 above, Design-Builder may provide written notice to Owner that it intends to terminate the Agreement unless the problem cited is cured, or commenced to be cured, within seven (7) days of Owner's receipt of such notice. If Owner fails to cure, or reasonably commence to cure, such problem, then Design-Builder may give a second written notice to Owner of its intent to terminate within an additional seven (7) day period. If Owner, within such second seven (7) day period, fails to cure, or reasonably commence to cure, such problem, then Design-Builder may declare the Agreement terminated for default by providing written notice to Owner of such declaration. In such case, Design-Builder shall be entitled to recover in the same manner as if Owner had terminated the Agreement for its convenience under Article 8 of the Agreement.

**11.5**   **Bankruptcy of Owner or Design-Builder.**

**11.5.1**   If either Owner or Design-Builder institutes or has instituted against it a case under the United States Bankruptcy Code (such party being referred to as the "Bankrupt Party"), such event may impair or frustrate the Bankrupt Party's ability to perform its obligations under the Contract Documents. Accordingly, should such event occur:

**11.5.1.1**   The Bankrupt Party, its trustee or other successor, shall furnish, upon request of the non-Bankrupt Party, adequate assurance of the ability of the Bankrupt Party to perform all future material obligations under the Contract Documents, which assurances shall be provided within ten (10) days after receiving notice of the request; and

**11.5.1.2**   The Bankrupt Party shall file an appropriate action within the bankruptcy court to seek assumption or rejection of the Agreement within sixty (60) days of the institution of the bankruptcy filing and shall diligently prosecute such action.

If the Bankrupt Party fails to comply with its foregoing obligations, the non-Bankrupt Party shall be entitled to request the bankruptcy court to reject the Agreement, declare the Agreement terminated and pursue any other recourse available to the non-Bankrupt Party under this Article 11.

**11.5.2**   The rights and remedies under Section 11.5.1 above shall not be deemed to limit the ability of the non-Bankrupt Party to seek any other rights and remedies provided by the Contract Documents or by law, including its ability to seek relief from any automatic stays under the United States Bankruptcy Code or the right of Design-Builder to stop Work under any applicable provision of these General Conditions of Contract.

# Article 12

## Electronic Data

**12.1**   **Electronic Data.**

**12.1.1**   The parties recognize that Contract Documents, including drawings, specifications and three-dimensional modeling (such as Building Information Models) and other Work Product may be transmitted among Owner, Design-Builder and others in electronic media as an alternative to paper hard copies (collectively "Electronic Data").

**12.2**   **Transmission of Electronic Data.**

**12.2.1**   Design-Builder shall provide Owner with electronic copies of all Contract Documents in both PDF and DWG formats.   Design-Builder shall be responsible for securing the legal rights to access such format, including, if necessary, obtaining appropriately licensed copies of the applicable software or electronic program to display, interpret and/or generate the Electronic Data.

**12.2.2**   Neither party makes any representations or warranties to the other with respect to the functionality of the software or computer program associated with the electronic transmission of Work Product. Unless specifically set forth in the Agreement, ownership of the Electronic Data does not include ownership of the software or computer program with which it is associated, transmitted, generated or interpreted.

**12.2.3**   By transmitting Work Product in electronic form, the transmitting party does not transfer or assign its rights in the Work Product. The rights in the Electronic Data shall be as set forth in Article 4 of the Agreement. Under no circumstances shall the transfer of ownership of Electronic Data be deemed to be a sale by the transmitting party of tangible goods.

**12.3**   **Electronic Data Protocol.**

**12.3.1**   The parties acknowledge that Electronic Data may be altered or corrupted, intentionally or otherwise, due to occurrences beyond their reasonable control or knowledge, including but not limited to compatibility issues with user software, manipulation by the recipient, errors in transcription or transmission, machine error, environmental factors, and operator error. Consequently, the parties understand that there is some level of increased risk in the use of Electronic Data for the communication of design and construction information and, in consideration of this, agree, and shall require their independent contractors, Subcontractors and Design Consultants to agree, to the following protocols, terms and conditions set forth in this Section 12.3.

**12.3.2**   Electronic Data will be transmitted in the format agreed upon in Section 12.2.1 above, including file conventions and document properties, unless prior arrangements are made in advance in writing.

**12.3.3**   The Electronic Data represents the information at a particular point in time and is subject to change. Therefore, the parties shall agree upon protocols for notification by the author to the recipient of any changes which may thereafter be made to the Electronic Data, which protocol shall also address the duty, if any, to update such information, data or other information contained in the electronic media if such information changes prior to Final Completion of the Project.

**12.3.4**   The transmitting party specifically disclaims all warranties, expressed or implied, including, but not limited to, implied warranties of merchantability and fitness for a particular purpose, with respect to the media transmitting the Electronic Data. However, transmission of the Electronic Data via electronic means shall not invalidate or negate any duties pursuant to the applicable standard of care with respect to the creation of the Electronic Data, unless such data is materially changed or altered after it is transmitted to the receiving party, and the transmitting party did not participate in such change or alteration.

# Article 13

## Miscellaneous

**13.1**   **Confidential Information.**

**13.1.1**   Confidential Information is defined as information which is determined by the transmitting party to be of a confidential or proprietary nature and: (i) the transmitting party identifies as either confidential or proprietary; (ii) the transmitting party takes steps to maintain the confidential or proprietary nature of the information; and (iii) the document is not otherwise available in or considered to be in the public domain. The receiving party agrees to maintain the confidentiality of the Confidential Information and agrees to use the Confidential Information solely in connection with the Project.

**13.2**   **Assignment.**

**13.2.1**   Neither Design-Builder nor Owner shall, without the written consent of the other assign, transfer or sublet any portion or part of the Work or the obligations required by the Contract Documents.

**13.3**   **Successorship.**

**13.3.1**   Design-Builder and Owner intend that the provisions of the Contract Documents are binding upon the parties, their employees, agents, heirs, successors and assigns.

**13.4**   **Governing Law.**

**13.4.1**   The Agreement and all Contract Documents shall be governed by the laws of the place of the Project, without giving effect to its conflict of law principles.

**13.5**   **Severability.**

**13.5.1**   If any provision or any part of a provision of the Contract Documents shall be finally determined to be superseded, invalid, illegal, or otherwise unenforceable pursuant to any applicable Legal Requirements, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provision or parts of the provision of the Contract Documents, which shall remain in full force and effect as if the unenforceable provision or part were deleted.

**13.6**   **No Waiver.**

**13.6.1**   The failure of either Design-Builder or Owner to insist, in any one or more instances, on the performance of any of the obligations required by the other under the Contract Documents shall

not be construed as a waiver or relinquishment of such obligation or right with respect to future performance.

**13.7   Headings.**

**13.7.1**   The headings used in these General Conditions of Contract, or any other Contract Document, are for ease of reference only and shall not in any way be construed to limit or alter the meaning of any provision.

**13.8   Notice.**

**13.8.1**   Whenever the Contract Documents require that notice be provided to the other party, notice will be deemed to have been validly given (i) if delivered in person to the individual intended to receive such notice, (ii) four (4) days after being sent by registered or certified mail, postage prepaid to the address indicated in the Agreement, or (iii) if transmitted by facsimile, by the time stated in a machine generated confirmation that notice was received at the facsimile number of the intended recipient.

**13.9   Amendments.**

**13.9.1**   The Contract Documents may not be changed, altered, or amended in any way except in writing signed by a duly authorized representative of each party.



**Kajima Building & Design Group, Inc.**
3490 Piedmont Road, NE, Suite 900
Atlanta, GA 30305-4804

404 812 8600    Main
404 812 8695    Fax
www.kbdgroupusa.com

August 10, 2016

Mr. Andre Schwiontek
President
Valmiera Glass Company
168 Willie Paulk Parkway
Dublin, GA

Re: Contract & Latest Budget 8/11/16

Mr. Schwiontek,

Attached is KBDG's revised proposal and the latest contract revision comments.

We have gone through many rounds of various budgets and design reviews.  The attached price is the best KBDG can do for the latest scope.  We have sought out the most cost effective design and we have pushed our subs and suppliers as far as they will go.  This will probably not meet your expectation, but as stated above, this is the best we can do.  Market conditions with materials especially steel, labor shortages, and numerous design changes have pushed up the cost of work.  Over the past two months of the design process many conceptual ideas were added to the project, then modified, or sometimes removed.  The lack of a firm design concept has impacted the budget and schedule of this project.

We are currently not performing any design work or construction work.  We will not resume any work until a contract is signed.  Attached is a revised schedule showing the recent delay impacts.

Please contact us anytime if you have any questions or items you wish to discuss.

Best Regards,

**Jim Goodwin**
**Vice President/ Regional Manager**
KBD Group, Inc.

Office: 404.812.8654
Cell:    404.788.7370

8/12/16

# VALMIERA GLASS


KBD GROUP

| Earthwork | | $ | 225,000 |
|---|---|---|---|
| | Civil Design | $ | 150,000 |
| | Erosion Control Maitenance | $ | 75,000 |
| | | | |
| Site Utilities | | $ | 518,912 |
| | Site Water | $ | 60,439 |
| | Site Fire | $ | 181,893 |
| | Sanitary Sewer | $ | 147,035 |
| | Storm Drainage | $ | 129,545 |
| | | | |
| Site Improvement | | $ | 238,510 |
| | Asphalt | $ | - |
| | Grass Pavers | $ | - |
| | Curb & Gutter | $ | - |
| | Haz Mat Building Pad | $ | 11,200 |
| | Sidewalks | $ | 122,400 |
| | Fences & Gates | $ | 104,910 |
| | | | |
| Concrete | | $ | 4,932,493 |
| | Footings | $ | 2,735,000 |
| | SOG / Base / VB | $ | - |
| | Silo Foundation Concession | $ | (291,507) |
| | VB @ Melting Wet Areas | $ | 14,000 |
| | Mezzanine Slab | $ | - |
| | Matt Slab | $ | 645,000 |
| | Wall @ CL !3 | $ | 195,000 |
| | CIP Deck/Col/Walls | $ | 1,600,000 |
| | Tiltup panels | $ | - |
| | Wall @ CL 13 Backfill | $ | 15,000 |
| | Tilt Panel Back Fill | $ | 20,000 |
| | | | |
| Masonry | | $ | 283,000 |
| | CMU | $ | 283,000 |
| Steel | | $ | 4,225,081 |
| | Structure | $ 2,163,350 | Div 05 |
| | Misc. Metals | included | Div 05 |
| | J&D | $ 943,531 | New Mill |
| | Erection | $ 1,118,200 | A&D |
| | Melting Embed Allowance | removed from scope | |
| | | | |
| Carpentry | | $ | 21,250 |
| | Rough | $ | 6,250 |
| | Finish | $ | 15,000 |
| | | | |
| Thermal & Moisture Protection | | $ | 1,682,670 |
| | Waterproofing | $ | 37,585 |
| | Mtl Wall Panels | $ 638,885 | 98,592 SF |
| | Mtl Roof Panels | $ 357,840 | 39,760 SF |
| | TPO roof | $ 591,643 | 266,506 SF |
| | Caulking | $ | 56,717 |
| | | | |
| Openings | | $ | 368,966 |
| | Man Doors | $ | 173,800 |
| | OHD | $ | 19,800 |
| | Glass | $ | 895 |
| | Fixed Louvers | $ | 174,471 |
| | | | |
| Finsishes | | $ | 631,646 |
| | GWB & ACT | $ | 364,340 |
| | Flooring | $ | - |
| | Paint & Epoxy Floor | $ | 192,306 |

| | | | |
|---|---|---|---|
| | Epoxy Water Proofing | $ 75,000 | |
| | | | |
| **Specialties** | | $ | **35,367** |
| | Signage | $ 13,000 | |
| | Bathroom Accessories | $ 8,767 | |
| | Fire Extinguishers | $ 5,000 | |
| | Lockers | $ 8,600 | |
| | Canopies | $ - | |
| | | | |
| **Equipment** | | $ | **31,350** |
| | Dock Equipment | $ 31,350 | |
| | | | |
| **Prefab** | | $ | **47,000** |
| | Guard house | $ 15,000 | |
| | Hazmat Building - Shed | $ 32,000 | |
| | | | |
| **Elevators** | | $ | **124,611** |
| | 5 MT Freight Elevators | $ 124,611 | |
| | | | |
| **Fire Protection** | | $ | **448,375** |
| | Fire Protection | $ 373,482 | |
| | Pump | $ 74,893 | |
| | | | |
| **Plumbing** | | $ | **430,815** |
| | Plumbing | $ 430,815 | |
| | | | |
| **HVAC** | | $ | **154,000** |
| | HVAC | $ 154,000 | |
| | | | |
| **Electrical** | | $ | **1,097,327** |
| | Electrical | $ 1,097,327 | |
| | | | |
| **Tanks** | | $ | **260,000** |
| | Water Storage Tanks | $ 260,000 | |
| | | | |
| | | **SUBTOTAL** $ | **15,756,373** |

| | | | | |
|---|---|---|---|---|
| **Addons** | | | $ | **2,715,240** |
| | General Conditions | | $ 816,000 | |
| | Design Fee | | $ 900,000 | |
| | Design Fee - July Structural Effort | | $ 45,000 | |
| | MIS | 0.25% | $ 43,793 | |
| | General Liability | 0.93% | $ - | |
| | Business License | 0.17% | $ - | |
| | Builder's Risk | | $ - | |
| | Contingency | | $ 200,000 | |
| | Construction Fee | 4.00% | $ 710,447 | |
| | | | | |
| | | **PROJECT TOTAL:** | $ | **18,471,613** |

| **ALTERNATES** | | | | |
|---|---|---|---|---|
| | | | | |
| 1 | Insurance | | $ | 238,507 |
| 2 | Silo Foundations | | $ | 311,507 |
| 3 | Silo Enclosure | | $ | 469,065 |



**General Proposal Clarifications August 11, 2016**

***Please refer to the Project Scope Proposal for additional Scope Items Included in our proposal. (Attached)***

- Kajima Building & Design Group, Inc. has reviewed the information received and has developed a design and construction plan consistent with the requirements of the project.
- We have assembled a design & construction team that is ready to start work as soon as contractor selection is complete and included herein, the staff and onsite construction facilities and support to construct this project.
- We are anticipating a release on or about Sept 1, 2016, to continue site and final building design and start the permitting process. This is an important milestone in the project cycle as the schedule becomes compressed and the work load increases throughout the project life. Staying on this timeline will insure the furnace area is ready for installation of equipment in July, 2017.
- Upon further detailed information release from Valmiera, we will begin final design development for the Melting, Production, and Warehouse areas of the building.
- We will select a site contractor early in this process that can begin work as soon as site grading is complete and a final site plan is developed and permitted.
- Once the project is awarded, we will continue to work with your team to insure the design meets the requirements of Valmiera and stay within the established budget.
- Our pre-construction team has been working for some time now on this project proposal and we have selected an experienced construction team for that is ready to start as soon as the award, design and permitting process is complete and a contract is in place.
- Our attached schedule is a high level outline for overall project planning, but will be more refined as the project unfolds to accurately detail and plan for all items within the scope of the project.
- We are confident that the project end dates that are required can be met and the project quality will exceed Valmiera's expectations.
- The following pages outline the scope.  We propose to deliver a high quality facility beneficial to Valmiera.
- This proposal (and contract) is based upon the clarifications, and drawings attached as part of this proposal.  The original RFP issued by the owner and documents from the Owner's Engineer do not apply to this scope of work.  KBDG the Owner and the Owner's Engineer (Barta) have worked closely together to develop the concept design attached to this proposal.  Many modifications have been made to the Owner's RFP documents, and the Owner's Engineer's RFP documents as a result of the early design meetings.  The concept drawings attached and this proposal represent the early changes and modifications.
- Items from the Technology Packages (Process Packages) are not included.  Design for these packages is also not included.



**Design:**

1. Design for the included scope of work is included.  Items not described in this package will not be included in the design package.
2. The proposed design will incorporate the most current of the above codes and standards and will incorporate our vast experience in each discipline. The proposed design will allow for efficiency, cost reduction where practical, and yet maintain the aesthetic qualities that distinguishes the Valmiera name.  We have included alternates for consideration to provide Valmiera with the best options for this project. Following is an outline of our proposal.

**General Information Items:**

1. This is a proposal for specific Design-Build Services as described in this proposal.
2. Bonds are not included but can be provided upon request.
3. General Liability Insurance is included.
4. Builders Risk Insurance is included.
5. On site Supervision is included
6. On-site office trailers for KBDG is included
7. Dumpsters and trash removal is include for KBDG
8. Building permit costs are not included.
9. Material testing, special inspections, soils testing is not included and shall be provided by the owner.
10. This is a "Shell Building" project.  Technology Packages (Process Packages) and other components of the project are not included in this proposal that may be required to receive a Certificate of Occupancy from the County/ City.  Some items in the other packages may be required to acquire a full acceptance of the building project from the Building Inspector. Substantial Completion is determined based upon being complete with this scope of work with punch list items remaining, not based upon a Certificate of Occupancy from the County/ City.

**Site Work:**

1. We have assumed that the major site work consisting of clearing & grubbing and mass grading will be done prior to the site being turned over before the start of construction. The following items are included in our proposal for site work
2. NPDES Monitoring and SWPPP efforts are included once grading work is complete.
3. Concrete wash out pit is included.
4. We have included Construction waste removal, temporary parking and an area for construction trailers and storage. We have included temporary lighting for the parking and storage areas during the construction period
5. Storm water runoff will be surface drained to the retention ponds.
6. Site Paving: asphalt and concrete paving, and all curbs is not included.  The owner is planning on having the County/ City perform this work.  Fine grading and layout for this work is also by the County/ City.



7. Onsite electrical service to the transformer(s) and including the pad mount transformers is by the utility company.   It is assumed that the pad mounted transformer will be set adjacent to the building.  KBDG will provide a transformer pad if not provided by the power company.

8. Communications utilities will be supplied and installed by the utility company.

9. Natural Gas utilities will be supplied and installed by the utility company.  KBDDG will connect to the meter supplied by the utility company located adjacent to the building.

10. Excavation of (and replacement with suitable) unsuitable soils, buried debris, unforeseen utilities, contaminated soils, and any unforeseen materials is excluded.

11. Truck scale is not included.

12. Sidewalks are included where indicated.

13. Site lighting is assumed to be installed by the local electrical service provider.  Site light poles are not included.

14. We have included a prefab guard house.

15. Site chain link fencing included along with automatic and other access gates.

16. County will install site utilities as required.  Site Utilities (all utility connections are assumed within 5 feet of the building. Utility impact fees and/ or development fees are not included. Meter fees and tap fees are not included.

**Architectural Systems and Building Construction:**

1. Our base design and price is based on the following:

2. Warehouse and production area; constructed with concrete tilt wall, structural columns with standard roof deck, attached insulation and TPO Roofing.

3. Melting area; Structural steel construction with IMP siding and a combination of Standing Seam and TPO roofing per the area requirements. Silo building will be R panels and TPO Roofing.

4. ~~A soils report was provided during the conceptual design phase and modifications to the design and budget are included to accommodate the latest report.~~

5. ~~Furnace Area assumed load is 1300 MT~~

6. ~~Batching Silos designed for 1 Silos each with an assumed load of 130 MT Each~~

7. Foundation walls at furnace area.

8. Silo Storage Area:  Foundation included as $311,507 allowance.

9. ~~A silo foundation is included as an alternate.~~

10. Furnace area foundation is included.

11. Elevated Slabs will be composite concrete and steel construction.

12. Slab floor joints will not be caulked.

13. Media tunnels are not included.

14. The melting (Furnace) area including elevator shaft walls, will be comprised of CMU metal panel walls.

15. Concrete basement division walls will be included as IMP.

16. The division walls in warehouse will be 203 mm (8") CMU to a height of 3.6 m (12') AFF, above this elevation drywall will be utilized to the roof deck.

17. The Fire Separation wall will be Concrete Tilt Panel construction.



18. Warehouse and Production buildings will be concrete tilt wall construction with structural supports, roof joist, metal decking R-20 rigid Insulation and 1.52 mm (45 mil) TPO roofing.
19. Melting will be structural steel framing, Metal Panel Siding and a combination of standing seam and TPO roofing.
20. Batching will be multi story with internal steel framing and metal decked floors. This framing will be designed and installed to support piping, electrical and manufacturing utility loads shown on Barta drawings. The process tower will consist of concrete slabs atop composite metal deck framing for support (00 elevation only). Interior walls in this area will be 2" IMP.
21. Out Building (1) will be Pre-Engineered buildings with ribbed siding and Metal Standing Seam Roofing.
22. All personnel doors in the plant/warehouse area will be hollow metal doors and frames.
23. Exterior doors will be insulated and weather tight.
24. Service Doors will be overhead coiling type. Exterior doors will be insulated.
25. All door hardware will be commercial grade 1.
26. Man-doors will utilize standard US sizes 3x7 and 6x7.
27. Partitions in office and lab areas will be painted.
28. Acoustical ceilings will be used in bathrooms.
29. All exposed CMU and Drywall in the Warehouse and Production area will be finished and painted.
30. All exposed Steel framing, Beams and Joist will be prime painted only in fabrication shop.  Field painting of exposed structural steel is not included.
31. Doors and handrails will be field painted.
32. Dock loaders will by hydraulic and include, indicator lights, dock seals, bumpers and swing arm lights at positions shown on plan.
33. Enclosed emergency stairs will be metal pan with concrete filled treads and landings.
34. We have included one (1) elevator for the melting area, freight elevator, 2,268 KG (5,000 lbs).
35. We have not included a water tank in our proposal for fire protection.
36. We have included a diesel fire pump.
37. We have included a complete wet fire sprinkler for all areas of the building.
38. Valve connections will be provided per code.
39. We have included fire protection connection from 5' outside building.
40. Freeze protection is provided in the warehouse.
41. Louvers are included in melting/ furnace area for crossflow ventilation.
42. An allowance is included for spot cooling in the Production area.
43. HVAC is included as small p-tac units in misc. office/ lab areas.
44. Battery Charging infrastructure is not included.
45. Emergency shower/eyewash stations are not included.
46. Floor drains are not included.
47. Non-freeze wall hydrants for exterior walls and roof locations are included.
    a. Piping will be insulated as required.
    b. Piping will be heat traced where exposed to the outside.
48. Our proposal includes a complete hot water system with connection to all fixture requiring hot water complete with instantaneous hot water heaters at Restrooms under lavatory
49. Piping will be insulated as required.



50. Our proposal includes a complete sanitary waste vent system with gravity flow to the existing site sewer.  Connection point will be provide by others 5' outside of the building foot print.
51. Gas for process furnace and other process equipment is excluded.
52. Plumbing and or piping for process systems/ equipment is excluded.
52. Process Piping Systems not included.
53. Water tower and cooling system not included.
54. Compressed air system not included.
55. Provide Card Access control system for egress doors associated with the Warehouse areas.
56. Provide (one) badging station which includes camera, printer and server with monitor.  Provide (five hundred) access cards.
57. Provide card reader station at the Guard House gate and employee Turnstile.



# VALMIERA GLASS

### PROJECT SCOPE PROPOSAL

Dublin, GA

August 10, 2016

Scope sections:

1. Intent & General Requirements
2. Site work
3. Concrete
4. Masonry
5. Metals
6. Wood and Plastics
7. Thermal and Moisture Protection
8. Doors and Windows
9. Finishes
10. Specialties
11. Equipment
12. Furnishings – Not Included In This Document
13. Special Construction – Not Included In This Document
14. Conveying Systems
15. Mechanical
16. Electrical
17. General – Not Included In This Document
18. Clarifications and Exceptions

# INTENT & GENERAL REQUIREMENTS

## 1.1 INTENT

These Project Scope Proposal describes the work to be performed by Kajima Building & Design Group, Inc. (KBDG) in support of the proposed Valmiera Glass Project located in Dublin, GA.  The work primarily involves partial design and construction of a multi-storied Glass Furnace Building, a one (1) Story Production and Warehouse area, steel framed w/insulated metal panels, concrete tilt wall and ribbed metal panel siding building with accessory occupancies and as indicated on the design drawings accompanying this proposal:

A-021 3D View
A-110 MASTER PLAN – OVERALL
A-112 PROCESS TOWER – BASEMENT &FIRST FLOOR PLAN
A-113 PRODUCTION & WAREHOUSE – FIRST FLOOR PLAN
A-114 PROCESS TOWER – SECOND FLOOR & THIRD LEVEL
A-115 PROCESS TOWER – FOURTH LEVEL
A-141 MASTER ROOF PLAN
A-211 MASTER BUILDING ELEVATIONS
C-106 SITE PLAN

In developing this proposal KBDG has received and relied upon the following information provided to us by Valmiera Glass as well as multiple design secessions with owner's employees and consultants (Barta):

- Geotechnical Report.  Terracon Consultants, Inc. ES 165020 Dated 3/31/2016.
- Owner furnished information and equipment arrangement (limited to furnace area)

This proposal is not intended to describe all items, but a general outline of the major scope items included in our proposal.

Unless otherwise expressly stated, the Work is limited to the design and construction which is generally outlined in this Project Scope Proposal, and which is reasonably required to be performed by KBDG in order to cause such design and construction to be accomplished.

 The requirements of Owner's Insurance carrier are unknown to KBDG and as such, modification to the design and/or construction specifically required by such carriers and shall be considered to be changes in the work for which the contract price will be equitably compensated.

## 1.2 – TESTING LABORATORY SERVICES

During the course of the construction work an independent professional testing laboratory company will be retained by the owner to perform in-situ and laboratory based quality control testing and inspection of

site, building materials, and building systems to include soils, exterior and interior concrete, masonry, steel, roofing, thermal systems, fire-resistant materials and coatings, smoke control systems, seismic and wind resistant components.  Copies of all test reports will be provided to Kajima Building & Design Group, Inc. and the local building official.

## 1.3 – CONSTRUCTION FACILITIES

During the course of the construction work KBDG will establish and maintain on-site temporary construction office facilities to include office trailers, telephones, copiers and computers, temporary toilets and related utilities.  Site office supplies are included in the proposal cost. A temporary electrical service will be provided to support the construction work and the cost for this temporary service is included in the proposal costs.  Once the permanent electrical service has been activated, the cost of the permanent electrical service will be paid for directly by Valmiera Glass.

## 1.4 – SUPERVISION

The KBDG project team will be led by its Project Manager.  The team will include both site based and office based personnel and the cost of travel for project personnel during the course of the project is included in the proposal cost. Formal monthly Project Reports will be prepared during the course of the project and the report will detail the entire status of the project to include design, construction, purchasing, cost, submittals, progress photographs and schedules.

## 1.5 – SITE SECURITY

During the course of construction temporary perimeter site security fencing has not been included as part of this proposal.
Watchman security during the course of construction has not been included as part of this proposal.

## 1.6 – BUILDERS RISK INSURANCE

In submitting this proposal KBDG will furnish Builders Risk Insurance Coverage and provide Valmiera Glass a copy of the coverage certificate indicating that Valmiera Glass is named and extents of coverage provided.

## 1.7 – TAP FEES, CONNECTION FEES, BUILDING AND RELATED PERMITS

The construction work will require that numerous permits will be required from the local and regulatory authorities.  All permit building applications and related documents will be prepared, submitted and secured by KBDG.  There has been no inclusion of cost for these items in this proposal.

## 1.8 – CONTRACT CLOSEOUT

3

The Contract Closeout work includes the preparation of record documents, which includes final design drawings and specifications, operating and maintenance manuals, and the preparation and submission of all final accounting documents and warranties.

## 1.9 – CLEAN UP

The clean-up and removal of debris will be performed during the course of the construction work such that the work place is kept clean and safe to allow construction activities to proceed on schedule. At the completion of the scope of work covered in this proposal a final clean-up will include broom cleaning of all floors, windows and finished flooring and all construction debris will be removed from the project site. .

## 1.10 – WARRANTIES AND BONDS

The following extended warranties are included:

- The roofing warranty is for a period of ten years
- Equipment Warranties (per the terms of the manufacturer)

## 1.11 – ARCHITECTURAL AND ENGINEERING DESIGN

For the scope contained in this document, the design work will be performed by Kajima Associates, Inc. (KAI) and will consist of design drawings and specifications prepared using CADD.  In addition the design team will review submittal documents and will conduct periodic site inspections and a final site inspection prior to completion of the scope of work.  The design disciplines include the following:

- Architectural Design
- Civil & Final Site Design
- Structural Engineering Design
- Mechanical Engineering Design (limited)
- Plumbing Engineering Design (limited)
- Fire Protection Engineering Design
- Electrical Engineering Design (limited)

**Design services excluded**:

- Interior Design
- Security Design
- Design of Data and Telecommunications Systems
- Process and Process Controls
- Silo Storage Structural Design
- Material Handling
- Cooling Water (Process) Design
- Technology, not limited to: Electrical, Structural, HVAC or other Technical Design related to process work.

4

*Project Scope Proposal*
*Valmiera Glass Dublin, GA*

**Design Assumptions**:

In the preparation of the architectural and engineering design underlying the documents, including the drawings and the Project Scope Proposal, a number of design assumptions have been made in the absence of equipment and utility data to use as the basis of design. Items unknown to KBDG at this time:

- Completed Plant Electrical requirements
- Completed Plant Water requirements
- Completed Plumbing/ HVAC requirements
- Completed Process Piping requirements
- Completed Civil/Site requirements

The design will conform to current US Standards including the following:
- International Building Code 2012 Edition w/Georgia Amendments
- American Society of Civil Engineers (ASCE 7-1)
- Fire Life Safety Code – International Fire Code 2012 Edition w/Georgia Amendments
- Energy Code - International Energy Conservation Code 2009 w/Georgia Amendments
- Americans with Disability Act (ADA)
- Fire Suppression – NFPA applicable Sections
- Electrical – NEC – 2014

**Fire Protection Design Assumptions**

Our Fire Protection Design is based on a preliminary water flow test obtained from the City of Dublin indicates an available water supply with a static pressure of 55 psi, residual pressure of 45 psi at 2167 gallons per minute.

**Warehouse Sprinkler Criteria:**

- K16.8 ESFR sprinklers with a minimum operating pressure of 35 psi
- Palletized or rack storage of Class I-IV commodities up to 25 Feet
- Maximum ceiling height of 30 feet
- Minimum clearance from top of storage to sprinklers will be maintained
- Storage of idle wood pallets is maintained below 6 feet in height
- Storage of plastic wrap and any other plastic products is maintained below 5 feet in height

**Manufacturing Area Sprinkler Criteria:**

- Most areas will be classified as Ordinary Hazard, Group I
- Mechanical Rooms will be classified as Ordinary Hazard, Group II

*Project Scope Proposal*
*Valmiera Glass Dublin, GA*

- Administrative/Welfare areas will be classified as Light Hazard

The Hazardous Storage building Sprinkler System will be fed from the main building.

**Additional Design Assumptions:**

- Natural Gas will be used as a heat source for the RTUs and GAU's.
- The Electrical Room and MCC room will be provided with ventilation and heating only.
- Assumed that the local code will not require a water storage tank for the sprinkler system.
- Assumed that manually operated water closet flush valves, urinal flush valves, lavatory faucets, and hand wash sink faucets are acceptable to the Owner.
- Assumed that the local water purveyor and/or plumbing inspector will not require backflow preventers on each hose station.
- Assumed that each hose station will not require a hose or a hose rack.
- Room pressurization control & monitoring will not be provided with the HVAC system. Rooms that require positive and negative pressure will be designed to provide such room pressures and will be balanced during HVAC testing and balancing.
- HVAC design for lab equipment is based on 3 watts/sq ft.
- The Electrical Room and MCC room will be provided with ventilation and heating only.
- Domestic Water Piping that is exposed in the process areas will be copper or galvanized steel.
- Electrical Service and main transformers will be supplied and installed by the local utility company.
- Utilization voltages for building loads is within 480V – 120V.
- Standby generation for facility is not provided.

# TWO - SITE WORK

## 2.1 – SITE CLEARING, TREE CUTTING

KBDG has not included any site clearing or tree cutting.

## 2.2 – EARTHWORK AND GRADING

The construction finish grades will be established with off-site structural fill for the building and paved areas by others. These Project Outline Specifications rely on the accuracy of the existing grades shown on the Topographical Survey and final as build survey provided by others. Prior to the start of site work, the existing grades will be verified. Fill will be placed in layers and will be compacted. The building pad subgrade will be prepared to an elevation of ± .10 foot at the bottom of the proposed finished floor. Rough and fine grading in preparation for paving and building slabs is included.

Removal of ledge or boulders of one (1) cubic yard or more, peat, topsoil in excess of ten inches (10″) and other unsuitable materials, if encountered during the site development and/or excavation for building foundations or utility trenches is **not** included.

The cost of soil boring and topographic surveys is not included.

*Project Scope Proposal*
*Valmiera Glass Dublin, GA*

**2.3 – EROSION AND SEDIMENT CONTROL**

Erosion control measures established by Laurens County during the site preparation will be assumed at execution of the contract. During construction, we will utilize and maintain existing silt fencing, rip rap, temporary seeding and additional measures required by the permitting authority. No additional or new erosion control methods or systems will be provided.

**2.4 – CHAIN LINK FENCE**

A six-foot (6′) high chain link fence complete with (2) man gates and (1) Slide Gate is provided. Two (2) Turnstiles will also be provided for personnel entrance.

**2.5 – CARD READER GATE**

Not included.  All security by others.

**2.6 – BITUMINOUS PAVING**

No bituminous paving sections are included in this scope and are assumed to be provided by others.

**2.7 – CONCRETE CURB AND GUTTER**

Not included
**2.8 – CONCRETE PAVEMENT & SIDEWALKS**
No concrete exterior Concrete Paving or Concrete Pavers is provided.
We have provided for 19,160 Sq. Ft. of Standard Sidewalk.

**2.9 – SITE UTILITIES**

The installation of a storm drainage system is only provided in the future expansion area.  All other site drainage is assumed to be surface drain directed to retention ponds via swales, channels & berms.

The retention pond for storm water runoff  will be designed and constructed by others.

The roof storm water will be discharge onto splash blocks at all downspout locations.

The installation of a new 8″ gravity sanitary sewer from a new manhole at the existing line to the building will be provided. Connection and tap fees are not included. Pipe will either be cast iron or PVC.

The installation of a new domestic water line will be provided connecting to the existing municipal water main within 5' of the new building.  A complete installation will be provided including a meter pit with meter, valves and backflow preventer. Distribution on site to all buildings requiring service will be provided. Piping will be ductile iron pipe or PVC.

7

The fire protection system will be fed with a new ten-inch (10″) water service connecting to the existing municipal water main.  System includes a backflow preventer as required by the municipality. A ten-inch (10″) fire loop will be provided around the facility.  Hydrants will be provided as required around the facility served from the fire loop each with a box type shut off valve.  Sectional post indicators and valves will be provided on the fire loop to separate no more than five (5) hydrants and/or sprinkler alarm valves. Post indicators and valves will be provided on each run-in to the building sprinkler risers. Piping will either be ductile iron or PVC type.

The gas service, meter, regulator will be provided and installed by the gas company.

*See Section 16 for description of primary feed, transformer and other site electrical.*

## 2.10 – GUARD HOUSE & TRAFFIC CONTROL

A 10′ x 10′ prefabricated guard house will be provided.

One set of traffic arms will be provided at the guard house to control entering and exiting traffic.

## 2.11 – LANDSCAPE

Landscaping Design or installation is not provided

# THREE - CONCRETE WORK

## 3.1 – CONCRETE FOUNDATIONS

Concrete for the foundation systems will be based upon a concrete mix achieving 4000 psi at 28 days. A shallow foundation system with a net allowable soil bearing pressure of 3000 psf will be provided and the foundations will be designed for a Seismic Soil Site Class of D and Seismic Design Category D.

A reinforced concrete footing, pier and foundation wall system as required to support all building loads will be provided as follows:

Building foundations are included based upon adequate soils per the loading criteria provided in the drawings, assumption for bearing is 3,000 psf.  A soils report (Geotechnical Report) has been provided so foundations do not account for conditions less than satisfactory.

Furnace Area assumed load is 1300 MT

Batching Silos designed for 1 Silos each with an assumed load of 500 MT Each

Foundation walls at furnace area will be cast in place re-enforced concrete.

8

Silo Storage area Reinforced Pad 1.2 m thick.

Furnace Foundation area Reinforced Pad 1.2 m thick.

Five (5) individual dock levelers will be in individual pits.  Concrete pads at egress doors at grade level are included. All exposed concrete at the dock will be rubbed to a smooth finish.

## 3.2 – CONCRETE SLABS

Warehouse Slab – 152 mm" (6") Thickness w/ #5 Re-bar on 457 mm (18") ctc each way

Production Slab – 152 mm" (6") Thickness w/ #5 Re-bar on 457 mm (18") ctc each way

First Floor Melting Area Base Slabs – 203 mm (8") Thickness w/ #5 Re-bar on 457 mm (12") ctc each way

We have included a 609 mm (2') Mat Slab with water proofing underneath in the Furnace and elevated slab area.

Water Containment Area. We have included a 1218 mm (4') Mat Slab under the Silo foundation.

Elevated Slabs will be composite concrete and steel construction.

Slab floor joints will be caulked in the Warehouse area, and not caulked in the production and Furnace area.

Slabs-on-grade will be soil supported.  Concrete for the slab systems will be based upon a concrete mix achieving 4000 psi at 28 days.    Fine grading for all floor slabs on grade will be provided. All slabs will be sloped to drains where required.

Epoxy-coated and non-exposed slabs-on-grade will have a smooth, steel-troweled finish and will be wet cured for a minimum of seven (7) days and then cured with a dissipating curing compound.  Just prior to occupancy, the exposed concrete floors will be broom cleaned.

Exposed slabs-on-grade will have a smooth, steel-troweled finish and will be wet cured for a minimum of seven (7) days.  A curing and sealing compound will be applied in accordance with the manufacturer's recommendations after the wet curing procedures.

All slabs-on-grade will be doweled at construction joints and will have saw cut control joints, to minimize shrinkage cracking.

Tilt Wall Panels will be cast in place re-enforced concrete on site.
A representative from an independent concrete testing laboratory to perform all slump testing; prepare and cure cylinders for the compressive test of all concrete is to be provided by the owner as required.

Concrete filled pipe bollards will be provided where indicated.

*Project Scope Proposal*
*Valmiera Glass Dublin, GA*

## FOUR - MASONRY

### 4.1 – CONCRETE  MASONRY UNIT

Interior CMU walls will have a net-area compressive strength of 2000 psi and will be reinforced with galvanized, ladder type horizontal joint reinforcement and with vertical reinforcing steel and concrete fill as required. Outside corners of interior CMU walls will have a rounded bullnose surface.

Concrete masonry unit walls will be fire rated where required by applicable building codes.

## 5 - METALS

### 5.1 – STRUCTURAL STEEL AND JOISTS

The Structural Steel system will consist of a steel column, beam, bar joist and metal roof deck for the entire building design using type IV unprotected non-combustible construction per local codes. All structural steel will conform to the latest design standards and specifications of the *American Institute of Steel Construction (AISC)* and SJI. All structural steel and bar joists will be shop painted gray.
The roof framing system will be designed to support a uniform live load of 20 psf, reducible by code, except 50 psf where pipe support is required at south of recuperator chimneys and furnace. Roof live loads will be increased where snow drifts accumulate.  The mezzanines will be designed for a uniform live load of 100 psf at Size Prep Rooms and Control Rooms and 150 psf at Boiler room.

The building framing system (including all columns, joists, beams, and girders) will not be designed to accommodate future expansion along the East Elevation Only (Warehouse).

The technology Steel is not included.

### 5.2 – METAL ROOF DECKING

Steel decking for the roof will be 1½″, 18-gauge, wide rib type.

### 5.3 – METAL FLOOR DECKING

Steel decking for the mezzanine will be ½"steel, and will have a Class C60 galvanized finish.

### 5.4 – MISCELLANEOUS METAL

All dock leveler frames, lintels, sill angles, overhead door frames, stair railings, trench drain frames, ladders, roof opening frames for roof top equipment provided in this scope of work are included. A vertical ladder will be installed for access to the building roof from the building interior.  A cage for the vertical

ladder will be installed for ladders above 20′ high.  Ladders and railings will be installed in accordance with *OSHA* requirements.

4″ tube frames will be provided at each truck dock.

Each interior overhead door shall have a bollard at each jamb and on each side of the opening

Concrete filled steel pan stairs will be provided where shown on the drawings.

Open grate steel stairs will be provided where shown on the drawings.  Grating will be galvanized; channels and rails will be galvanized.

## SIX -WOOD AND LAMINATES

### 6.1 – ROUGH CARPENTRY

Wood blocking will be provided in the metal stud partitions for wall-mounted accessories installed during construction of the building, such as handrails, toilet accessories, etc.  Any special equipment that requires additional support is not included.

Treated wood blocking will be provided within the roof system at perimeter, under curbs, etc., as required for fastening.

### 6.2 – FINISH CARPENTRY

Counters and cabinets will be constructed of particleboard with plastic laminate finish on exposed surfaces for the Guard House counters.

### 6.3 – INTERIOR SIGNAGE

ADA Signage will be provided.

## SEVEN – THERMAL AND MOISTURE PROTECTION

### 7.1 – WATERPROOFING

14,157 Sq. Ft. of Bentonite Water proofing will be provided in the furnace foundations only.

### 7.2 – BUILDING INSULATION

No building Insulation is provided. Should the owner elect to provide materials for building insulation, an additional charge will be added to the contract sum for the installation.

11

**7.3 –SINGLE PLY ROOF MEMBRANE SYSTEM**

The roof system will be a single ply 45 mil thick, white mechanically fastened thermoplastic as manufactured by Firestone, Carlisle, Sarnafil, J.P. Stevens, or equal.

The roof insulation will be polyisocyanurate with a glass fiber reinforced felt face over 1 layer of owner supplied insulation material applied directly over the decking.

The manufacturer's warranty will be 10 years.

Walkway pads are provided at all traffic concentration points such as roof hatches and roof ladders and surrounding rooftop equipment.  One roof hatch and steel ladder will be provided for roof access.

Full time roof inspection will be provided by the owners testing inspection agency during the entire roofing operation.
.

**7.4 –METAL PLY ROOF SYSTEM**

Where Metal Roofing is shown on the drawings, a 16", 24GA T-Panel in standard colors with R-20 Ridged Insulation and Hi-Temp Ice & Water Shield will be provided.

**7.5 – FLASHING AND SHEET METAL**

The roof will pitch at a rate of (1/4″) per foot to the roof drainage system.  External gutters and downspouts will be provided at the warehouse, docks and related areas.  Downspouts will empty directly into splash blocks at the exterior grade.  All required roof related metal flashing will be provided and will have a baked on finish to match the metal panel exterior wall system.

**7.6 – MANUFACTURED ROOF SPECIALTIES**

Aluminum scuppers, edge details, conductor heads and downspouts shall be provided. All required exposed to view roof specialties shall have a baked on finish to match the insulated metal panel exterior wall system.

**7.7 –ROOF ACCESSORIES**

Roof curbs and equipment supports shall be provided with a minimum twelve (12″) inch curb height above the finish roof membrane.

**7.8 – SEALANTS AND CAULKING**

Caulking of exterior door and window frames, metal panel joints and masonry control joints as required to provide a watertight wall systems is included. Caulking of joints in fire rated partitions and walls will

be a U.L. listed fire rated joint treatment system. Exterior/ interior sealant shall be two (2) part polyurethane sealant to match exterior metal panel color.

Caulking of intersection between dissimilar materials is included i.e. door frames and walls, countertops and walls. Toilet fixtures and walls/ floors.

## EIGHT – DOORS, WINDOWS AND GLASS

### 8.1 – STEEL DOORS AND FRAMES

Interior personnel doors will be 18-gauge hollow metal set in 16 gauge pressed metal frames. Exterior doors will be 16-gauge hollow metal set in 14 gauge pressed metal frames and will have an insulated core. Door hardware will include locksets, hinges, closures, exit devices, etc. as required. Locksets will be heavy-duty commercial mortise type, lever design, with a satin chrome finish. All lock cylinders will be master keyed.

### 8.2 – SECTIONAL OVERHEAD DOORS

Sectional non-insulated overhead doors will be 24 Ga prefinished w/white skins.  Nominal panel thickness is 1-5/8″.  Hardware to be galvanized steel, manual operation. Locking to be interior slide lock with padlocking capability.

## NINE– FINISHES

### 9.1 – GYPSUM BOARD SYSTEMS

The interior partitions will consist of metal stud with five-eighths inch (5/8″ gypsum wallboard on both sides, taped and finished and non-insulated. Owner may wish to supply insulation material for gypsum walls. Installation cost for insulation materials are not provided for in this proposal and will be an additional cost to the owner.

Fire-rated metal stud and gypsum wallboard partitions will be provided as required by code.

Moisture resistant gypsum wallboard will be used in toilets and other areas subject to moisture.

### 9.2 – ACOUSTICAL CEILINGS

A two foot by two foot by five eight thick (2′x2′x5/8″) acoustical ceiling system will be installed throughout the support areas (Control, toilets). The suspended support tees will be pre-painted aluminum.

### 9.3 – PAINTING

All hollow metal doors and pressed metal doorframes will be painted.

Miscellaneous steel including pipe bollards, handrails, guardrails, ladders, etc., will receive a high gloss industrial grade paint finish.

All exposed Steel framing, Beams and Joist will be primer painter only.

## TEN – SPECIALTIES

### 10.1 – TOILET COMPARTMENTS

The toilet rooms will have wall mounted partitions and wall-mounted urinal screens.  The partitions and screens will be metal with Baked Enamel Finish with Chrome hardware.

### 10.2 – METAL LOCKERS

Provide 50 twelve inch wide by (sixteen) inch deep by three feet high (12″ x (16)″ x 3′) double tier lockers in each locker room. Locker doors will be fully louvered. Lockers will have a factory applied baked enamel paint finish with color chosen from manufacturer's standards. Lockers will have sloped tops. Benches will be made from 1-1/4″ thick by 9-1/2″ wide laminated maple on steel tube pedestals.

### 10.3 – FIRE EXTINGUISHERS, CABINETS AND ACCESSORIES

Fire Extinguishers will be provided at code minimums

### 10.4 – TOILET AND BATH ACCESSORIES

Toilet rooms will be equipped with toilet room accessories consisting of soap dispensers, feminine napkin disposal units and dispensers, wall-hung frame mirrors, recessed or surface mounted paper towel dispensers and receptacles, toilet paper holders and grab bars.  Provisions will be included for the ADA accessibility.

## ELEVEN – EQUIPMENT

### 11.1 – DOCK LEVELERS

Dock levelers (5 included) will be hydraulically operated vertical storing as manufactured by Serco, Rite-Hite, or Poweramp. The leveler capacity will be 35,000 lbs. and the platform size will 6′-6″ wide x 6′-8″ long. The leveler lip will be 20″ long. The leveler pit will be continuous including space between levelers. The leveler will have a mechanical lock to support the ramp while servicing. The hydraulic pump and power pack will be remote mounted on the wall between doors. A weather seal is included on the underside of the leveler.

The control panel will be furnished with a master type including controls for the leveler, the communication lights, and the vehicle restraint.

14

*Project Scope Proposal*
*Valmiera Glass Dublin, GA*

The safety light communication system will include exterior traffic style green/red lights, exterior caution signs, an interior control panel, and interlock with the dock leveler and door for automatic operation.

## 11.2 – DOCK SEALS AND BUMPERS

The dock seal base fabric will be 22oz. Vinyl with 4″ exposure and a 3-1/2″ wide yellow guide stripe. Vertical side seals will be tapered to provide 7′-8″ clear between pads.  The head pad will be sized and positioned to provide a truck height coverage range of 12′-6″ to 13′-6″ Doors over 9′-0″ high will have adjustable head curtains. Dock bumpers will be fabricated from rubberized fabric truck tire pads.  Two are provided at each leveler.

## TWELVE – FURNISHINGS

**12.1** Not Provided

## THIRTEEN – SPECIAL CONSTRUCTION

**13.1** Not Provided

## DIVISION FOURTEEN – CONVEYING SYSTEMS

### 14.1 – HYDRAULIC FREIGHT ELEVATORS

One (1) five (5) stop, Five Thousand (5,000) pound capacity hydraulic freight elevator will be provided. Elevators will have a travel speed of one hundred twenty-five feet (150′) per minute.  Elevators will be equipped with brushed stainless steel doors with front stainless steel cab panels, telephone compartment, car position indicator, and emergency light and alarm bell. Interior cab will be manufacturer's standard. Elevators will be manufactured by Otis, Kone, ThyssenKrupp or equal.

## FIFTEEN – PLUMBING, FIRE PROTECTION, HVAC

### PLUMBING SYSTEMS

### 15.1 – SANITARY WASTE AND VENT SYSTEMS

The sanitary waste and vent systems will connect all installed plumbing fixtures and drains to the site sanitary collection system. Underground piping will be service weight cast iron soil pipe and fittings with compression joints or DWV type polyvinyl chloride pipe and fittings.

15

Aboveground piping elsewhere will be no-hub cast iron soil pipe and fittings or DWV type polyvinyl chloride pipe and fittings.

### 15.2 – DOMESTIC COLD AND HOT WATER SYSTEM

INCLUDED:

1. Bathrooms/Locker Areas where indicated on the drawings
2. Maintenance Rooms where indicated on the drawings

A domestic potable cold water system will be provided and connected to all plumbing fixtures, hose bibbs as required. All equipment and fixtures furnished under this contract will be connected and made operational complete with all valves and appurtenances. Connections to mechanical equipment will be provided with backflow preventers and/or pressure regulators as required. Water piping will be routed parallel and perpendicular to column lines. The service entrance will be provided with a water meter and backflow preventer as required by local codes.

### 15.3 – NATURAL GAS SYSTEMS

All gas service installation and operation shall be installed in accordance with all applicable local building codes (2006 International Fuel Gas Code with Georgia Amendments).  Provide new gas piping from existing gas main to the new rooftop units, and gas-fired unit heaters. Gas piping shall be black carbon steel, schedule 40 with malleable iron fittings. Aboveground piping in return air plenums shall be carbon steel with welded joints and without valves. Aboveground piping exposed to exterior weather conditions will be painted with special corrosion inhibiting paint manufactured for this purpose.  Aboveground piping elsewhere will be carbon steel with welded joints or thread and couple joints. All gas burning equipment will be purged, fired, adjusted, tested, provided with pressure regulators and made ready for operation. Pressure regulators shall be vented outdoor as required.

The new gas piping system will provide the natural gas @ 5 psig within the building to all the HVAC equipment.

Gas supply and piping for Furnace and Process loads are not provided.

### 15.4 – COMPRESSED AIR SYSTEM

No compressed air system or distribution will be provided.

### 15.5 – PLUMBING FIXTURES, DRAINS AND CLEANOUTS

16

Plumbing fixtures will be as manufactured by *American standard, Kohler, Crane, Beneke, Sloan, McGuire, Delta, Elkay, Just, Bradley, Fiat, Town & Country, Oasis, Halsey Taylor, Haws, Symmons, Woodford, PPP* or approved equal.

Plumbing fixtures include water closets, urinals, lavatories, mop basins, electric water coolers, showers, process area handwash sinks, emergency shower/eyewash stations, and hosebibbs.

- Water closets shall be manually operated flush valve type, white vitreous china, wall mounted, with anti-microbial seats.
- Urinals shall be manually operated flush valve type, white vitreous china, wall hung.
- Lavatories shall be white vitreous china with manually operated faucets with tempering valves.
- Mop basins shall be fiberglass with chrome plated faucets with bucket hooks and vacuum breaker outlet.
- Electric water coolers shall be stainless steel, wall hung, sensor operated.
- Shower stalls shall be acrylic or fiberglass floor and walls with pressure balancing mixing valve, and ADA required items including fold up seat, grab bars, showerhead with hose and slide bar, and shower curtain with rod & hooks.
- All fixtures shall have local stops.
- Floor cleanouts will have cast iron bodies with scoriated nickel-bronze covers.

## 15.6 – FIRE Protection Systems

(SEE DESIGN CRITERIA ABOVE)

The Warehouse and Production Area will be fully sprinkled with automatic, hydraulically designed, sprinkler systems in accordance with all applicable NFPA guidelines and building codes.

Eight inch (8″) sprinkler lead-ins will support hydraulically sized wet-pipe alarm risers, complete with wall or yard post indicators and valves, alarm check valves, electric bells and flow and tamper switches as required.

Fire extinguishers will be provided as required by *NFPA 10*.

## 15.7 – FIRE PUMP SYSTEM

A Diesel Fire Pump will be provided and sized at 1,250 gallons per minute

## 15.8 – HVAC

The heating, ventilating and air conditioning (HVAC) systems will be designed in accordance with all applicable local building codes (2006 International Mechanical Code with Georgia amendments).

The heating systems for the Maintenance offices, dock offices, shop area, lab and lab area offices, locker rooms, break room, service corridor / interstitial space and general office areas will be designed to the following design basis table:

| | |
|---|---|
| Indoors | 72 °F dry bulb in the office areas |
| | 60 °F dry bulb in the storage areas |
| Outdoors | 23 °F dry bulb |

The air conditioning systems will be designed to the following conditions:

| | |
|---|---|
| Indoors | 75°F dry bulb at 50% relative humidity in the office areas |
| | (Humidity Control will not be provided) |
| Outdoors | 96°F dry bulb |
| | 76°F wet bulb |

The ventilating & exhaust systems will be designed to the minimum requirements of the following conditions:

| | |
|---|---|
| All Areas | As required by code |
| Toilets | 75 CFM per Water closet or Urinal |
| Storage Areas | 6 air changes per hour Ventilation |
| Mechanical/Electrical Rooms | 10 air changes per hour Ventilation |

## 15.9 – PACKAGE ROOFTOP COOLING UNIT

The non-process and office areas will be air conditioned by direct expansion gas-fired rooftop units.

The variable air volume (VAV) systems shall be a packaged type complete with evaporator and condenser fans, cooling and condenser coils, gas-fired heating section, refrigerant piping and accessories, filters, dampers, variable frequency drives and all controls for variable air volume and economizer operation. The units will be manufactured by *Aaon, Trane* or *York*.

The constant volume systems shall be single zone, packaged type complete with evaporator and condenser fans, cooling and condenser coils, gas-fired heating section, refrigerant piping and accessories, filters, dampers, motor starter & disconnect switches and all controls for single zone controls and economizer operation.  The units will be manufactured by *Aaon, Trane, York, Carrier or equal*.

## 15.10 – DUCTWORK

Variable Air Volume:  Conditioned air will be distributed through medium pressure galvanized steel ductwork from the air units to variable air volume boxes.  From the boxes to the grilles, registers and diffusers, air will be distributed through low-pressure galvanized steel ductwork.  Air will return to the unit via return air plenums.

18

Constant Volume Ductwork:  Conditioned air from the air units shall be distributed to grilles, registers and diffusers by low-pressure galvanized steel ductwork.

Air Devices:  Ceiling diffusers will be steel cone face type suitable for mounting in a lay-in ceiling grid system.  Flexible run outs will be sized to fit the nominal neck size of the diffusers with a maximum of six feet (6′) long.

Duct Insulation: All supply ducts shall be provided with 2″ of fiberglass insulation with foil vapor barrier wrap.  Any return or exhaust duct that is routed in unconditioned space shall be insulated and wrapped with ½″ insulation for condensation protection.

## 15.11 – VENTILATION FANS

The locker rooms, toilets and mechanical/electrical rooms shall be exhausted with roof mounted centrifugal exhaust fan.  Time clocks will control these roof mounted exhaust fans except for the mechanical/electrical room exhaust fan which will be controlled by space thermostats for summer ventilation. Motorized dampers on intake louvers shall be interlock with the exhaust fans.

Exhaust fans installed in Class/Division or battery charging areas shall have explosion proof motors.

The furnace area shall be provided with outside air louvers with manual dampers.

## 15.12 – HEATING/VENTILATING UNITS

The areas not air-conditioned shall be ventilated with a roof or wall mounted exhaust fans. These include areas such as Warehouse, Shipping, Mechanical and Electrical rooms, and water service and fire protection rooms.  Makeup air shall be provided by intake louvers with motorized dampers.  Heating shall be provided by gas unit heaters.

## 15.13 – TEMPERATURE CONTROLS

Controls necessary for proper system operation will be provided.  Controls will be electronic and will be local.  There will not be a building management system for HVAC controls.

## 15.14 – BALANCING AND ADJUSTING

After installation of the mechanical systems all equipment will be tested, balanced and adjusted and system test and balance reports will be prepared.

## Sixteen – Electrical

### 16.1 – ELECTRICAL GENERAL REQUIREMENTS & STANDARDS

All installation shall comply with applicable sections of National, State and Local Codes, Laws, Ordinances, Rules and Regulations of authorities having jurisdiction, including:

- National Electrical Code - 2014 NEC or latest
- International Energy Conservation Code - 2009 IECC & ASHRAE 90.1-2007
- Occupational Safety and Health Administration (OSHA)
- State and Local Fire Regulation and Requirements
- National Fire Protection Association (NFPA)
- Underwriter's Laboratories, Inc. (UL)

All equipment shall comply with the latest editions of applicable regulations and standards of:

- Insulated Power Cable Engineers Association (IPCEA)
- Institute of Electrical and Electronics Engineers (IEEE)
- National Electrical Manufacturers' Association (NEMA)
- American National Standards Institute (ANSI)

## 16.2 – ELECTRICAL SERVICE

The local Utility Company will provide utility transformer. Provide utility meter empty conduit connection as required. Provide secondary duct bank, cables and switchboard for one 480V/3PH/4W-4000A service. Switchboard will be located in electrical room #001.

Provide secondary power wiring from Utility Company Transformer to Switchgear.

## 16.3 – GROUNDING SYSTEM

Grounding System shall be provided per code.
- Provide ground loop (4/0) around the building and connect to columns every 150'.
- Equipment ground shall consist of a conductor used to connect all metallic non-current carrying parts of equipment to the equipment ground. The equipment ground shall be connected to the main switchboard ground.
- Grounding resistance shall be 5 ohms or less. A minimum of two test stations shall be provided.

## 16.4 – HAZARDOUS AREA

Provide electrical installation per code for the hazardous areas (Hazardous storage building and Flam. Liquid room #407). Refer to architectural drawing for hazardous area information.

## 16.5 – WATERPROOF AREA

Provide electrical installation per code for the wet areas (Waste fiber areas #008, air tunnel areas #010 & #012, Water treatment areas #004 & #016 and Texturing area #115). Refer to architectural drawing for wet area information.

20

**16.6 – TEMPORARY SERVICE ENTRANCE**

A temporary 480V service will be provided from a utility company source to the building for electrical light and power requirements while the building is under construction.

**16.7 – ELECTRICAL DISTRIBUTION PROVIDED**

480/277 Switch board(s) to serve the following:
- HVAC Systems
- Process Utilities
- Utility Power 480v/3P
- Lighting

**Additional Electrical Scope Items included:**

- Distribution Transformers –Dry type ventilated w/class 220 type insulators, 150 Degree rise for all primary and secondary type transformers
- One (1) Switchboard, Two (2) Motor Control Centers
- Distribution Panel Boards as required
- Lighting Panel Boards as required
- Receptacle Panel Boards as required
- Short Circuit & Arc Flash Studies
- Main Circuit Breakers for items in this scope
- Wiring will be provided for lighting and receptacle use throughout the facility.
- Provide electrical connection to the elevator
- Provide electrical connections to the Guard House

All conductors greater than 100 Amps will be Aluminum

The appropriately rated fire stop material will be provided to seal all wall penetrations.

All bussing in electrical gear shall be aluminum

UPS is not provided

**16.8 – INTERIOR LUMINAIRES**

The interior lighting systems will be designed to provide the average maintained horizontal illumination levels to achieve code minimum foot candles using T-5 Fluorescent fixtures throughout the facility.

Exterior Wall Pack lighting will be provided.

Emergency Night Lighting (24 hr operation)will be provided

21

*Project Scope Proposal*
*Valmiera Glass Dublin, GA*

Exit & Emergency Lighting fixtures will be Standard Code w/self-contained battery.


## 16.9 – BUILDING, HVAC, AND PLUMBING RELATED ELECTRICAL WORK

- Provide necessary devices and electrical work such as magnetic starter, manual starter, disconnect switch, power supply, under this electrical scope of work to complete the building HVAC and plumbing system. Refer to document of each trade for electrical requirement of those equipment.

- Provide motor control center for mechanical system three-phase fans. Provide manual starter for the single-phase fractional power fan. The starter shall be in the room that the fan is serving.


## 16.10 – SITE LIGHTING

Site Lighting will not be provided.


## 16.11 – PACKAGED ENGINE GENERATOR SYSTEMS

No emergency Generator package will be provided.

## 16.12 – LIGHTNING PROTECTION SYSTEMS

No U.L. listed lightning protection system will be provided

## 16.13 – ADDRESSABLE FIRE ALARM SYSTEM

- A class B closed circuit electrically supervised, addressable fire alarm system will be provided.
- Activation of any manual or automatic initiating devices will sound all alarms within the building.
- Provide remote annunciator at building entrance, and guardhouse.
- Connect general alarm from new fire alarm control panel to existing fire alarm control panel in the existing building.

The following manual and automatic initiating devices will activate the system:

1. Area Smoke detectors and Duct smoke detectors
2. Sprinkler flow switches

- Battery backup will be provided in case of utility power outage.
- Provide lightning arrestors at all power and signal circuits in the control panel.

*Project Scope Proposal*
*Valmiera Glass Dublin, GA*

- Provide duct mounted smoke detector for RTU's and AHU's on both of supply and return duct under this electrical work. Provide test and remote indicator for each duct mounted detector in the room that the RTU is serving. Refer to HVAC drawings for Mechanical layout locations.
- Activation of duct mounted smoke detector shall shut-down all related HVAC equipment.

Provide addressable modules and connections to the following devices per Fire Protection drawings.
- Sprinkler Water Flow Switch (WFS)
- Tamper Switch (TS)
- Post Indicator Valve (PIV)

Fire Alarm Manufactures:
- Notifier; a Honeywell company
- Siemens Building Technologies,

## 16.14 – INTRUSION DETECTION AND SECURITY ACCESS SYSTEM

No building intrusion detection and security access system will be provided.

## 16.15 – CLOCK AND PROGRAM SYSTEMS

No clock and program system will be provided.

## 16.16 – TELEPHONE SERVICE

Two (2) four inch (4″) telephone service entrance conduit will be provided to the building from the utility service tie point with pull strings for the utility to provide and install the service cables.

Equipment mounting boards and dedicated 120 volt receptacles will be provided as required.

We have included (15) Voice/Data Drops to be located at the owners direction.

All communications cabling will be provided by the owner.

## 16.17 – COMMUNICATION SYSTEMS

See 16.16
.

## 16.18 – INTERCOM SYSTEM

No Intercom system will be provided

## 16.19 – PUBLIC ADDRESS SYSTEM

23

No all call paging system with background music will be provided.

**16.20 – CCTV SYSTEM**

No CCTV system will be provided.
-
**16.21 – CATV SYSTEM**

No CATV system will be provided.

## SEVENTEEN – GENERAL

Not provided


## EIGHTEEN – CLARIFICATIONS AND EXCEPTIONS

The providing of the following items is not included in the Work:

- Boundary and topographical surveys
- Cost of Building Permits
- Geotechnical services
- Utility access and hook-up charges or usage fees
- Permanent utility costs and service charges
- Maintenance equipment and supplies
- Furniture or furnishings
- Watchman security
- Work attributable to concealed, unknown or unforeseeable conditions as addressed in the contract
- Cost of Payment or Performance Bond
- Process related scope


Valmiera Glass
Georgia Facility
New Construction Project
Dublin, GA
Use:   Industrial –Glass manufacturing with accessory Occupancies

**Valmiera Project Schedule**                                           **KBD Group**

| ID | Task Name | Duration | Start | Finish |
|----|-----------|----------|-------|--------|
| 1 | **Valmiera Project** | **406 days?** | **4/26/16** | **11/15/17** |
| 2 | **Project Milestones** | **406 days?** | **4/26/16** | **11/15/17** |
| 3 | Award Project To KBDG | 0 days | 4/26/16 | 4/26/16 |
| 4 | Contract Executed | 0 days | 8/19/16 | 8/19/16 |
| 5 | <New Task> | 1 day? | 5/10/16 | 5/10/16 |
| 6 | Furnace Area Substantially Complete (Structure & Envelope) | 0 days | 11/1/17 | 11/1/17 |
| 7 | Production Area Substantially Complete (Structure & Envelope) | 0 days | 11/1/17 | 11/1/17 |
| 8 | Warehouse Area Substantially Complete (Structure & Envelope) | 0 days | 11/15/17 | 11/15/17 |
| 9 | Start Installation Of Furnace | 0 days | 6/15/17 | 6/15/17 |
| 10 | Furnace Start-Up (Heat-up) | 0 days | 10/30/17 | 10/30/17 |
| 11 | Production Start | 0 days | 11/15/17 | 11/15/17 |
| 12 | | | | |
| 13 | **Design** | **310 days** | **5/2/16** | **7/7/17** |
| 14 | Project Introduction Meetings | 5 days | 5/2/16 | 5/6/16 |
| 15 | Programing/ Conceptual Design | 15 days | 5/16/16 | 6/3/16 |
| 26 | Civil Design | 20 days | 5/16/16 | 6/10/16 |
| 16 | Owner Review Meetings | 5 days | 6/6/16 | 6/10/16 |
| 17 | Budget Review of Conceptual Design | 5 days | 6/6/16 | 6/10/16 |
| 18 | Structural Revision Set | 10 days | 6/13/16 | 6/24/16 |
| 19 | Project Budget Review | 12 days | 6/27/16 | 7/12/16 |
| 20 | Design Development | 25 days | 8/19/16 | 9/22/16 |
| 27 | Civil Permit | 10 days | 6/13/16 | 6/24/16 |
| 21 | Owner Review of DD set | 7 days | 9/23/16 | 10/3/16 |
| 22 | Permit Drawings | 10 days | 10/4/16 | 10/17/16 |
| 23 | Submit Building Permit | 30 days | 10/18/16 | 11/28/16 |
| 28 | Budget Pricing Review of Permit Set | 12 days | 10/18/16 | 11/2/16 |
| 24 | Permit Drawings | 10 days | 11/29/16 | 12/12/16 |

Gantt chart task bars and milestone labels:
- Valmiera Project
- Project Milestones
- Award Project To KBDG
- Contract Executed
- Furnace Area Substantially Complete (Structure & Envelope)
- Production Area Substantially Complete (Structure & Envelope)
- Warehouse Area Substantially Complete (Structure & Envelope)
- Start Installation Of Furnace
- Furnace Start-Up (Heat-up)
- Production Start
- Design
- Project Introduction Meetings
- Programing/ Conceptual Design
- Civil Design
- Owner Review Meetings
- Budget Review of Conceptual Design
- Structural Revision Set
- Project Budget Review
- Design Development
- Civil Permit
- Owner Review of DD set
- Permit Drawings
- Submit Building Permit
- Budget Pricing Review of Permit Set
- Permit Drawings

## Valmiera Project Schedule

**KBD Group**

| ID | Task Name | Duration | Start | Finish |
|----|-----------|----------|-------|--------|
| 25 | Issue CD set of drawings | 0 days | 12/12/16 | 12/12/16 |
| 96 | | | | |
| 97 | **Technology Packages** | **210 days** | **9/12/16** | **6/30/17** |
| 103 | **Steel Tech Package** | **210 days** | **9/12/16** | **6/30/17** |
| 104 | Design | 30 days | 9/12/16 | 10/21/16 |
| 105 | Pricing | 15 days | 10/24/16 | 11/11/16 |
| 106 | Procurement | 75 days | 11/14/16 | 2/24/17 |
| 107 | Install Steel Package | 60 days | 4/10/17 | 6/30/17 |
| 98 | **Electrical Package** | **205 days** | **9/19/16** | **6/30/17** |
| 99 | Design | 15 days | 9/19/16 | 10/7/16 |
| 100 | Pricing | 10 days | 10/10/16 | 10/21/16 |
| 101 | Procurement | 60 days | 10/24/16 | 1/13/17 |
| 102 | Install Electrical Tech Package | 60 days | 4/10/17 | 6/30/17 |
| 29 | **Piping Package** | **205 days** | **9/26/16** | **7/7/17** |
| 30 | Design | 15 days | 9/26/16 | 10/14/16 |
| 31 | Pricing | 10 days | 10/17/16 | 10/28/16 |
| 32 | Procurement | 60 days | 10/31/16 | 1/20/17 |
| 33 | Install Piping Package | 60 days | 4/17/17 | 7/7/17 |
| 34 | **Mech Package** | **205 days** | **9/26/16** | **7/7/17** |
| 35 | Design | 15 days | 9/26/16 | 10/14/16 |
| 36 | Pricing | 10 days | 10/17/16 | 10/28/16 |
| 37 | Procurement | 60 days | 10/31/16 | 1/20/17 |
| 38 | Install Tech HVAC Package | 60 days | 4/17/17 | 7/7/17 |
| 39 | | | | |
| 40 | | | | |
| 41 | **Site Work** | **147 days** | **6/27/16** | **1/17/17** |
| 42 | Re-Start Grading with New Design | 20 days | 6/27/16 | 7/22/16 |
| 51 | Furnace Area Graded | 20 days | 6/27/16 | 7/22/16 |
| 43 | Fine Grade Building Pad | 5 days | 8/22/16 | 8/26/16 |



## Valmiera Project Schedule

**KBD Group**



| ID | Task Name | Duration | Start | Finish |
|----|-----------|----------|-------|--------|
| 44 | Grade paved Areas | 15 days | 8/29/16 | 10/3/16 |
| 46 | Storm Drains | 20 days | 8/29/16 | 9/26/16 |
| 47 | Sewer Lines | 20 days | 9/26/16 | 10/21/16 |
| 48 | Water Line | 7 days | 10/24/16 | 11/1/16 |
| 49 | Fire Line | 15 days | 11/2/16 | 11/22/16 |
| 45 | Fine Grade Paved Areas | 10 days | 11/23/16 | 12/6/16 |
| 50 | Paving | 30 days | 12/7/16 | 1/17/17 |
| 52 | | | | |
| 53 | **Shell Building** | **200 days** | **11/1/16** | **8/7/17** |
| 54 | **Furnace Area** | **200 days** | **11/1/16** | **8/7/17** |
| 55 | Foundations | 20 days | 11/1/16 | 11/28/16 |
| 56 | Concrete Columns | 30 days | 11/29/16 | 1/9/17 |
| 57 | Elevated Concrete Slab (Production Floor) | 40 days | 1/10/17 | 3/6/17 |
| 58 | Slab On Grade Under Production | 10 days | 3/7/17 | 3/20/17 |
| 59 | Steel Erection Basement Level | 30 days | 3/7/17 | 4/17/17 |
| 60 | Steel Erection 2nd Level | 10 days | 4/18/17 | 5/1/17 |
| 61 | Steel Erection 3rd Level | 10 days | 5/2/17 | 5/15/17 |
| 62 | Steel Erection 4th Level | 10 days | 5/16/17 | 5/29/17 |
| 63 | Roofing | 20 days | 5/30/17 | 6/26/17 |
| 64 | Poured Concrete Decks | 15 days | 5/30/17 | 6/19/17 |
| 65 | Siding | 30 days | 5/30/17 | 7/10/17 |
| 66 | Fire Protection | 40 days | 5/30/17 | 7/24/17 |
| 67 | Interior Walls & Partitions | 40 days | 5/30/17 | 7/24/17 |
| 68 | Electrical | 40 days | 5/30/17 | 7/24/17 |
| 69 | Misc Finishes | 50 days | 5/30/17 | 8/7/17 |
| 70 | **Manufacturing Area** | **160 days** | **11/29/16** | **7/10/17** |
| 71 | Foundations | 20 days | 11/29/16 | 12/26/16 |
| 72 | Slabs On Grade for Tilt | 30 days | 12/13/16 | 1/23/17 |
| 73 | Pour Tilt Panels | 40 days | 12/27/16 | 2/20/17 |

**Valmiera Project Schedule**                                                                                       **KBD Group**

| ID | Task Name | Duration | Start | Finish |
|----|-----------|----------|-------|--------|
| 74 | Erect Tilt Panels | 10 days | 2/21/17 | 3/6/17 |
| 75 | Erect Steel | 30 days | 3/7/17 | 4/17/17 |
| 76 | Roofing | 10 days | 4/18/17 | 5/1/17 |
| 77 | Remaining Slab on Grade | 20 days | 5/2/17 | 5/29/17 |
| 78 | Fire Protection | 45 days | 5/2/17 | 7/3/17 |
| 79 | Lighting | 50 days | 5/2/17 | 7/10/17 |
| 80 | HVAC | 40 days | 5/2/17 | 6/26/17 |
| 81 | Doors | 10 days | 5/2/17 | 5/15/17 |
| 82 | Painting | 10 days | 5/2/17 | 5/15/17 |
| 83 | **Warehouse Area** | **140 days** | **1/10/17** | **7/24/17** |
| 84 | Foundations | 15 days | 1/10/17 | 1/30/17 |
| 85 | Slabs On Grade for Tilt | 20 days | 1/24/17 | 2/20/17 |
| 86 | Pour Tilt Panels | 30 days | 2/14/17 | 3/27/17 |
| 87 | Erect Tilt Panels | 10 days | 3/28/17 | 4/10/17 |
| 88 | Erect Steel | 15 days | 4/11/17 | 5/1/17 |
| 89 | Roofing | 10 days | 5/2/17 | 5/15/17 |
| 90 | Remaining Slab on Grade | 20 days | 5/16/17 | 6/12/17 |
| 91 | Fire Protection | 45 days | 5/16/17 | 7/17/17 |
| 92 | Lighting | 50 days | 5/16/17 | 7/24/17 |
| 93 | HVAC | 40 days | 5/16/17 | 7/10/17 |
| 94 | Doors | 10 days | 5/16/17 | 5/29/17 |
| 95 | Painting | 10 days | 5/16/17 | 5/29/17 |





KAJIMA
ASSOCIATES
INC.

ARCHITECTURE • PLANNING • INTERIORS

KAJIMA ASSOCIATES, INC.
3455 PIEDMONT ROAD NE, SUITE 900 — ATLANTA, GEORGIA 30305

| DATE | # | REMARKS | ISSUANCE |
|---|---|---|---|
| 08-11-2016 | 1 | CONCEPTUAL DESIGN | |

PROJECT:

VALMIERA GLASS®
DUBLIN, GA

VALMIERA
PRODUCTION
FACILITY

SHEET TITLE:
3D VIEWS

| | |
|---|---|
| PROJECT NO. | 16604 |
| PROJECT DESIGNER | KAI |
| DRAWN BY | CHECKED BY |
| Author | Checker |
| SCALE | |

SHEET:

A-021

NOT FOR CONSTRUCTION

3D VIEW 1   SCALE: 1

3D VIEW 2   SCALE: 2

PRINTED ON:
8/14/2016 4:47:2 PM



MASTER PLAN - OVERALL SCALE: 1/32" = 1'-0" 1

# KAJIMA ASSOCIATES INC.

ARCHITECTURE • PLANNING • INTERIORS

THE IDEAS, DESIGNS, DRAWINGS, AND SPECIFICATIONS REPRESENTED HERE ARE AND SHALL REMAIN THE PROPERTY OF KAJIMA ASSOCIATES, INC. AND ANY REPRODUCTIONS, REUSE, SALE OR OTHER DISPOSITION OF THESE DOCUMENTS FOR OTHER THAN THE SPECIFIC PROJECT FOR WHICH THEY HAVE BEEN PREPARED AND DEVELOPED IS EXPRESSLY FORBIDDEN WITHOUT WRITTEN CONSENT OF THE ARCHITECT. VISUAL CONTACT WITH THESE DRAWINGS OR SPECIFICATIONS SHALL CONSTITUTE EVIDENCE OF THE ACCEPTANCE OF THESE RESTRICTIONS. (C) COPYRIGHT BY KAJIMA ASSOCIATES, INC.

ARCHITECT/MECHANICAL/PLUMBING/ELECTRICAL ENGINEERS:
**KAJIMA ASSOCIATES, INC.**
3490 PIEDMONT ROAD NE, SUITE 900 – ATLANTA, GEORGIA 30305

SEAL:

| DATE | # | REMARKS | ISSUANCE: |
|---|---|---|---|
| 08-11-2016 | 1 | CONCEPTUAL DESIGN | |

PROJECT:

VALMIERA GLASS®
DUBLIN, GA

VALMIERA PRODUCTION FACILITY

SHEET TITLE:
MASTER PLAN - OVERALL

PROJECT NO.: 16804
PROJECT DESIGNER: KAI
KAI
DRAWN BY: Author
CHECKED BY: Checker
SCALE: 1/32" = 1'-0"
SHEET:

# A-110

**NOT FOR CONSTRUCTION**

PRINTED ON: 7/25/2016 4:49:35 PM



PROCESS TOWER - FIRST FLOOR PLAN SCALE: 3/64" = 1'-0" 2

PROCESS TOWER - BASEMENT PLAN SCALE: 3/64" = 1'-0" 1

PRINTED ON: 7/25/2016 4:49:51 PM

KAJIMA ASSOCIATES INC.

ARCHITECTURE • PLANNING • INTERIORS

THE IDEAS, DESIGNS, DRAWINGS, AND SPECIFICATIONS REPRESENTED HERE ARE AND SHALL REMAIN THE PROPERTY OF KAJIMA ASSOCIATES, INC. © COPYRIGHT BY KAJIMA ASSOCIATES, INC.

ARCHITECT/MECHANICAL/PLUMBING/ELECTRICAL ENGINEERS:

KAJIMA ASSOCIATES, INC.

3490 PIEDMONT ROAD NE, SUITE 900 – ATLANTA, GEORGIA 30305

SEAL:

| DATE | # | REMARKS | ISSUANCE: |
|---|---|---|---|
| 08-11-2016 | 1 | CONCEPTUAL DESIGN | |

PROJECT:

VALMIERA GLASS®
DUBLIN, GA

VALMIERA PRODUCTION FACILITY

SHEET TITLE:

PROCESS TOWER - BASEMENT & FIRST FLOOR PLAN

PROJECT NO.: 16804

PROJECT DESIGNER: KAI KAI

DRAWN BY: Author

CHECKED BY: Checker

SCALE: 3/64" = 1'-0"

SHEET: A-112

NOT FOR CONSTRUCTION



PRODUCTION AND WAREHOUSE - FIRST FLOOR PLAN
SCALE: 3/64" = 1'-0"
1

KAJIMA ASSOCIATES INC.

ARCHITECTURE • PLANNING • INTERIORS
3490 PIEDMONT ROAD, SUITE 900 ATLANTA, GEORGIA 30305 (404) 812-8600

THE IDEAS, DESIGNS, DRAWINGS, AND SPECIFICATIONS REPRESENTED HERE ARE AND SHALL REMAIN THE PROPERTY OF KAJIMA ASSOCIATES, INC. AND ANY REPRODUCTIONS, REUSE, SALE OR OTHER DISPOSITION OF THESE DOCUMENTS FOR OTHER THAN THE SPECIFIC PROJECT FOR WHICH THEY HAVE BEEN PREPARED AND DEVELOPED IS EXPRESSLY FORBIDDEN WITHOUT WRITTEN CONSENT OF THE ARCHITECT. VISUAL CONTACT WITH THESE DRAWINGS OR SPECIFICATIONS SHALL CONSTITUTE EVIDENCE OF THE ACCEPTANCE OF THESE RESTRICTIONS. © COPYRIGHT BY KAJIMA ASSOCIATES, INC.

ARCHITECT/MECHANICAL/PLUMBING/ELECTRICAL ENGINEERS:

**KAJIMA ASSOCIATES, INC.**

3490 PIEDMONT ROAD NE, SUITE 900 -- ATLANTA, GEORGIA 30305

SEAL:

| DATE | # | REMARKS | ISSUANCE: |
|---|---|---|---|
| 08-11-2016 | 1 | CONCEPTUAL DESIGN | |

PROJECT:

VALMIERA GLASS®
DUBLIN, GA

VALMIERA PRODUCTION FACILITY

SHEET TITLE:
PRODUCTION & WAREHOUSE - FIRST FLOOR PLAN

PROJECT NO.: 16804

PROJECT DESIGNER: KAI
KAI

DRAWN BY: Author
CHECKED BY: Checker

SCALE: 3/64" = 1'-0"

SHEET:
**A-113**

**NOT FOR CONSTRUCTION**

PRINTED ON:
7/25/2016 4:50:05 PM





PROCESS TOWER - THIRD LEVEL PLAN 2
SCALE: 3/64" = 1'-0"

PROCESS TOWER - SECOND FLOOR PLAN 1
SCALE: 3/64" = 1'-0"

KAJIMA ASSOCIATES INC.
ARCHITECTURE • PLANNING • INTERIORS

ARCHITECT/MECHANICAL/PLUMBING/ELECTRICAL ENGINEERS:
**KAJIMA ASSOCIATES, INC.**
3490 PIEDMONT ROAD NE, SUITE 900 – ATLANTA, GEORGIA 30305

SEAL:

| DATE | # | REMARKS | ISSUANCE: |
|---|---|---|---|
| 08-11-2016 | 1 | CONCEPTUAL DESIGN | |

PROJECT:

VALMIERA GLASS®
DUBLIN, GA

VALMIERA PRODUCTION FACILITY

SHEET TITLE:
PROCESS TOWER - SECOND FLOOR & THIRD LEVEL

PROJECT NO.: 16804
PROJECT DESIGNER: KAI
KAI
DRAWN BY: Author
CHECKED BY: Checker
SCALE: 3/64" = 1'-0"
SHEET:
**A-114**

**NOT FOR CONSTRUCTION**

PRINTED ON: 7/27/2016 9:18:06 AM

KAJIMA
ASSOCIATES
INC.

ARCHITECTURE • PLANNING • INTERIORS

THE IDEAS, DESIGNS, DRAWINGS, AND SPECIFICATIONS REPRESENTED HERE ARE AND REMAIN THE PROPERTY OF KAJIMA ASSOCIATES, INC. AND ARE INTENDED FOR USE SOLELY ON THIS SPECIFIC PROJECT. NONE OF THE IDEAS, DESIGNS, DRAWINGS, OR SPECIFICATIONS MAY BE USED OR DISCLOSED TO ANY PERSON, FIRM, OR CORPORATION FOR ANY PURPOSE WHATSOEVER WITHOUT THE WRITTEN PERMISSION OF KAJIMA ASSOCIATES, INC.

ARCHITECT/MECHANICAL/ENGINEER/PROJ. ENGINEER
KAJIMA ASSOCIATES, INC.
3490 PIEDMONT ROAD NE, SUITE 900 – ATLANTA, GEORGIA 30305

SEAL:

| DATE | # | REMARKS | ISSUANCE |
|------|---|---------|----------|
| 08-11-2016 | 1 | CONCEPTUAL DESIGN | |

PROJECT:

VALMIERA GLASS®
DUBLIN, GA

VALMIERA
PRODUCTION
FACILITY

SHEET TITLE:
PROCESS TOWER -
FOURTH LEVEL

| | |
|---|---|
| | PROJECT NO.: |
| | 16804 |
| | PROJECT DESIGNER: |
| KAI | KAI |
| DRAWN BY: | CHECKED BY: |
| Author | Checker |
| | SCALE: |
| | 3/64" = 1'-0" |
| | SHEET: |

# A-115

**NOT FOR CONSTRUCTION**

PROCESS TOWER - FOURTH LEVEL
PLAN   SCALE: 3/64" = 1'-0"   1

OFFICE
409

SIZE PREP 3
406

CORR
405

MAINT
SERVICE
408

ELEV

STAIR 8
S-408

STAIR 9
S-409

FLAM LIQUID
407

ROOF

OPEN

FURNACE BELOW

PRINTED ON:
7/23/2016 4:50:34 PM



MASTER ROOF PLAN
SCALE: 1/32" = 1'-0"
1

# KAJIMA ASSOCIATES INC.

ARCHITECTURE • PLANNING • INTERIORS
3490 PIEDMONT ROAD, SUITE 900 ATLANTA, GEORGIA 30305 (404) 812-8600

THE IDEAS, DESIGNS, DRAWINGS, AND SPECIFICATIONS REPRESENTED HERE ARE AND SHALL REMAIN THE PROPERTY OF KAJIMA ASSOCIATES, INC. AND ANY REPRODUCTIONS, REUSE, SALE OR OTHER DISPOSITION OF THESE DOCUMENTS FOR OTHER THAN THE SPECIFIC PROJECT FOR WHICH THEY HAVE BEEN PREPARED AND DEVELOPED IS EXPRESSLY FORBIDDEN WITHOUT WRITTEN CONSENT OF THE ARCHITECT. VISUAL CONTACT WITH THESE DRAWINGS OR SPECIFICATIONS SHALL CONSTITUTE EVIDENCE OF THE ACCEPTANCE OF THESE RESTRICTIONS. © COPYRIGHT BY KAJIMA ASSOCIATES, INC.

ARCHITECT/MECHANICAL/PLUMBING/ELECTRICAL ENGINEERS:
**KAJIMA ASSOCIATES, INC.**
3490 PIEDMONT ROAD NE, SUITE 900 -- ATLANTA, GEORGIA 30305

SEAL:

| DATE | # | REMARKS | ISSUANCE: |
|---|---|---|---|
| 08-11-2016 | 1 | CONCEPTUAL DESIGN | |

PROJECT:

VALMIERA GLASS®
DUBLIN, GA

VALMIERA PRODUCTION FACILITY

SHEET TITLE:
MASTER ROOF PLAN

PROJECT NO.: 16804
PROJECT DESIGNER: KAI
KAI
DRAWN BY: Author
CHECKED BY: Checker
SCALE: 1/32" = 1'-0"
SHEET:

# A-141

NOT FOR CONSTRUCTION

PRINTED ON:
7/25/2016 4:50:49 PM



MASTER BUILDING ELEVATION - EAST | SCALE: 1/32" = 1'-0" | 1

MASTER BUILDING ELEVATION - SOUTH | SCALE: 1/32" = 1'-0" | 2

MASTER BUILDING ELEVATION - WEST | SCALE: 1/32" = 1'-0" | 3

NORTH ELEVATION | SCALE: 1/32" = 1'-0" | 4

PRINTED ON: 8/4/2016 8:49:42 PM

KAJIMA ASSOCIATES INC.

ARCHITECTURE • PLANNING • INTERIORS
3490 PIEDMONT ROAD, SUITE 900 ATLANTA, GEORGIA 30305 (404) 812-8600

THE IDEAS, DESIGNS, DRAWINGS, AND SPECIFICATIONS REPRESENTED HERE ARE AND SHALL REMAIN THE PROPERTY OF KAJIMA ASSOCIATES, INC. AND ANY REPRODUCTIONS, REUSE, SALE OR OTHER DISPOSITION OF THESE DOCUMENTS FOR OTHER THAN THE SPECIFIC PROJECT FOR WHICH THEY HAVE BEEN PREPARED AND DEVELOPED IS EXPRESSLY FORBIDDEN WITHOUT WRITTEN CONSENT OF THE ARCHITECT. VISUAL CONTACT WITH THESE DRAWINGS OR SPECIFICATIONS SHALL CONSTITUTE EVIDENCE OF THE ACCEPTANCE OF THESE RESTRICTIONS. © COPYRIGHT BY KAJIMA ASSOCIATES, INC.

ARCHITECT/MECHANICAL/PLUMBING/ELECTRICAL ENGINEERS:

**KAJIMA ASSOCIATES, INC.**

3490 PIEDMONT ROAD NE, SUITE 900 -- ATLANTA, GEORGIA 30305

SEAL:

| DATE | # | REMARKS | ISSUANCE: |
|---|---|---|---|
| 08-11-2016 | 1 | CONCEPTUAL DESIGN | |

PROJECT:

VALMIERA GLASS®
DUBLIN, GA

VALMIERA PRODUCTION FACILITY

SHEET TITLE:

MASTER BUILDING ELEVATIONS

PROJECT NO.: 16804

PROJECT DESIGNER: KAI

DRAWN BY: Author

CHECKED BY: Checker

SCALE: 1/32" = 1'-0"

SHEET:

# A-211

**NOT FOR CONSTRUCTION**

EAST DETENTION BASIN
SEE C-504 FOR CONTROL
STRUCTURE AND PIPING DETAILS
RIP RAP APRON AT OUTLET
WIDTH AT PIPE 12'
LENGTH 20'
WIDTH AT END OF APRON 32'

100' RETAINING WALL
MAXIMUM HEIGHT 8'

INVERT 243.

18" CMP

STANDARD INLET - GRATE TYPE
FRAME 253.2

WATER TOWER
(N.I.C.)

NYOPLAST INLET
GRATE 255.27
INVERT 251.11

NYOPLAST INLET
GRATE 255.27
INVERT 251.17

F.F.E. 247.0

F.F.E. 257.0

15" CPP

12" CPP

NYOPLAST INLET
GRATE 255.27
INVERT 252.22

NYOPLAST INLET
GRATE 255.27
INVERT 252.22

12" CPP

GRATE INLET
ELEVATION 243.0
INVERT 240.

NYOPLAST INLET
GRATE 255.27
INVERT 253.27

NYOPLAST INLET
GRATE 255.27
INVERT 253.27

INVERT 238.0

WEST DETENTION BASIN
SEE C-504 FOR CONTROL
STRUCTURE AND PIPING DETAILS
RIP RAP APRON AT OUTLET
WIDTH AT PIPE 12'
LENGTH 20'
WIDTH AT END OF APRON 32'

WILLIE PAULK PARKWAY

2 PARALLEL 36" REINFORCED CONCRETE PIPE
-175 LINEAR FOOT OF PIPE EACH RUN FOR A
TOTAL OF 350 LINEAR FOOT OF 36" RCP

SHEET OUTLINE (TYP)

SHEET MATCHLINES (TYP)

**NOTES:**
1. SURVEY INFORMATION OBTAINED USING HIPER+ SURVEY GRADE GPS ALONG WITH FC-100 DATA COLLECTOR.
2. CONTOURS ARE DRAWN AT 1 FOOT INTERVALS.
3. THIS IS LOCATED IN THE 34TH AND 51ST LAND LOT WITHIN THE 1ST LAND DISTRICT AND THE 342ND G.M. DISTRICT OF LAURENS COUNTY, GEORGIA.

**EXISTING LEGEND**
MAJOR CONTOUR — 260
MINOR CONTOUR — 276
16" WATER LINE — W
8" WATER LINE — 8"W
FENCE
SEWER — S
STRIPING
PROPERTY LINE
UTILITY EASEMENT

EXISTING ASPHALT
WETLANDS
BUILDING
CONCRETE

**EXISTING LEGEND**
STORM PIPE
SIGN          FIRE HYDRANT
WATER VALVE          MANHOLE

**PROPOSED ITEMS LEGEND**
PROPOSED MAJOR CONTOURS — 250
PROPOSED MINOR CONTOURS — 251
STORM PIPES
HIGH POINT OR LOW POINT          HP/LP
PROPOSED PAVEMENT STRIPING

**PROPOSED ITEMS LEGEND**
PROPOSED BUILDINGS
PROPOSED LIGHT DUTY PAVEMENT
PROPOSED HEAVY DUTY PAVEMENT
PROPOSED GRASS PAVERS
PROPOSED CONCRETE

SITE PLAN

SCALE:
1" = 60'

GRAPHIC SCALE
( IN FEET )
1 inch = 60 ft.

**KAJIMA ASSOCIATES INC.**
ARCHITECTURE • PLANNING • INTERIORS

**KAJIMA ASSOCIATES, INC.**

SEAL:

DATE          REMARKS          ISSUANCE

PROJECT:

**VALMIERA GLASS**
DUBLIN, GA

**VALMIERA PRODUCTION FACILITY**

SHEET TITLE:
**GRADING PLAN OVERVIEW**

PROJECT NO.: 16804
PROJECT ENGINEER
DRAWN BY: KAI          DESIGNER: KAI
JLC          CHECKED BY: Checker
SCALE: As indicated
SHEET

**C-106**

**NOT FOR CONSTRUCTION**



# CERTIFICATE OF LIABILITY INSURANCE

| | DATE(MM/DD/YYYY) |
|---|---|
| | 07/11/2016 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to  the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Aon Risk Services South, Inc. Atlanta GA Office 3565 Piedmont Rd NE,Blg1,#700 Atlanta GA 30305 USA | PHONE (A/C. No. Ext): (866) 283-7122 | FAX (A/C. No.): (800) 363-0105 | |
| | E-MAIL ADDRESS: | | |
| | **INSURER(S) AFFORDING COVERAGE** | | NAIC # |
| INSURED | INSURER A: Liberty Insurance Corporation | | 42404 |
| Kajima Building & Design Group, Inc. 3490 Piedmont Road NE, Suite 900 Atlanta, GA 30305 USA | INSURER B: Liberty Mutual Fire Ins Co | | 23035 |
| | INSURER C: The Ohio Casualty Insurance Co | | 24074 |
| | INSURER D: Indian Harbor Insurance Co | | 36940 |
| | INSURER E: | | |
| | INSURER F: | | |

## COVERAGES    CERTIFICATE NUMBER: 570062642339061    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

Limits shown are as requested

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | X COMMERCIAL GENERAL LIABILITY | | | TB7-621-094012-026 | 07/01/2016 | 07/01/2017 | EACH OCCURRENCE | $2,000,000 |
| | ☐ CLAIMS-MADE  X OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $500,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $2,000,000 |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $4,000,000 |
| | X POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $4,000,000 |
| | OTHER: | | | | | | | |
| B | AUTOMOBILE LIABILITY | | | AS2-621-094012-036 | 07/01/2016 | 07/01/2017 | COMBINED SINGLE LIMIT (Ea accident) | $2,000,000 |
| | X ANY AUTO | | | | | | BODILY INJURY ( Per person) | |
| | OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | |
| | HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | |
| C | X UMBRELLA LIAB  X OCCUR | | | EUO(17)56164886 | 07/01/2016 | 07/01/2017 | EACH OCCURRENCE | $10,000,000 |
| | ☐ EXCESS LIAB  ☐ CLAIMS-MADE | | | | | | AGGREGATE | $10,000,000 |
| | X DED ☐ RETENTION | | | | | | | |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY  Y/N | | | WA7-62D-094012-016 | 07/01/2016 | 07/01/2017 | X PER STATUTE  ☐ OTH-ER | |
| | ANY PROPRIETOR / PARTNER / EXECUTIVE OFFICER/MEMBER EXCLUDED? N (Mandatory in NH) | N/A | | | | | E.L. EACH ACCIDENT | $1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE-EA EMPLOYEE | $1,000,000 |
| | | | | | | | E.L. DISEASE-POLICY LIMIT | $1,000,000 |
| D | E&O-PL-Primary | | | CE0742003204 | 07/01/2016 | 07/01/2017 | Each Claim | $10,000,000 |
| | | | | SIR applies per policy terms & conditions | | | SIR Aggregate Limit | $250,000 $10,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
EVIDENCE OF INSURANCE

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Kajima Building & Design Group, Inc. 3490 Piedmont Road NE, Suite 900 Atlanta GA 30305 USA | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. AUTHORIZED REPRESENTATIVE  *Aon Risk Services South Inc.* |

©1988-2015 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)        The ACORD name and logo are registered marks of ACORD

Holder Identifier :

Certificate No :    570062642339

<u>LIABILITY INSURANCE EXHIBITC</u>

1.      DESIGN-BUILDER'S INSURANCE

Prior to commencement of the Work, Design-Builder shall secure and thereafter maintain at all times during the performance of the Agreement, the insurance specified in Sections 1.1 through 1.6 below with **the minimum** limits **and minimum coverages** specified.  All insurance shall be in a form and issued by companies reasonably acceptable to Owner and written by companies licensed **and authorized to conduct an insurance business** in the State of **Georgia** and carry an A.M. Best rating of not less than A- / VII.

      **1.1**    Workers Compensation and Employers Liability Insurance

          **(a)**  Workers Compensation insurance, as required by any applicable law or regulation, including, but not limited to, worker's compensation insurance for all of Design-Builder's workers at the Site and anyone directly or indirectly employed by Design-Builder and anyone for whom Design-Builder may be liable for worker's compensation claims that may arise out of or result from the Work, and in the event any Work is subcontracted, Design-Builder shall require all Subcontractors similarly to provide worker's compensation insurance for each Subcontractor's employees and anyone directly or indirectly employed by such Subcontractors and anyone for whom such Subcontractors may be liable for worker's compensation claims that may arise out of or result from the Work.

          **(b)** Employers Liability Insurance as follows:

| Bodily Injury by Accident | $1,000,000 Each Accident |
| Bodily Injury by Disease | $1,000,000 Policy Limit |
| Bodily Injury by Disease | $1,000,000 Each Employee |

      **1.2**    Commercial General Liability Insurance as follows:

| $ 2,000,000 | Bodily Injury and Property Damage Each Occurrence |
| $ 4,000,000 | General Aggregate Limit |
| $ 4,000,000 | Products and Completed Operations Aggregate Limit |

Standard Insurance Services Office (ISO) Commercial General Liability Insurance policy (CG0001) or equivalent **(**which, unless included in the primary policy, will include a design builder means and methods rider (ISO form CG-2279) or design-builder rider (ISO form CG-2280, including Bodily Injury, Property Damage, Personal Injury, Contractual Liability covering Design-Builders indemnity obligations under the Agreement, Contractual and Completed Operations covering operations at the Site**,** severability of interest, underground explosion and collapse coverage, additional insured endorsement **(**expressly providing coverage for on-going and completed operations), and waiver of subrogation endorsement.  Completed Operations Liability Coverage must be maintained for a three year period after project completion.

      **1.3**    Automobile Liability Insurance as follows:

| $ 2,000,000 | Combined Single Limit Each Occurrence |

Insurance covering all owned, non-owned and hired automobiles and such insurance

shall provide coverage of a Comprehensive Automobile Liability policy.

**1.4**     Professional (Errors & Omissions) Liability

$10,000,000          Each Claim

$250,000              Self-Insured Retention

$10,000,000          Aggregate

Coverage for the negligent acts, errors or omissions of the Design-Builder while providing design services for the Owner.

**1.5**     **Umbrella or Excess Liability**

Design-Builder shall provide, pay for, and maintain umbrella or excess liability insurance on an occurrence basis in excess of the underlying insurance required by Sections 1.1, 1.2, and 1.3, which is at least as broad as the underlying insurance policies.  Design-Builder may satisfy the minimum limits and coverage requirements of such underlying insurance by purchasing coverage for the limits specified or by any combination of underlying and umbrella limits, provided the total amount of insurance is not less than the sum of the limits specified for the underlying policy, plus the following minimum limits and coverages:

**Minimum limits**:

(i)     $10,000,000 combined single limit and aggregate limit.

**Coverages**:

(i)     "Pay on behalf of" wording;

(ii)    Concurrent with the effective dates for the primary coverage;

(iii)   Aggregates to apply where applicable in primary coverage;

(iv)    Care, custody, and control, which follows the form of the primary coverage; and

(v)     Drop-down feature

**1.6**     Other Property

Notwithstanding anything in the Agreement, the General Conditions or this Exhibit to the contrary, Design-Builder and Subcontractors shall retain the risk of loss for any damage whatsoever to their own equipment, stationary or mobile, tools, supplies, materials, automobiles and vehicles, highway or otherwise, cranes, and hoists or any other property owned or leased, including employee tools, which will not be incorporated into the physical construction. If separate insurance is maintained for any property described in this section, it shall contain a waiver of subrogation on the part of the insurance company in favor of the Owner.   If Design-Builder or Subcontractors choose to self-insure any of the property described under this section, it is agreed that the Owner shall be held harmless for any loss or damage to such property while on the Site.

**1.7**     Subcontractors Obligations

Design-Builder shall require that each of its Subcontractors provide insurance meeting the requirements of the Design-Builder's subcontract agreement forms.

**1.8**     General

Insurance policies required of Design-Builder and Subcontractors in Section 1.2, 1.3, and 1.5 shall be endorsed to name as "additional insureds" Owner, the City of Dublin and County of Laurens Development Authority (the "Authority"), the City of Dublin, Georgia (the "City"), the County of Laurens, Georgia (the "County"),  and the directors, officers,

employees, officials, members, and representatives of any of them (collectively the "Additional Insureds").  The coverage afforded the Additional Insureds under these policies shall be primary insurance to the extent the claim arises from the covered acts and omissions of Design-Builder or its Subcontractors.  In such cases, if the Additional Insured has other insurance that is or may be applicable to the loss, such other insurance shall be on an excess and non-contributory basis.  Any deductibles applicable to the required insurance of Design- Builder shall be paid for, assumed by, for the account of and at Design-Builder's (or, as the case may be, its Subcontractor's) sole risk.  Owner shall not be responsible for the payment of any such deductible on insurance required or carried by Design-Builder or its Subcontractor. Design-Builder and its Subcontractors shall obtain endorsements from all such insurers  expressly waiving any and all claims against the Additional Insured that are covered by such insurance.  Nothing contained herein shall relieve Design- Builder of its obligations to exercise due care in the performance of its duties in connection with the Work or to complete the Work in conformance with the Contract Documents.